## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| 5171 CAMPBELLS LAND CO., INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 19-22715-CMB |

## EXHIBITS 1 THROUGH 5 TO STIPULATION AND CONSENT ORDER BETWEEN DEBTOR AND PERKINS & MARIE CALLENDER'S, LLC

# EXHIBIT 1



**LICENSE AGREEMENT**

**BETWEEN**

**PERKINS & MARIE CALLENDER'S, LLC**
**6075 POPLAR AVENUE, SUITE 800**
**MEMPHIS, TN  38119**

**AND**

**5171 CAMPBELLS LAND CO., INC.**
**C/O MEYER UNKOVIC & SCOTT LLP**
**HENRY W. OLIVER BUILDING**
**535 SMITHFIELD STREET, SUITE 1300**
**PITTSBURGH, PA 15222**

**DATED**

**JANUARY 31, 2018**

**FOR**

**1601 PROSPECT ROAD**
**ASHTABULA, OH 44004**

**STORE 3383**
**FS-172**

## TABLE OF CONTENTS

Section

Page

1. INTRODUCTION AND GRANT OF LICENSE .................................................................. 1
   A. INTRODUCTION ..................................................................................................... 1
   B. GRANT OF LICENSE ............................................................................................ 1
   C. RIGHTS RESERVED BY COMPANY .................................................................. 2

2. TRAINING ...................................................................................................................... 2

3. GUIDANCE ..................................................................................................................... 3
   A. GUIDANCE AND ASSISTANCE ........................................................................... 3
   B. OPERATIONS MANUAL ....................................................................................... 3

4. MARKS ............................................................................................................................ 4
   A. GOODWILL AND OWNERSHIP OF MARKS....................................................... 4
   B. LIMITATIONS ON LICENSEE'S USE OF MARKS .............................................. 4
   C. NOTIFICATION OF INFRINGEMENTS AND CLAIMS ........................................ 4
   D. DISCONTINUANCE OF USE OF MARKS ........................................................... 4
   E. INDEMNIFICATION OF LICENSEE ..................................................................... 5
   F. WEBSITE................................................................................................................ 5

5. RELATIONSHIP OF THE PARTIES/INDEMNIFICATION.............................................. 5
   A. INDEPENDENT CONTRACTORS ....................................................................... 5
   B. NO LIABILITY FOR ACTS OF OTHER PARTY .................................................. 5
   C. TAXES ................................................................................................................... 6
   D. INDEMNIFICATION ............................................................................................... 6

6. CONFIDENTIAL INFORMATION ................................................................................... 6

7. FEES ............................................................................................................................... 8
   A. ROYALTY FEE ..................................................................................................... 8
   B. DEFINITION OF GROSS SALES......................................................................... 8
   C. INTEREST ON LATE PAYMENTS....................................................................... 8
   D. APPLICATION OF PAYMENTS ........................................................................... 9

8. RESTAURANT OPERATING STANDARDS .................................................................. 9
   A. CONDITION, APPEARANCE AND OPERATION OF THE RESTAURANT ....... 9
   B. RESTAURANT MENU......................................................................................... 10
   C. APPROVED PRODUCTS, DISTRIBUTORS AND SUPPLIERS....................... 10
   D. SPECIFICATIONS, STANDARDS AND PROCEDURES .................................. 11
   E. COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES................ 11
   F. MANAGEMENT AND PERSONNEL OF THE RESTAURANT .......................... 12
   G. INSURANCE........................................................................................................ 12

9. MARKETING.................................................................................................................. 13
   A. BY COMPANY ..................................................................................................... 13
   B. BY LICENSEE ..................................................................................................... 14
   C. GRAND OPENING ............................................................................................... 14

10. REPORTS, FINANCIAL STATEMENTS AND FINANCIAL CONDITION ..................... 14

| Section | | | Page |
|---|---|---|---|
| 11. | INSPECTIONS AND AUDITS. | | 15 |
| | A. | COMPANY'S RIGHT TO INSPECT THE RESTAURANT | 15 |
| | B. | COMPANY'S RIGHT TO AUDIT | 16 |
| 12. | TRANSFER OF LICENSE | | 16 |
| | A. | BY COMPANY | 16 |
| | B. | LICENSEE MAY NOT TRANSFER WITHOUT APPROVAL OF COMPANY | 16 |
| | C. | RIGHT OF FIRST REFUSAL | 17 |
| | D. | CONDITIONS FOR APPROVAL OF TRANSFER | 17 |
| | E. | TRANSFER TO A WHOLLY-OWNED ENTITY | 18 |
| | F. | DEATH OR DISABILITY OF LICENSEE | 19 |
| | G. | EFFECT OF CONSENT TO TRANSFER | 19 |
| | H. | INVESTMENT OFFERINGS | 19 |
| 13. | CONDEMNATION AND CASUALTY | | 20 |
| 14. | TERMINATION OF THE LICENSE | | 20 |
| 15. | DAMAGES | | 23 |
| 16. | COVENANT NOT TO COMPETE; RIGHTS AND OBLIGATIONS OF COMPANY AND LICENSEE UPON TERMINATION OR EXPIRATION OF THE LICENSE | | 23 |
| | | | 23 |
| | A. | COVENANT NOT TO COMPETE | 23 |
| | B. | PAYMENT OF AMOUNTS OWED TO COMPANY | 24 |
| | C. | MARKS AND SYSTEM | 24 |
| | D. | CONFIDENTIAL INFORMATION | 25 |
| | E. | CONTINUING OBLIGATIONS | 25 |
| 17. | RENEWAL OF LICENSE | | 25 |
| 18. | ENFORCEMENT | | 26 |
| | A. | SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS | 26 |
| | B. | WAIVER OF OBLIGATIONS | 26 |
| | C. | FORCE MAJEURE | 27 |
| | D. | INJUNCTIVE RELIEF | 27 |
| | E. | RIGHTS OF PARTIES ARE CUMULATIVE | 27 |
| | F. | COSTS AND ATTORNEYS' FEES | 27 |
| | G. | GOVERNING LAW, VENUE AND JURISDICTION | 28 |
| | H. | WAIVER OF PUNITIVE/EXEMPLARY DAMAGES | 28 |
| | I. | WAIVER OF JURY TRIAL | 28 |
| | J. | BINDING EFFECT | 28 |
| | K. | INTERPRETATION | 28 |
| | L. | TIME | 29 |
| 19. | NOTICES AND PAYMENTS | | 29 |
| 20. | ACKNOWLEDGMENTS | | 29 |

Attachment A - Disclosure Acknowledgment Statement
Attachment B - Guarantee and Assumption of Licensee's Obligations
Attachment C – ACH Authorization Form

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement") is made and entered into as of January 31, 2018 (the "Agreement Date"), by and between **PERKINS & MARIE CALLENDER'S, LLC** ("PMC"), a Delaware limited liability company, whose principal address is 6075 Poplar Avenue, Suite 800, Memphis, TN 38119 and **5171 Campbells Land Co., Inc.** a Pennsylvania corporation, whose principal address is 535 Smithfield Street, Suite 1300, Pittsburgh, Pennsylvania 15222. For purposes of simplicity, we will sometimes refer to Perkins & Marie Callender's, LLC as "us," "we" or the "Company," and we will sometimes refer to you as "you" or "Licensee."

1.     INTRODUCTION AND GRANT OF LICENSE.

    A.     INTRODUCTION.

    Through expenditure of considerable time, skill, effort and money, we have developed a system for establishing, operating and licensing distinctive, high quality restaurants serving the public under the name "Perkins." A Perkins restaurant consists of all structures, facilities, appurtenances, grounds, landscaping, signs, flagpole and flag, furniture, fixtures, equipment and entry, exit, parking and other areas. The approved food, beverage and other products served and sold by Perkins restaurants (the "Products") for consumer consumption and not for resale are prepared in accordance with our standards, specifications and secret recipes. Perkins restaurants are established pursuant to our plans and specifications for construction, conversion remodeling, decorating, equipment and layout, and are operated in accordance with our distinctive business formats, construction plans, inspection and consultation programs, signs, flags, equipment, layouts, methods, specifications, standards, recipes (including secret flour and pancake mix recipes), confidential information, trade secrets, operating procedures, training programs and materials, guidance, policy statements and related materials, designs, advertising, publicity, and marketing programs and other materials (which we may modify from time to time) (collectively, the "System"). We own, use, promote and license certain trade names, trademarks, service marks and other commercial symbols, and applications related thereto, including "Perkins," "Perkins Restaurant and Bakery," "Perkins Restaurants," "Perkins Family Restaurants (and Bakeries)," "Perkins Pancake Houses" and "Perkins 'Cake & Steak" (collectively, the "Marks"), and the confidential information, copyrights and business format and related property rights which comprise the System. We may change, modify or improve the System from time to time to enhance the operations of Perkins restaurants. All improvements and additions you, we or anyone else makes to the System, whenever made or used in connection with the System, will inure to us and become our sole property. We grant, to qualified persons, licenses to own and operate Perkins restaurants pursuant to the System selling the Products and services we authorize and approve.

    B.     GRANT OF LICENSE.

        (1)     Grant. You have applied for a license to own and operate a Perkins restaurant (the "Restaurant") at, and only at, the location known as: 1601 Prospect Road, Ashtabula, Ohio 44004 (the "Premises") and we have approved your application in reliance upon all of the representations and warranties you have made to us in connection with your desire to operate a Perkins restaurant, including but not limited to the information contained in your application for a license and, if the Restaurant is newly constructed and equipped, the representations and warranties you made to us in the Commitment Agreement between you and us dated N/A. Subject to the provisions of this agreement, and in reliance on such representations and warranties, we hereby grant to you a non-exclusive license (the "License") to operate a Perkins restaurant at the Premises, and to use the System and the Marks in operating the

Restaurant, for a term of twenty (20) years, beginning on the date of this Agreement, unless this Agreement is sooner terminated as provided in Section 14 of this Agreement. Termination or expiration of this Agreement will constitute a termination or expiration of the License. You may not conduct your business pursuant to this Agreement from any location other than the Premises except upon our approval of your application for change of location and the payment of the then current change of location fee.

(2)    Best Efforts.  You agree that you will at all times faithfully, honestly and diligently perform your obligations under this Agreement, and that you will continuously exert, during the full term of this Agreement, your best efforts to promote and enhance the business of the Restaurant and the goodwill of the Marks and the System.

C.    RIGHTS RESERVED BY COMPANY.

We retain the right, in our sole and absolute discretion, to: (1) operate and grant to others the right to operate Perkins restaurants or other restaurants using the System or the Marks at such locations which may include locations within the Trade Area (as defined in Section 16A) and on such terms and conditions as we deem appropriate; (2) operate and grant to others the right to operate restaurants under other trade names, trademarks, service marks and commercial symbols different from the Marks, notwithstanding the fact that such restaurants may be the same as or similar to a Perkins restaurant; and (3) sell the Products or other products identified by the Marks or by other trademarks in any channel of distribution.

2.    TRAINING.

Prior to the execution of this Agreement, we have furnished you, your Restaurant Operations Director and your Restaurant Managers (each as hereinafter defined) training in the operation of a Perkins restaurant.  We will furnish similar training to all successors to such persons.  No person shall be permitted to supervise the Restaurant until the training has been completed.  The training program will include classroom instruction and field training and will be furnished at our training facility and/or at a Perkins restaurant, and will last for such duration as we determine to be necessary.

Your Restaurant Operations Director and Restaurant Managers must complete the training program to our satisfaction.  If we, in our sole discretion, determine that any of such persons are unable to complete the training program satisfactorily, upon our request you agree to hire, as soon as practicable, a replacement who must complete our training program to our satisfaction.  We may also offer such refresher or supplemental training programs to you and such persons as we, from time to time, deem appropriate at such places as we designate.  By giving you prior written notice, we will have right to require attendance at any refresher or supplemental training program by you or any of such persons.

No tuition charge will be made for required initial training programs.  You will be responsible for the travel, local transportation, lodging and meal expenses, and compensation of yourself, your Restaurant Operations Director and your Restaurant Managers incurred while attending the training program and any refresher or supplemental training programs we offer to you or require you or such persons to attend. Reasonable charges may be made by us for training materials and we may require you to purchase certain equipment to be used in such training.

3.   GUIDANCE.

A.   GUIDANCE AND ASSISTANCE.

We will furnish guidance to you with respect to:

(1)   preparation, packaging, sale and delivery of Products authorized for sale at Perkins restaurants;

(2)   development, preparation and packaging of new Products we develop for sale at Perkins restaurants;

(3)   specifications, standards and operating procedures utilized by Perkins restaurants, and any modifications thereof;

(4)   approved equipment, furniture, furnishings, signs, food products, operating materials and supplies;

(5)   development and implementation of local advertising and promotional programs; and

(6)   general operating and management procedures of Perkins restaurants.

In our discretion, we will furnish this guidance and assistance to you in the form of our confidential operations manual, bulletins, written reports and recommendations, or other written materials (all of which are hereinafter referred to as the "Operations Manual"), inspection reports for the Restaurant, refresher training programs and/or telephonic consultations or consultations at our offices or at the Restaurant. If you request, we will furnish additional guidance and assistance relative to the operation of the Restaurant at per diem fees and charges we establish from time to time. If special training of Restaurant personnel or other assistance in operating the Restaurant is requested by you, and must take place at the Restaurant, all our expenses for such training, including a per diem charge and travel, local transportation, lodging and meal expenses for our personnel, must be paid by you.

B.   OPERATIONS MANUAL.

We will loan to you during the term of this Agreement one copy of the Operations Manual which may consist of multiple parts and/or volumes and which may, at our option, be provided to you in electronic format. The Operations Manual will contain mandatory and suggested specifications, standards and operating procedures we prescribe from time to time for Perkins restaurants and information relative to your obligations under this Agreement and in the operation of a Perkins restaurant. We may modify the Operations Manual from time to time to reflect changes in the specifications, standards and operating procedures of Perkins restaurants, to disclose information concerning new Products and services which we may develop for sale at Perkins restaurants, to specify types, brands and models of equipment which you must utilize to produce and sell such new Products and services, and to specify changes in the decor, format, image, Products, services and operation of a Perkins restaurant. You must keep your copy of the Operations Manual current by immediately inserting all modified pages we furnish to you and destroying the then obsolete pages. In the event of a dispute relative to the contents of the Operations Manual, the master copies we maintain at our principal office will be controlling. You may not at any time copy any part of the Operations Manual, disclose any part of it to employees or others not having a need to know its contents for purposes of operating the Restaurant, or permit its removal from the Restaurant without our prior approval. In the event a new version of the Operations Manual is provided to you, you must immediately return the then obsolete version to us. To the extent the Operations Manual contains any specification, standard or operating

procedure concerning the operation of the Restaurant, such provision shall be deemed to be incorporated into this Agreement.

4.    MARKS.

A.    GOODWILL AND OWNERSHIP OF MARKS.

You acknowledge that your right to use the Marks is derived solely from this Agreement and is limited to your operation of the Restaurant pursuant to and in compliance with this Agreement and all applicable standards, specifications and operating procedures we prescribe from time to time during the term of the License. Any unauthorized use of the Marks by you will constitute a breach of this Agreement and an infringement of our rights in and to the Marks. You acknowledge and agree that all of your usage of the Marks and any goodwill established by your use of the Marks will inure to our exclusive benefit, and that this Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to operate a Perkins restaurant in compliance with this Agreement). All provisions of this Agreement applicable to the Marks will apply to any other trademarks, service marks and commercial symbols we later develop, authorize and license you to use.

B.    LIMITATIONS ON LICENSEE'S USE OF MARKS.

You agree to use the Marks as the sole trade identification of the Restaurant. You must also identify yourself as the independent owner of the Restaurant in the manner we prescribe. You must not use any Mark as part of any corporate or trade name or with any prefix, suffix or other modifying words, terms, designs or symbols (other than logos and additional trade and service marks we license to you under this Agreement), or in any modified form, nor may you use any Mark in connection with the performance or sale of any unauthorized services or products or in any other manner we have not expressly authorized in writing. You must prominently display the Marks in the manner we prescribe at the Restaurant, on menus and in connection with advertising and marketing materials. You must not employ any of the Marks in signing contracts, applications for licenses or permits, or in any manner that may imply our responsibility for, or result in our liability for, any of your indebtedness or obligations, nor may you use the Marks in any way not authorized herein. You further agree to give such notices of trade and service mark registrations as we specify, and you must obtain such fictitious or assumed name registrations as may be required under applicable law.

C.    NOTIFICATION OF INFRINGEMENTS AND CLAIMS.

You agree to immediately notify us of any apparent infringement of or challenge to your use of any Mark, or claim by any person of any rights in any Mark. You agree not to communicate with any person other than us and our counsel in connection with any such infringement, challenge or claim. We will have sole discretion to take such action as we deem appropriate in connection with any infringement, challenge or claim, and the right to exclusively control any settlement, litigation or U.S. Patent and Trademark Office or other proceeding arising out of the alleged infringement, challenge or claim or otherwise relating to any Mark. You agree to execute any and all instruments and documents, render such assistance, and do such acts and things as may, in the opinion of our counsel, be necessary or advisable to protect and maintain our interest in any litigation or other proceeding or to otherwise protect and maintain our interest in the Marks.

D.    DISCONTINUANCE OF USE OF MARKS.

If it becomes advisable at any time in our sole judgment to modify or discontinue use of any Mark and/or for the Restaurant to use one or more additional or substitute trade or service marks, you agree, at your expense, to comply with our directions to modify or otherwise

discontinue the use of such Mark, and/or use one or more additional or substitute trade or service marks, within a reasonable time after we give you notice.

### E.    INDEMNIFICATION OF LICENSEE.

We agree to indemnify you against, and to reimburse you for, and, at our option, to defend you against, all damages for which you are held liable in any proceeding arising out of your use of any Mark, pursuant to and in compliance with this Agreement, and for all costs you reasonably incur in the defense of any such claim brought against you or in any such proceeding in which you are named as a party, including reasonable attorney's fees, provided that you have timely notified us of such claim or proceeding and you have otherwise complied with this Agreement. We have the right to approve any counsel employed by you in the defense of any such claim, and in the event we elect to defend any such claim, the fees and expenses of any separate counsel employed by you shall not be reimbursable.

### F.    WEBSITE

Prior to establishing a website in connection with your operation of the Restaurant, you must submit to us a sample of the website information in the form and manner prescribed by us from time to time; you shall not establish a website which has not been approved in writing by us. You must follow our standards and specifications for websites as prescribed by us from time to time. In the event that you alter a previously approved website, you must submit to us a sample of alterations and receive our approval prior to implementing such alterations to the website.

### 5.    RELATIONSHIP OF THE PARTIES/INDEMNIFICATION.

### A.    INDEPENDENT CONTRACTORS.

It is understood and agreed that this Agreement does not create a fiduciary relationship between you and us, that we and you are and shall be independent contractors, and that nothing in this Agreement is intended to make either you or us a general or special agent, legal representative, joint venturer, partner or employee of the other for any purpose or to grant either you or us the right to direct or supervise the daily affairs of the other. You agree to identify yourself conspicuously in all dealings with customers, suppliers, public officials, Restaurant personnel and others as the owner of the Restaurant under a license granted by us. All of your stationary, business cards, and other materials we may require from time to time must contain your corporate name and a conspicuously displayed notice in the place we designate that you operate your Restaurant as an independently owned and operated licensed business and that you independently own and operate the Restaurant as a System licensee. You acknowledge that no agreement we make with any third party is for your benefit. In addition, neither we nor you will interfere with each other's contractual relations or employment decisions. Finally, nothing in this Agreement authorizes you to make any contract, agreement, warranty, or representation on our behalf, or to incur any debt or other obligation in our name; and we will not, in any event, assume liability for, or be deemed liable hereunder as a result of, any such action; nor will we be liable by reason of any of your acts or omissions in your employment decisions or your operation the licensed business or for any claim or judgment arising therefrom against us.

### B.    NO LIABILITY FOR ACTS OF OTHER PARTY.

You agree that you will not employ any of the Marks in signing any contract, check, legal obligation, application for any license or permit, or in a manner that may imply that we are responsible, or which may result in liability to us for, any of your indebtedness or obligations. You further agree not to use the Marks in any way not expressly authorized by this Agreement. Except as expressly authorized in writing, neither we nor you may make any express or implied agreements, warranties, guarantees or representations, or incur any debt in the name of or on behalf of the other, or represent that our relationship is other than licensor and licensee, and

neither we nor you will be obligated by or have any liability under any agreements or representations made by the other that are not expressly authorized in writing. We will not be obligated for any damages to any person or property directly or indirectly arising out of the operation of the Restaurant, your employment decisionsor your business conducted pursuant to or beyond the scope of this Agreement or the License.

      C.     <u>TAXES</u>.

Except for taxes which we are required to collect from you in connection with items you purchase from us, we will have no liability for any sales, use, service, occupation, excise, gross receipts, income, property or other taxes, whether levied upon you, the Restaurant, your property, us or the royalty fees which you pay to us, in connection with the sales made or business conducted by you. Payment of all such taxes will be your responsibility.

      D.     <u>INDEMNIFICATION</u>.

You agree, during and after the term of this Agreement, to indemnify, defend and hold us, our affiliated entities, and their and our shareholders, directors, partners, officers, employees, agents, representatives, successors and assignees (collectively, the "Indemnitees"), harmless against and reimburse the Indemnitees for all claims, obligations and damages described in Section 5B, any and all claims arising out of the use of the Marks in any manner not in accordance with this Agreement and all losses, liabilities, claims, taxes, demands, damages, causes of action, governmental inquiries and investigations, costs and expenses, including reasonable attorneys' and accountants' fees, consequently, directly or indirectly incurred, arising from, as a result of, or in connection with this Agreement, the operation of the Restaurant, your employment decisions or any of your or your employees' actions, errors, omissions, breaches or defaults under this Agreement or any acts or omissions alleged or proven to be a result of our negligence. For purposes of this indemnification, "claims" shall mean and include all obligations, actual and consequential damages, expenses, losses, costs and other liabilities reasonably incurred in the defense of any claim against the Indemnitees, including without limitation reasonable accountants', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses and travel, lodging and meal expenses incurred in litigation or preparation for litigation, whether or not litigation is filed. If the Indemnitees reasonably conclude that their interests are not being adequately represented by your counsel, the Indemnitees will have the right to employ their own attorneys to defend any claim against them in the manner they deem appropriate or desirable in their sole discretion, and your indemnification hereunder shall apply to and include the costs incurred in any such defense. Your obligation to indemnify the Indemnitees will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

6.     <u>CONFIDENTIAL INFORMATION</u>.

We possess certain confidential and proprietary information and trade secrets consisting of, but not limited to, the following categories of information, methods, techniques, procedures and knowledge we have developed (collectively, the "Confidential Information"):

          (1)     methods and procedures relating to the development and operation of Perkins restaurants, whether contained in the Operations Manual or otherwise;

          (2)     secret recipes and flour and other mixes, menu analysis and methods of preparation of Products and services offered in Perkins restaurants;

          (3)     methods, procedures and techniques for preparing, packaging, marketing, selling and delivering Products and services offered in Perkins restaurants;

(4)     knowledge of test programs, concepts and results relating to the planning, development and testing of the System and Products and services offered in Perkins restaurants;

(5)     sources for purchase of food, beverages and other ingredients used by Perkins restaurants;

(6)     marketing programs and image; and

(7)     methods, techniques, specifications, procedures, information, systems and knowledge of and experience in the development, licensing and operation of Perkins restaurants.

We will disclose the Confidential Information to you during training, in the Operations Manual and training manuals, and in guidance and assistance furnished to you during the term of this Agreement. You may also learn additional Confidential Information and trade secrets of ours during the term of this Agreement. You acknowledge and agree that you will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Restaurant, and that the use of the Confidential Information in any other business, or the disclosure of the Confidential Information to any other person or entity, would constitute an unfair method of competition with us and other Perkins restaurant licensees.

You acknowledge and agree that the Confidential Information, which we have invested a substantial amount of money and time in developing, is a valuable asset of ours, includes trade secrets of ours, and will be disclosed to you solely on the condition that you agree, and you do hereby agree, that you:

(1)     will not use the Confidential Information in any other business or capacity;

(2)     will maintain the absolute secrecy and confidentiality of the Confidential Information during and after the term of this Agreement (except as authorized by this Agreement);

(3)     will not make unauthorized copies of any portion of the Confidential Information which is in written, audio, video or other reproducible form; and

(4)     will adopt and implement all reasonable procedures we prescribe from time to time to prevent unauthorized use or disclosure of the Confidential Information, including requiring your Restaurant Operations Director and Restaurant Managers and other employees who have access to the Confidential Information to execute confidentiality agreements in the form we approve or prescribe prior to or during their employment. Furthermore, other than for consumption in the Restaurant or approved carry-out or retail sales programs, you agree not to sell or provide to any person or entity other than us or our designee, for use, testing or any other purpose, any mixes for preparation of Products you purchase from us or our designees.

Notwithstanding anything to the contrary contained in this Agreement and provided you have obtained our prior written consent, which consent shall not be unreasonably withheld, the restrictions on your disclosure and use of Confidential Information will not apply to the following: (i) information, processes or techniques which are or become generally known in the restaurant industry, other than through disclosure (whether deliberate or inadvertent) by you; and (ii)

disclosure of Confidential Information in judicial or administrative proceedings to the extent that you are legally compelled to disclose such information, provided that you have used your best efforts, and have afforded us the opportunity, to obtain an appropriate protective order or other assurance satisfactory to us of confidential treatment for the information required to be so disclosed.

You will fully and promptly disclose to us, all ideas, concepts, formulas, recipes, methods and techniques relating to the development and/or operation of the Restaurant, conceived or developed by you and/or your employees during the term of this Agreement. You acknowledge that such ideas, concepts, formulas, recipes, methods and techniques shall be our sole property, and you shall not be entitled to any compensation whatsoever for the same.

7.    FEES.

A.    ROYALTY FEE.

You agree to pay to us a royalty fee equal to four percent (4%) of the Gross Sales [except in the states of Iowa and Wisconsin the royalty fee rate is 5% of the Gross Sales] of the Restaurant (as defined in Subsection B of this Section). The royalty fee shall be paid on Thursday of each week based on Gross Sales for the previous week ending Sunday via electronic funds transfer ("ACH") under which we automatically deduct such fees due to us from your bank account.  [Prior to opening, you will have provided us with your bank's name, address and account number, a voided check from the bank account, and sign and give to us all requisite documents, including Attachment C to this Agreement, necessary to effectuate the ACH Transfer and our ability to withdraw funds from such bank account via electronic fund transfer.] You must immediately notify us of any change in your banking relationship, including changes in account numbers. We may charge you a royalty fee on Gross Sales of any additional activity which is added to the operations of the Restaurant, including but not limited to, bakery operations.

B.    DEFINITION OF GROSS SALES.

As used in this Agreement, the term "Gross Sales" shall mean gross sales of all food, beverage and other menu items, merchandise, goods and other services sold or performed by or for you or the Restaurant, in, upon, or from the Premises, or through or by means of the business conducted at the Restaurant, the Premises or otherwise, whether for cash or credit.  Sales and service taxes collected from customers and paid to the appropriate taxing authority and the discounted portion of employee meals, and sales of cigars, cigarettes and newspapers shall not be included in Gross Sales.

C.    INTEREST ON LATE PAYMENTS.

All royalty fees, Marketing Fund contributions (as described in Section 9 of this Agreement), amounts due for your purchases from us or our subsidiaries or affiliates, and other amounts which you owe to us or our subsidiaries or affiliates will bear interest beginning on the first day of the month or period, whichever is applicable, immediately following the date such amounts were due at the highest applicable legal rate for open account business credit, not to exceed one and one-half percent (1.5%) per month or period.  This Section 7C does not constitute an agreement on our part to accept payments from you after the payments are due or our commitment to extend credit to, or otherwise finance your operation of, the Restaurant. Further, you acknowledge that your failure to pay all amounts when due will constitute grounds for termination of this Agreement, as provided in Section 14 of this Agreement, notwithstanding the provisions of this Section 7C.

D.    **APPLICATION OF PAYMENTS**.

Notwithstanding your designation, we will have sole discretion to apply any of your payments to any of your past due indebtedness for initial or royalty fees, Marketing Fund contributions, purchases from us or our subsidiaries or affiliates, interest or any other outstanding indebtedness in such order and amounts as we may elect. The acceptance of a partial or late payment will not constitute a waiver of any of our rights or remedies contained in this Agreement.

8.    **RESTAURANT OPERATING STANDARDS.**

A.    **CONDITION, APPEARANCE AND OPERATION OF THE RESTAURANT**.

You agree that:

(1)    neither the Restaurant nor the Premises will be used for any purpose other than the operation of a Perkins restaurant in compliance with this Agreement;

(2)    you will maintain the condition and appearance of the Restaurant, its equipment, furniture, furnishings, flags, signs and the Premises in accordance with our specifications and standards as in effect from time to time and consistent with the image of a Perkins restaurant as an efficiently operated business offering high quality food service and observing the highest standards of cleanliness and sanitation;

(3)    you will perform all periodic maintenance with respect to the decor, equipment, furniture, furnishings and signs of the Restaurant and the Premises that is required from time to time to maintain such condition, appearance and efficient operation, including, without limitation:

(a)    thorough cleaning, repainting and redecorating of the interior and exterior of the Premises at reasonable intervals;

(b)    interior and exterior repair of the Premises; and

(c)    repair or replacement of damaged, worn out or obsolete equipment, furniture, furnishings, flags and signs.

(4)    you will not make any material alterations to the Premises, or to the appearance of the Restaurant as originally developed, without our prior written approval;

(5)    we have the right to require that you remodel, redecorate, re-equip, modernize and refurnish the Premises and the Restaurant to reflect any changes in Perkins restaurants that we prescribe as our then-current standards and specifications, provided that at the time of our request, at least 25% of our Company owned and operated restaurants meet such standards and specifications. You understand that such remodeling, redecorating, re-equipping, modernization or refurnishing may require a substantial investment on your part and that we cannot make any guarantee of any particular return on that investment. We have the right to approve the layouts, designs, and new equipment, furniture and furnishings you use in any remodeling, redecorating and re-equipping; and

(6)   you will place or display at the Premises (interior and exterior) only such signs, flags, emblems, lettering, logos and display and advertising materials that we from time to time approve.

**B.**   **RESTAURANT MENU.**

You agree that the Restaurant will offer for sale all food and beverage products and services that we from time to time require. You agree that the Restaurant will sell only products that we have approved. You agree that the Restaurant will not sell any Products to any person for resale to any third person. The Restaurant must not offer for sale or sell at the Premises or any other location any unapproved products, or use the Premises for any purpose other than the operation of the Restaurant.

We have the right to approve the Restaurant's offering of Products or services on a test basis, which approval we may condition in any manner. We will have the right to stop the test at any time after its commencement.

**C.**   **APPROVED PRODUCTS, DISTRIBUTORS AND SUPPLIERS.**

The reputation and goodwill of Perkins restaurants is based upon, and can be maintained only by, the sale of distinctive, high quality food products and beverages and the presentation, packaging, service and delivery of such products in an efficient and appealing manner. We have developed various proprietary products which are prepared by or for us according to our proprietary and secret recipes and formulas. We have developed standards and specifications for food products, ingredients, seasonings, mixes, beverages, materials and supplies incorporated in or used in the preparation, cooking, serving, packaging and delivery of prepared food products authorized for sale at Perkins restaurants. We have and will periodically approve suppliers and distributors of the foregoing products that meet our standards and requirements, including, without limitation, standards and requirements relating to product quality, prices, consistency, reliability, financial capability, labor relations and customer relations. You agree that for use in the Restaurant you will:

(1)   purchase our proprietary flour, pancake, cookie, muffin and other mixes and batters, and other products developed by us from time to time pursuant to secret recipes or formulas, only from us or a third party licensed by us to prepare and sell such products; and

(2)   purchase all other food products, ingredients, seasonings, mixes, beverages, materials and supplies used in the preparation of Products; menus, paper, glassware, china and plastic products; packaging or other materials, utensils and uniforms that meet our standards and specifications from suppliers we have approved.

You must at all times maintain an inventory of approved food products, beverages, ingredients and other products sufficient in quantity and variety to realize the full potential of the Restaurant.

We may approve a single distributor or other supplier for any Product and may approve a distributor or other supplier only as to certain of the Products. We may concentrate purchases with one or more distributors or suppliers to obtain lower prices and/or the best advertising support and/or services for any group of Perkins restaurants we license and/or operate. Approval of a distributor or other supplier may be conditioned on requirements relating to the frequency of delivery, standards of service, including prompt attention to complaints or other criteria, and concentration of purchases, as set forth above, and may be temporary, pending our further evaluation of such distributor or other supplier.

You agree to notify us and submit to us all information, specifications and samples that we request if you propose to purchase any food products, mixes, seasonings, beverages, menus, paper, glassware, china or plastic products, packaging, uniforms or other materials or utensils from a distributor or other supplier who has not been previously approved by us. We will notify you within a reasonable time whether you are authorized to purchase such products from such distributor or other supplier.

We may, from time to time, conduct market research and testing to determine consumer trends and the marketability of new food products and services. You agree to cooperate and assist us by participating in our customer surveys and market research programs, test marketing new food products and services in the Restaurant and providing us with timely reports and other relevant information regarding such customer surveys and market research.

D.    SPECIFICATIONS, STANDARDS AND PROCEDURES.

You acknowledge that the operation of the Restaurant in compliance with our high standards is important to us and all other Perkins restaurant licensees. You agree to cooperate with us by maintaining our high standards in the operation of the Restaurant. You further agree to comply with all mandatory specifications, standards and operating procedures relating to appearance, function, cleanliness, sanitation, safety, business hours, delivery services, new Products, purchasing or leasing new or different equipment for preparation and sale of new Products, compliance with the decor, format and image, including equipment, furniture, fixtures and signage, of a Perkins restaurant (as it may be developed or changed by us from time to time) and operation of a Perkins restaurant. Mandatory specifications, standards and operating procedures we prescribe from time to time in the Operations Manual, or otherwise communicate to you in writing, will constitute provisions of this Agreement as if fully set forth in this Agreement. All references to this Agreement include all such mandatory specifications, standards and operating procedures. You agree that the Restaurant will conduct business in the ordinary course seven days a week (excluding holidays we specify) and the number of hours each day that we authorize. You acknowledge that approved restaurant hours may vary from one location to another depending on conditions in the market where the restaurant is located.

E.    COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES.

You agree to secure and maintain in force in your name all required licenses, permits and certificates relating to the operation of the Restaurant. You further agree to operate the Restaurant in full compliance with all applicable laws, ordinances and regulations, including, without limitation, all government regulations relating to health and sanitation, workers' compensation insurance, unemployment insurance and withholding and payment of federal, state and local income taxes, social security taxes and sales taxes as well as all labor and employment and data privacy laws and regulations. All of your advertising must be completely factual, be in good taste in our judgment and conform to the highest standards of ethical advertising. You agree that in all dealings with us, your customers, suppliers and public officials, you will adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business or advertising practice which may be injurious to our business or to the goodwill associated with the Marks and other Perkins restaurants.

You agree to notify us, by telephone within forty-eight (48) hours followed within five (5) days by written notification, including copies of any pleadings or process received of: (i) the commencement of any action, suit or proceeding relative to the Restaurant; (ii) the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality which may adversely affect the operation or financial condition of the Restaurant; and (iii) any notice of violation of any law, ordinance or regulation relating to health or safety. You agree that you will not accept service of process for us.

F.    MANAGEMENT AND PERSONNEL OF THE RESTAURANT.

(1)    You agree that at all times you will (i) employ on terms reasonably satisfactory to us a Restaurant Operations Director who shall have principal operational responsibility for the Restaurant and who shall have such qualifications and experience as we shall reasonably require and who shall have completed our training program and (ii) employ on a full-time basis a general manager or an associate manager and a food production manager, each of whom has completed our training program (a "Restaurant Manager").  If the Restaurant is your only licensed Perkins restaurant, the duties of the Restaurant Operations Director and the Restaurant Manager may be performed by the same person.  You must, at all times during the term of this Agreement, have in your employment at the Restaurant not less than three certified managers who have satisfactorily completed our training program.  The Restaurant shall at all times be under the direct on-premises supervision of a Restaurant Manager.  You agree to hire all employees of the Restaurant and be exclusively responsible for the terms of their employment and compensation and for the proper training of your employees in the operation of the Restaurant.  You agree to require all employees to maintain a neat and clean appearance and to conform to the standards of dress and/or uniforms that we specify from time to time for Perkins restaurants.

(2)    You shall not recruit or hire any of our employees or any employees of any Perkins restaurant operated by us or by a Perkins restaurant licensee without obtaining our prior written permission or the prior written permission of the other licensee unless six months have expired since such employee's termination of employment with us or the licensee.  In the event you breach this sub-section of the Agreement, you shall pay to us or the licensee an amount of ten thousand dollars ($10,000.00) for the employment of a non-manager and twenty-five thousand dollars ($25,000.00) for the employment of a manager.

G.    INSURANCE.

During the term of the License, you agree to comply with all insurance requirements related to the Restaurant's lease or mortgage and to maintain in force at all times, under policies of insurance issued by carriers we have approved:

(1)    employer's liability and workers' compensation insurance as prescribed by applicable law;

(2)    comprehensive general liability insurance (with products, completed operations and contractual liability and independent contractors coverage) and comprehensive motor vehicle liability insurance (for owned and non-owned vehicles) against claims for bodily and personal injury, death and property damage caused by or occurring in conjunction with the operation of the Restaurant (or otherwise in conjunction with your conduct of business pursuant to this Agreement) under one or more policies of insurance, each on an occurrence basis, with single-limit coverage for personal and bodily injury, death and property damage of at least $2,000,000 (or such other amount as we may reasonably require), for each occurrence;

    (3)    all-risk building and contents insurance including flood and earthquake, vandalism and theft insurance for the replacement value of the Restaurant and its contents;

    (4)    business interruption insurance for a period adequate to reestablish normal business operations; and

    (5)    builders' risk insurance on a completed value non-reporting basis during the period of any remodeling of the Restaurant.

The insurance requirements are stated in the Operations Manual and we may periodically increase the amounts of insurance you will be required to maintain, and we may require different or additional kinds of insurance at any time, including excess liability insurance, to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards, or other relevant changes in circumstances. Each insurance policy must name us as an additional insured and must provide for thirty (30) days' prior written notice to us of any material modification, cancellation, termination or expiration of such policy.

Prior to the expiration of the term of each insurance policy, you agree to furnish us with a certificate of insurance or with a certified copy of each renewal or replacement insurance policy you will maintain for the immediately following term and evidence of the payment of the premium for the insurance policy. If you fail or refuse to maintain required insurance coverage, or to furnish satisfactory evidence of required insurance coverage and payment of the premiums we, at our option and in addition to our other rights and remedies under this Agreement, may obtain the required insurance coverage on your behalf. You must cooperate fully with us in our effort to obtain such insurance policies, promptly execute all forms or instruments required to obtain or maintain any such insurance, allow any inspections of the Restaurant which are required to obtain or maintain such insurance and pay to us, on demand, any costs and premiums we incur.

Your obligations to maintain insurance coverage as described above will not be affected in any manner by reason of any separate insurance we maintain, nor will the maintenance of insurance relieve you of any obligations under Section 5 of this Agreement.

9.    <u>MARKETING</u>.

    A.    <u>BY COMPANY</u>.

Recognizing the value of advertising to the goodwill and public image of Perkins restaurants, we will maintain and administer a marketing fund (the "Marketing Fund") for the marketing programs that we deem necessary or appropriate, in our sole discretion. You agree to contribute to the Marketing Fund three percent (3%) of Gross Sales of the Restaurant calculated in the same manner as, and payable via ACH Transfer together with, the royalty fees due under this Agreement

We will direct all marketing programs financed by the Marketing Fund, and we will have sole discretion over the creative concepts, materials and endorsements used in the programs, and the geographic, market, and media placement and allocation of the programs. You agree that the Marketing Fund may be used to pay the costs of preparing and producing video, audio and written advertising materials; administering multi-regional advertising programs, including, without limitation, purchasing direct mail and other media advertising, and employing advertising agencies to assist therewith; supporting public relations, market research, and menu development; and other advertising and marketing activities that we, in our sole discretion, deem appropriate.

The Marketing Fund will be accounted for separately from our other funds and will not be used to defray any of our general operating expenses, except for such reasonable salaries,

administrative costs and overhead as we may incur in activities reasonably related to the administration of the Marketing Fund and its marketing programs including, without limitation, conducting market research and menu development, preparing advertising and marketing materials, and collecting and accounting for contributions to the Marketing Fund (including, but not limited to, attorneys' and accountants' fees and other expenses of litigation). We may spend in any fiscal year an amount greater or less than the aggregate contribution of all Perkins restaurants to the Marketing Fund in that year and the Marketing Fund may borrow from us or from other lenders to cover deficits of the Marketing Fund or cause the Marketing Fund to invest any surplus for future use by the Marketing Fund. You authorize us to collect for the Marketing Fund any advertising or promotional monies or credits offered by any supplier based upon your purchases. All interest earned on monies contributed to the Marketing Fund will be used to pay the expenses of the Marketing Fund incurred in advertising and promotion, including the reasonable administrative expenses related thereto before other assets of the Marketing Fund are expended. We will prepare an annual statement of monies collected and costs incurred by the Marketing Fund within one hundred twenty (120) days after the end of our fiscal year and will furnish this statement to you upon your written request. We have the right to cause the Marketing Fund to be incorporated or operated through a separate entity at such time as we deem appropriate, and that entity will have all of our rights and duties pursuant to this Section 9A.

You understand and acknowledge that the Marketing Fund is intended to enhance recognition of the Marks and patronage of Perkins restaurants. Although we will endeavor to utilize the Marketing Fund to develop advertising and marketing materials and programs, and to place advertising that will benefit all Perkins restaurants, we undertake no obligation to ensure that expenditures by the Marketing Fund in or affecting any geographic area are proportionate or equivalent to the contributions to the Marketing Fund by Perkins restaurants operating in that geographic area or that any Perkins restaurant will benefit directly or in proportion to its contributions to the Marketing Fund from the development of advertising and marketing materials or the placement of advertising. Except as expressly provided in this Section 9A, we assume no direct or indirect liability or obligation to you with respect to our maintenance, direction or administration of the Marketing Fund. You acknowledge that we have the right, and you hereby authorize us, to settle or otherwise compromise all disputes with regard to the Marketing Fund.

B. **BY LICENSEE.**

In addition to your contributions to the Marketing Fund, you agree to spend annually for local advertising of the Restaurant (including classified telephone directory advertising) an amount not less than one percent (1%) of the Gross Sales of the Restaurant. Samples of all local advertising and promotional materials that we have not prepared or previously approved must be submitted to us for approval prior to use. You may not use any advertising or promotional materials that we have disapproved.

C. **GRAND OPENING**

You must, within sixty days of the opening of the Restaurant, execute a "grand opening" program. Such program must be submitted to and approved by our Marketing Department prior to execution.

10. **REPORTS, FINANCIAL STATEMENTS AND FINANCIAL CONDITION.**

Unless otherwise agreed by us in writing, you agree to adopt the Company's financial and operational reporting chart of accounts format, as set forth in the Operations Manual or otherwise furnished to you, which may be amended from time to time. You also agree to maintain accurate books of account, governmental reports, register tapes, guest checks, daily reports and complete copies of all federal and state income tax returns, property and sales and use tax returns. Such records, reports and returns must be preserved for such periods of time as

are reasonably specified by us from time to time in the Operations Manual or otherwise but not less than the minimum time prescribed by applicable law.

With respect to the operation and financial condition of the Restaurant, you agree to furnish us, in the form we from time to time prescribe:

(1)     by the tenth (10th) day of each month for the preceding calendar month, a report of the Gross Sales of the Restaurant, other revenues generated at the Restaurant and other information which we may request that may be useful in connection with our marketing and other legitimate functions. This report must also include a statement computing amounts then due for royalty fees and Marketing Fund contributions and be certified by you or by your chief executive or financial officer;

(2)     by the twentieth (20th) day of each month for the preceding calendar month, a profit and loss statement for the Restaurant and be certified by you or by your chief executive or financial officer;

(3)     upon our request, such other data, information and supporting records for such periods as we from time to time reasonably require; and

(4)     within one hundred twenty (120) days after the end of your fiscal year, a fiscal year-end balance sheet, income statement and statement of changes in financial position (cash flow) of the Restaurant for such fiscal year, reflecting all year-end adjustments (audited if available) and a statement of annual Gross Sales certifying that your Gross Sales for the immediately preceding fiscal year have been calculated and reported in compliance with the terms of this Agreement, each of which shall be certified by you or by your chief executive or financial officer.

If at any time you are delinquent in the payment of any amount owed to us or our affiliates, you agree: (1) upon our request, to furnish us income statements and balance sheets for such periods and as of such dates and all in such detail as we may request, for you and each entity affiliated with you, whether or not such entity conducts any business with the Restaurant, (2) that we may directly contact any lender, lessor, supplier or vendor for the purpose of obtaining information relating to the Restaurant and any lease or financial arrangements and you hereby authorize such persons to disclose all such information to us and, if you are an entity, you agree that we may contact any of your officers, directors, shareholders or partners for any purpose reasonably related to your undertakings contained in this Agreement and (3) to furnish, at our request, books of account, governmental reports, register tapes, guest checks, daily reports and complete copies of federal and state income tax returns, property and sales and use tax returns.

11.    **INSPECTIONS AND AUDITS.**

    A.    **COMPANY'S RIGHT TO INSPECT THE RESTAURANT.**

To determine whether you are complying with this Agreement, and with specifications, standards and operating procedures we prescribe for the operation of Perkins restaurants, we or our agents will have the right, at any reasonable time, to:

(1)     inspect the Restaurant and the Premises;

(2)     observe and video tape the operations of the Restaurant for such consecutive or intermittent periods as we deem necessary;

(3)    remove, in reasonable quantities, samples of any food and beverage product, material or other products for testing and analysis;

(4)    interview personnel of the Restaurant;

(5)    interview customers of the Restaurant; and

(6)    inspect and copy any books, records and documents relating to the operation of the Restaurant.

You agree to fully cooperate with us in connection with any such inspections, observations, videotaping, product removal and interviews.  You agree to present to your customers any evaluation forms we periodically prescribe and to participate and/or request your customers to participate in any surveys performed by us or on our behalf.

B.    COMPANY'S RIGHT TO AUDIT.

We have the right at any time during business hours, and without prior notice to you, to inspect and audit, or cause to be inspected and audited, the business records, bookkeeping and accounting records, sales and income tax records and returns and other records of the Restaurant and the books, records and tax returns of any entity which holds the License granted under this Agreement.  You must fully cooperate with our representatives and any independent accountants that we hire to conduct any such inspection or audit.  If any such inspection or audit discloses an understatement of the Gross Sales of the Restaurant, you agree to pay to us, within fifteen (15) days after receipt of the inspection or audit report, the royalty fees and Marketing Fund contributions due on the amount of such understatement, plus interest (at the rate and on the terms provided in Section 7C of this Agreement) from the date originally due until the date of payment.  Further, in the event such inspection or audit is made necessary due to your failure to furnish us with reports, supporting records, other information or financial statements, as required by this Agreement, or to furnish such reports, records, information or financial statements on a timely basis, or if an understatement of Gross Sales for the period of any audit is determined by any such audit or inspection to be greater than two percent (2%), you agree to reimburse us immediately upon notice for the cost of the inspection or audit, including, without limitation, the charges of attorneys and independent accountants, and the travel, lodging and meal expenses and applicable per diem charges for our employees.  The foregoing rights will be in addition to all other remedies and rights that we may have under this Agreement or under applicable law.

12.    TRANSFER OF LICENSE.

A.    BY COMPANY.

This Agreement is fully transferable by us and will inure to the benefit of any transferee or other legal successor to our interests in this Agreement.

B.    LICENSEE MAY NOT TRANSFER WITHOUT APPROVAL OF COMPANY.

The rights and duties created by this Agreement are personal to you.  We have granted the License to you in reliance upon the individual and collective character, skill, aptitude, attitude, and business ability of the persons who will be engaged in the ownership and management of the Restaurant, your financial capacity and the representations and warranties made to us in the application and the Commitment Agreement, if applicable, and the representations, warranties and covenants contained in this Agreement.  Accordingly, neither this Agreement nor the License (or any interest therein), nor any part or all of the ownership of Licensee (if an entity) or the Restaurant (or any interest therein), may be transferred, in whole or in part, directly or indirectly, without our prior written approval, and any attempted transfer without our prior written approval will constitute a breach of this Agreement and convey no rights to or interests in this Agreement

or the License. As used in this Agreement the term "transfer" means and includes the voluntary, involuntary, direct or indirect assignment, sale, gift, pledge, grant of security interest or other transfer by you (or any of your owners) of any interest in: (i) this Agreement or any related agreement between you and us; (ii) the License; (iii) the Licensee; (iv) the Restaurant or (v) the Premises. This Section 12B shall not apply to any interest in the Restaurant or the Premises conditionally transferred to any bona fide lender as collateral security for any loans to you or to any financing or refinancing structured as a sale-leaseback, provided that upon the sale of the Restaurant, it is simultaneously leased back pursuant to a Lease Agreement which is subject to our rights under this Agreement.

### C.   RIGHT OF FIRST REFUSAL.

If at any time during the term of this Agreement and for a period of one year thereafter any interest in this Agreement, the License, the Restaurant, the Premises, or a controlling interest in Licensee is proposed to be sold, the seller shall obtain a bona fide, executed, written offer from a responsible and fully disclosed purchaser and shall submit an exact copy of such offer to us along with any other information that we may reasonably request to evaluate the offer and the identity of the proposed purchaser shall be disclosed to us. We shall have the right, exercisable by written notice delivered to you within thirty (30) days after the date of delivery of an exact copy of such offer and all requested information to us, to purchase such interest for the price and on the terms and conditions contained in such offer, provided that we may substitute cash for any form of payment proposed in such offer. Regardless of the terms of the offer, we may, in our discretion, structure the transaction as an asset purchase, rather than a stock purchase and to substitute cash for securities or other property as consideration. If less than the entire interest in the Licensee, this Agreement, the License, the Restaurant or the Premises is proposed to be sold, we shall have the right to purchase the entire interest for a price equal to the proposed price plus a pro-rata increase based on the value of the interest to be purchased. Our credit shall be deemed equal to the credit of any proposed purchaser and shall have not less than ninety (90) days to prepare for closing. We shall be entitled to all representations and warranties customarily given by the seller of assets of a business. We shall not be obligated to pay any finder's or broker's fee or commission.

If we do not exercise our right of first refusal, the sale or other transfer may be completed pursuant to and on the terms of such offer, subject to our approval of the transfer as otherwise provided in this Agreement; provided, however, that if the proposed sale or other transfer is not completed within one hundred twenty (120) days after delivery of such offer to us, or if there is any change in the terms of the proposed transaction, we shall have an additional right of first refusal for an additional thirty (30) days.

Our right of first refusal shall not apply to the sale or transfer of an interest in this Agreement, the License, Licensee, the Premises or the Restaurant to a member of Licensee's immediate family or, if Licensee is an entity, between or among the owners of Licensee provided that such transfer is otherwise permissible under this Agreement.

### D.   CONDITIONS FOR APPROVAL OF TRANSFER.

The proposed transferee and its owners (if the proposed transferee is an entity) must meet our then applicable standards for licensees. In addition, if the transfer is one of a series of transfers which in the aggregate constitute the transfer of the License or the Restaurant or a controlling interest in the Licensee, all of the following conditions must also be met prior to, or concurrently with, the effective date of the transfer:

> (1)   the transferee must have sufficient business experience, aptitude and financial resources to operate the Restaurant;

(2)     prior to the effective date of the transfer, you or the transferee must pay all royalty fees, Marketing Fund contributions and all other amounts owed to us or our subsidiaries and affiliates, which are then due and unpaid, and cure all defaults under this Agreement or any other agreement between you and us to our satisfaction (or make provision for their cure satisfactory to us);

(3)     the transferee and its management personnel must have completed our training program to our satisfaction;

(4)     the transferee must apply for a new license agreement in accordance with our then current standards for a term equal to the remaining term of this Agreement or for a full term. If the application is approved, we and the transferee will enter into a temporary agreement to govern the operation of the Restaurant until commencement of the new license agreement, provided that the transferee upgrades and modernizes the Restaurant to our then-current standards and meets the other requirements;

(5)     you or the transferee must pay us the then current transfer fee to defray expenses incurred by us, plus any broker fees or commissions incurred by us in connection with the transfer;

(6)     you, and if you are an entity, your owners, officers and directors must execute a general release, in a form satisfactory to us, of any and all existing claims against us, our subsidiaries and affiliates, and our and their officers, directors, partners, employees and agents;

(7)     we must approve the material terms and conditions of such transfer, including, without limitation, our determination that the price and terms of payment are not so burdensome as to adversely affect the subsequent operation or financial results of the Restaurant;

(8)     you and your transferring owners must execute a non-competition covenant in favor of us and the transferee, containing the terms contained in Section 16A;

(9)     the lessor and lender, if any, of the Premises must give you its or their advance written consent to the transfer of the Premises, if required, and you must provide us with a copy of such consent; and

(10)    you and your owners must guarantee the transferee's financial obligations to us in its commitment agreement and license agreement for two years from the date of transfer.

If the proposed transfer is to or among owners of you, subsection (5) of the above requirements shall not apply.

E.     TRANSFER TO A WHOLLY-OWNED ENTITY.

If you are in full compliance with this Agreement, we will not unreasonably withhold our approval of a transfer to an entity which conducts no business other than the Restaurant (or other Perkins restaurants), which is actually managed by you and in which you maintain management control and own and control one hundred percent (100%) of the equity and voting power of all issued and outstanding securities, provided that you guarantee, in accordance with our then

current form, the performance of such transferee's obligations under this Agreement. Transfers of interests in such entity will be subject to the other provisions of this Section 12.

### F.    DEATH OR DISABILITY OF LICENSEE.

Upon your death or permanent disability, or, if you are an entity, upon the death or permanent disability of the owner(s) of a controlling interest in you, the executor, administrator, conservator, guardian or other personal representative of such person must transfer its interest in this Agreement, the License, the Restaurant, or its interest in you, to a third party who meets our then-current qualifications for licensees and whom we approve. The disposition of this Agreement, the License, the Restaurant, or such interest in you (including, without limitation, transfer by bequest or inheritance), must be completed within a reasonable time, not to exceed six (6) months from the date of death or permanent disability, and will be subject to all the terms and conditions applicable to transfers contained in this Section 12. Failure to so transfer the interest in this Agreement and the License or such interest in the Restaurant or the Licensee within such period of time will constitute a breach of this Agreement.

### G.    EFFECT OF CONSENT TO TRANSFER.

Our consent to a transfer of this Agreement, the License, the Restaurant or an interest in you will not constitute a waiver of any claims we may have against you (or your owners if you are an entity), nor shall it be deemed a waiver of our right to demand exact compliance with any of the terms or conditions of this Agreement by the transferee.

### H.    INVESTMENT OFFERINGS.

In the event that you (or any of your owners) shall, subject to the restrictions and conditions of transfer contained in this Section 12, attempt to raise or secure funds by the sale of securities (including, without limitation, common or preferred stock, bonds, debentures or general or limited partnership interests) by means of any investment offering, whether public or private, recognizing that the written information concerning us, the System, this Agreement, or our relationship used with respect thereto may reflect upon us, you agree to submit any such written information to us prior to its inclusion in any registration statement, prospectus or similar offering circular or memorandum. You agree to promptly reimburse us for any out-of-pocket expenses incurred by us incurred in such review, including the fees of our attorneys and accountants. Our written consent obtained pursuant to this Section 12G shall not imply or constitute our approval with respect to the sale of the securities, the offering literature submitted to us or any other aspect of the offering. No information respecting us may be included in any securities disclosure document, unless such information has been furnished to us, in writing, pursuant to your written request, in which you state the specific purpose for which the information is to be used. Should we, in our sole discretion, object to any reference made about us or our business in such offering literature or prospectus, such literature or prospectus shall not be used unless and until our objections are withdrawn. We assume no responsibility for the offering whatsoever.

The prospectus or other literature utilized in any such offering shall contain the following language in bold-face type on the first textual page thereof:

"PERKINS & MARIE CALLENDER'S, LLC IS NOT DIRECTLY OR INDIRECTLY THE ISSUER OF THE SECURITIES OFFERED HEREBY AND ASSUMES NO RESPONSIBILITY WITH RESPECT TO THIS OFFERING AND/OR THE ADEQUACY OR ACCURACY OF THE INFORMATION SET FORTH HEREIN, INCLUDING ANY STATEMENTS MADE WITH RESPECT TO IT. PERKINS & MARIE CALLENDER'S, LLC COMPANY DOES NOT ENDORSE OR MAKE ANY RECOMMENDATION WITH RESPECT TO THE INVESTMENT CONTEMPLATED BY THIS OFFERING."

You and each of your owners agree to indemnify, defend and hold harmless us and our officers, directors, partners, employees and agents from any and all claims, demands, liabilities, and all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred in the defense of such claims, demands or liabilities, arising from the offer or sale of such securities, whether asserted by a purchaser of any such security or by a governmental agency. We shall have the right (but not the obligation) to defend any such claims, demands or liabilities and/or to participate in the defense of any action to which we are named as a party with counsel of our own choosing, all of whose fees and expenses will be subject to indemnification hereunder.

13.    CONDEMNATION AND CASUALTY.

You must give us immediate notice in writing of any proposed taking of the Restaurant or the Premises by eminent domain. If we agree that the Restaurant or the Premises (or substantial parts thereof) will be taken, we will give due and prompt consideration to transferring the License to a nearby location which you select within two (2) months of the taking. If we approve the location and authorize the transfer, and if you open a new restaurant at such location in accordance with our specifications within one (1) year of the closing of the Restaurant, the new restaurant will henceforth be deemed to be the Restaurant under this Agreement. If a condemnation takes place and the new restaurant does not, for whatever reason, become the Restaurant under this Agreement in strict accordance with this Section 13 (or if it is reasonably evident that such will be the case), the License and this Agreement will terminate as provided for in Section 14.

If the Restaurant is damaged by fire or other casualty, you will expeditiously repair the damage. If the damage or repair requires closing the Restaurant, you will immediately notify us, will repair or rebuild the Restaurant in accordance with our standards, will commence reconstruction within four (4) months after closing, and will reopen the Restaurant for continuous business operations as soon as practicable but in no event later than twelve (12) months after closing of the Restaurant, giving us ample advance written notice of the date of reopening. If the Restaurant is not reopened in accordance with this Section 13, the License and this Agreement will terminate as prescribed in Section 14.

Nothing in this Section 13 will extend the term of this Agreement but you will not be required to pay us any royalty fee or Marketing Fund contribution payments for periods during which the Restaurant is closed by reason of condemnation or casualty.

14.    TERMINATION OF THE LICENSE.

(A)    Unless cured to our satisfaction, this Agreement shall terminate 30 days from the date notice is given to you in accordance with Section 19, if you or any guarantor:

> (1)    fail to report accurately the Gross Sales of the Restaurant or fail to make payments of any amounts due to us for royalty fees, Marketing Fund contributions, or any other amounts due to us, our affiliates or our subsidiaries;
>
> (2)    fail to comply with any other provision of this Agreement or any mandatory specification, standard or operating procedure we prescribe unless however, such failure cannot reasonably be corrected within such thirty (30) day period and you undertake within ten (10) days after such written notice is delivered to you, and diligently thereafter continue, efforts to bring the Restaurant and the Premises into full compliance, and furnish proof acceptable to us of such efforts and the date by which full compliance will be achieved;

   (3) have made any material misrepresentation to us regarding your organizational or financial structure or financial condition;

   (4) you or any person controlling you, controlled by you, or under common control with you is in default of any other agreement with us (for purposes of this clause control means the ownership by a person or entity, directly or indirectly, of 10% or more of another person or entity or the power to affect the policies of another person or entity);

   (5) in our good faith reasonable judgment, fail to employ on a full time basis a qualified Restaurant Operations Director and Restaurant Managers with qualifications and experience acceptable to us.

  (B) Unless we have notified you in writing to the contrary after discovering the relevant facts, this Agreement will terminate automatically and immediately without further action by us or notice to you, if:

   (1) become insolvent or are unable to pay your or their debts as they mature or make an assignment for the benefit of creditors or an admission of inability to pay obligations as they become due or file a voluntary petition in bankruptcy or any pleading seeking any reorganization, liquidation, dissolution or composition or other settlement with creditors under any law, or admit or fail to contest the material allegations of any such pleading filed against you, or are adjudicated a bankrupt or insolvent or a receiver or other custodian is appointed for a substantial part of your assets or the Restaurant or a final judgment remains unsatisfied or of record for ninety (90) days or longer (unless a supersedeas bond is filed), or if execution is levied against any substantial part of your assets or a tax levy is made, or suit to foreclose any lien or mortgage against you or the Restaurant is instituted and is not dismissed within ninety (90) days, or if a substantial part of your real or personal property is sold after levy of judgment thereupon by any sheriff, marshal or constable, or the claims of your creditors are abated or subject to a moratorium under any law;

   (2) except as provided in Section 13, discontinue operating the Restaurant as a Perkins restaurant, or abandon, surrender or transfer control of the Restaurant without our prior approval;

   (3) have made any material misrepresentation or omission in the application for the License or in the Commitment Agreement or in this Agreement or in any other material submitted to us on which we have relied in determining whether to grant you the License;

   (4) are, or are discovered to have been, convicted of or plead no contest to a felony, or other crime or offense that is likely to adversely affect your reputation or the reputation of the Company, the System, or the Restaurant;

   (5) make or attempt to make an unauthorized transfer in violation of Section 12;

(6)    make any unauthorized use or disclosure of any Confidential Information or any portion of the Operations Manual;

(7)    lose the right to possession of the Premises or a substantial part thereof, whether or not due to your fault, except as otherwise provided as in Section 13 of this Agreement regarding condemnation and casualty;

(8)    take action toward dissolving or liquidating the entity owning the License, or any such action is taken against you, without providing us advance written notice or complying with Section 12 of this Agreement;

(9)    deny our representatives the right to enter and inspect the Restaurant or to examine or audit its books and records;

(10)   make any unauthorized use of the Marks or contest in any court or proceeding our ownership of the Marks or the System or any part thereof;

(11)   fail on three (3) or more separate occasions, for which notices of default were given, within any period of twelve (12) consecutive months to comply with this Agreement whether or not such failures to comply are corrected after notice of default is given, or fail on two (2) or more separate occasions, for which notices of default were given, within any period of twelve (12) consecutive months to comply with the same obligation under this Agreement whether or not such failures to comply are corrected after notice of default is given; or

(12)   you breach a material obligation, representation or warranty contained in this Agreement and such breach by its nature cannot be cured.

In any judicial proceeding in which the validity of termination is at issue, we will not be limited to relying on the reasons for termination which are set forth in any notice sent to you in accordance with this Section 14.

(C)    You may terminate this Agreement at any time by giving us at least twelve (12) but not more than fifteen (15) months written notice.

(D)    Our rights to terminate this Agreement are in addition to all rights or remedies available at law or in equity in case of any breach, failure or default, or threatened breach, failure or default, all of which rights and remedies shall be cumulative and not alternative.

15.   DAMAGES.

Except as otherwise provided in this Agreement, if this Agreement and the License granted hereby terminate under any of the provisions of Section 14 of this Agreement, you agree to promptly pay us (as liquidated damages for the loss of the benefit bargained for in this Agreement due to premature termination only, and not as a penalty or as damages for breaching this Agreement or in lieu of any other payment) a lump sum equal to the royalty fees and Marketing Fund contributions payable to us during the thirty-six (36) calendar months immediately preceding the termination. In the event the Restaurant shall not have been open for thirty-six (36) months prior to termination, the monthly average of such payments during such shorter period shall be multiplied by thirty-six (36) for purposes of this section. In the event there are fewer than thirty-six (36) months remaining in the term hereof, the amount you agree to pay shall be equal to the number of months remaining in the term of this Agreement multiplied by the average monthly royalty fees and Marketing Fund contributions payable to us during the thirty-six (36) months immediately preceding termination.

If we are unable to determine the amount payable to us by you by reason of your failure to submit some or all of your Gross Sales reports as required pursuant to Section 10 of this Agreement, you agree that we may estimate the Gross Sales of your Restaurant for the applicable periods described above for the purpose of computing the amount payable to us by you under this Section 15.

16.   COVENANT NOT TO COMPETE; RIGHTS AND OBLIGATIONS OF COMPANY AND LICENSEE UPON TERMINATION OR EXPIRATION OF THE LICENSE.

A.   COVENANT NOT TO COMPETE.

You acknowledge and agree that we have invested a substantial amount of time and money in developing the System, the Marks, and the Confidential Information and that we would be unable to protect our System, the Marks, Confidential Information and trade secrets against unauthorized use or disclosure and would be unable to encourage a free exchange of ideas and information among us and our licensees if prospective licensees or licensees were permitted to hold interests in or perform services for any competing business and that the following restrictions are reasonably required in order to protect our information, marketing strategies, operating policies and other elements of the System from unauthorized appropriation. Therefore, you agree that during the term of this Agreement, neither you, your Restaurant Operations Director nor any of your officers, directors, stockholders, partners or any member of your or their immediate family or families will have any direct or indirect or beneficial interest or perform services as an officer, director, manager, employee or consultant or otherwise for or in any business which owns, operates, licenses, franchises or develops restaurants which are the same as or similar to that of Perkins restaurants or which otherwise competes with Perkins restaurants. You understand and acknowledge that the determination of any similarity to or competition with Perkins restaurants is dependent on many factors including, but not limited to, marketing strategies; menu; guest check average; size, configuration, decor and "trade dress" of the restaurants; operating methods and policies; target audience demographic profile; and hours of service.  You further understand because of the possibility of changes in the System and the emergence of new unforeseen competing restaurant concepts, that determining whether or not any competing restaurant business is the same or similar to Perkins restaurants will depend on the facts and circumstances existing at the time such determination is made.  You further agree that for a period of two (2) years after the termination or expiration of this Agreement, you and all of such persons will be subject to the same restriction on competing activities within the trade area (the "Trade Area") of the Restaurant or within the trade area (as reasonably determined by us) of any Perkins restaurant operated by us or any other licensee of ours, but in no event within a radius of three (3) miles from any such restaurant. The Trade Area is that area contained within a 3 mile radius of the Restaurant. You acknowledge that the determination of the Trade Area is based on many

factors, some of which are subjective, and that the Trade Area as described in this Agreement is reasonable under the circumstances. For purposes hereof, an indirect interest will be presumed to exist if such interest is that of the spouse or of a parent or child of another person, in addition to other forms of indirect or beneficial interests. If any of the persons to whom the foregoing restrictions apply are not parties to this Agreement, you agree to cause all such persons to execute and deliver to you and us an agreement containing the foregoing restrictions. The restrictions of this Section shall not be applicable to the ownership of a Perkins restaurant operated pursuant to a License Agreement with us or to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent five percent (5%) or less of the number of shares of that class of securities issued and outstanding. You further acknowledge that this section confers no rights of exclusivity on you with respect to your operation of a Perkins restaurant within the Trade Area and will not prevent us from placing another Perkins restaurant or other food service establishment within the Trade Area.

B.  **PAYMENT OF AMOUNTS OWED TO COMPANY.**

You must pay to us within fifteen (15) days after the effective date of termination or expiration of this Agreement, or such later date that the amounts due to us are determined, all royalty fees, Marketing Fund contributions, amounts owed for your purchases from us or our subsidiaries and affiliates, predecessors, successors and assigns, interest due on any of the foregoing, and all other amounts owed to us or our subsidiaries and affiliates under this Agreement or otherwise.

C.  **MARKS AND SYSTEM.**

You agree that immediately after the termination or expiration of this Agreement, you will:

(1)     not directly or indirectly at any time or in any manner identify yourself or any business as a current or former Perkins restaurant, or as a franchisee or licensee of, or as otherwise associated with us, or use any Mark or any colorable imitation thereof in any manner or for any purpose, or utilize for any purpose any trade name, trade or service mark or other commercial symbol that suggests or indicates a connection or association with us;

(2)     remove from the Premises and discontinue using for any purpose the oversized American flag and the bakery display cases;

(3)     remove from the Premises, discontinue using for any purpose and return to us (or with our consent, destroy) any and all signs, flags, menus, fixtures, furniture, furnishings, equipment, advertising, materials, stationery supplies, forms or other articles that display or contain any Mark or that otherwise identify or relate to a Perkins restaurant;

(4)     remove all Marks that are affixed to uniforms and/or, at our direction, cease to use all uniforms that have been used in the Restaurant;

(5)     take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Mark;

(6)     change the telephone number of the Restaurant and direct the telephone company to provide a recorded message advising callers that the prior number is no longer in service, and instruct all telephone directory publishers to modify all telephone directory listings of the Restaurant associated with any Marks when the directories are next published;

(7)    terminate or assign to us, as we may elect, any website that identifies you as currently or formerly associated with us or that displays any Mark, as well as any domain name of such website, and you acknowledge that we shall have the sole right to any such domain name;

(8)    take such action to alter the physical interior and exterior decor of the Restaurant (specifically including, but not limited to, removing distinctive architectural features of or on the building) as will effectively de-identify and distinguish the Premises from the System; and

(9)    furnish to us, within thirty (30) days after the effective date of termination or expiration, evidence satisfactory to us of your compliance with the foregoing obligations.

In the event that you fail to take such actions as required above to our satisfaction within thirty (30) days of termination or expiration of this Agreement, you grant us the right to enter the Premises to remove all items bearing the Marks and take such actions as we deem necessary to de-identify the Restaurant from the System without committing any trespass or incurring any liability for such actions. You acknowledge and agree that you will be responsible for all costs and expenses that we incur in taking such actions.

D.    CONFIDENTIAL INFORMATION.

You agree that upon termination or expiration of this Agreement, you will immediately cease to use in any business or otherwise any of our Confidential Information disclosed to, or otherwise learned or acquired by you, and that you will return to us all copies of the Operations Manual and all other Confidential Information which we have loaned or made available to you or which is otherwise in your possession. You must also provide us with any and all supplies of our flour and other proprietary mixes for which you will be compensated at the lower of their cost or market value.

E.    CONTINUING OBLIGATIONS.

All obligations of the Company and Licensee which expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire.

17.    RENEWAL OF LICENSE.

You understand that you have no unilateral right to renew or extend this Agreement or to obtain a new license to operate the Restaurant beyond the expiration date provided for in this Agreement. However, if you desire to obtain a new license upon the expiration of this Agreement, you must apply to us for a new license agreement at least ninety (90) days, but not more than twelve (12) months, before expiration of the term of this Agreement. Upon payment of a renewal fee, which will not exceed our then standard initial license fee, we will process your application in good faith and in accordance with our procedures, criteria and requirements regarding upgrading of facilities, credit, market feasibility and related criteria then being applied by us in issuing new licenses to use the System. If you fulfill our upgrading and other then-current requirements, we will grant you a new license in the form of agreement then in use by us. If you are granted a new license, you (and if you are an entity, your owners) will be required to execute a general release, in a form satisfactory to us, of any and all claims against us and our subsidiaries, affiliates, partners, successors and assigns, and our and their respective officers, directors, shareholders, partners, agents, employees, representatives and servants, including claims arising under this Agreement and federal, state and local laws, rules and regulations. If

you are not granted a new license, we will return the renewal fee less expenses incurred in processing your application.

During the pendency of your application for the issuance of a new license, royalty fees and Marketing Fund contributions will be paid at the rate specified in this Agreement. Upon issuance of the new license agreement, fees must be paid at the rates specified in the new license agreement, which may be greater than the rates specified in this Agreement.

18.    ENFORCEMENT.

A.    SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS.

Except as expressly provided to the contrary, each section, paragraph, term and provision of this Agreement, and any portion thereof, shall be considered severable and if, for any reason, any such provision of this Agreement is held to be invalid, contrary to, or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which we are a party, that ruling shall not impair the operation of, or have any other effect upon, such other portions of this Agreement as may remain otherwise enforceable, all of which shall continue to be given full force and effect and bind the parties to this Agreement, although any portion held to be invalid shall be deemed not to be a part of this Agreement from the date the time for appeal expires, if you are a party thereto, or otherwise upon your receipt of a notice of non-enforcement thereof from us. To the extent that any provision of Section 12D(8) or Section 16A is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited and/or length of time, but could be made enforceable by reducing any or all thereof, you and we agree that such provisions shall be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction in which enforcement is sought. If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required under this Agreement, or the taking of some other action not required under this Agreement, or if under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any specification, standard or operating procedure we prescribe is invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions of this Agreement, and we will have the right, in our sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to be valid and enforceable. You agree to be bound by any promise or covenant imposing the maximum duty permitted by law which is contained within the terms of any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions of this Agreement, or any specification, standard or operating procedure that we prescribe, any portion or portions which a court may hold to be unenforceable in a final decision to which we are a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order. Such modifications to this Agreement shall be effective only in such jurisdiction, unless we elect to give them greater applicability, and shall be enforced as originally made and entered into in all other jurisdictions.

B.    WAIVER OF OBLIGATIONS.

You and we may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice thereof to the other or such other effective date stated in the notice of waiver. Any waiver granted by us shall be without prejudice to any other rights we may have, will be subject to continuing review by us, and may be revoked, in the good faith exercise of our sole discretion, at any time and for any reason, effective upon delivery to you of ten (10) days' prior written notice. You and we shall not be deemed to have waived or impaired any right, power, or option reserved by this Agreement (including, without limitation, the right to demand strict compliance with every term, condition, and covenant herein, or to declare any breach thereof to be a default and to terminate the License

prior to the expiration of its term), by virtue of any custom or practice of the parties at variance with the terms hereof; any failure, refusal, or neglect by you or us to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder, including, without limitation, any mandatory specification, standard, or operating procedure; any waiver, forbearance, delay, failure, or omission by us to exercise any right, power, or option, whether of the same, similar or different nature, with respect to any other Perkins restaurant; or the acceptance by us of any payments from you after any breach by you of this Agreement.

### C.   FORCE MAJEURE.

Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if a failure to perform particular obligations results from: (i) transportation shortages, inadequate supply or unavailability from the manufacturers or suppliers of equipment, merchandise, supplies, labor, material, or energy, or the voluntary surrender of the right to acquire or use any of the foregoing in order to accommodate or comply with the orders, requests, regulations, recommendations, or instructions of any federal, state, or municipal government or any department or agency thereof; (ii) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state or municipal government or any department or agency thereof; (iii) acts of God; (iv) fires, strikes, embargoes, war or riot; or (v) any other similar event or cause.

Any delay resulting from any of such causes shall extend the time for performance or excuse performance, in whole or in part, as may be reasonable, except that such causes shall not excuse payments of amounts owed at the time of such occurrence or payment of any amounts due thereafter.

### D.   INJUNCTIVE RELIEF.

You agree that we will have the right to preliminary injunctive relief to restrain any conduct by you in the development or operation of the Restaurant that could materially damage the goodwill associated with the System, the Marks and Perkins restaurants. You agree that we will not be required to post a bond to obtain injunctive relief, that your only remedy if an injunction is entered against you will be the dissolution of that injunction, and that you will not have any right to recover damages for wrongful entry of such an injunction.

### E.   RIGHTS OF PARTIES ARE CUMULATIVE.

Your and our rights under this Agreement are cumulative and no exercise or enforcement by you or us of any right or remedy hereunder shall preclude the exercise or enforcement by you or either of us of any other right or remedy hereunder or which you or we are entitled by law to enforce.

### F.   COSTS AND ATTORNEYS' FEES.

In any proceeding by us to enforce or interpret any provision of this Agreement, or appeal thereof, the party prevailing in such proceeding shall be entitled to reimbursement of its costs and expenses, including but not limited to, reasonable accounting and attorneys' fees. Attorneys' fees shall include, without limitation, reasonable legal and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses, whether incurred prior to or in preparation for or in contemplation of the filing of any written demand or claim, action, hearing or proceeding. In any such proceeding involving more than one allegation, issue or provision of this Agreement under circumstances where neither party prevails on all allegations or issues, the presiding court or other body may apportion costs and expenses between the parties.

G.    GOVERNING LAW, VENUE AND JURISDICTION.

EXCEPT TO THE EXTENT GOVERNED BY THE UNITED STATES TRADEMARK ACT OF 1946 OR OTHER FEDERAL LAW, THIS AGREEMENT AND THE LICENSE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TENNESSEE WITHOUT REGARD TO CONFLICT OF LAWS RULES.    YOU AGREE THAT WE MAY INSTITUTE ANY ACTION AGAINST YOU TO ENFORCE THE PROVISIONS OF THIS AGREEMENT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE AND COUNTY IN WHICH OUR PRINCIPAL PLACE OF BUSINESS IS THEN LOCATED AND YOU IRREVOCABLY SUBMIT TO THE JURISDICTION AND VENUE OF SUCH COURTS AND WAIVE ANY OBJECTION YOU MAY HAVE TO EITHER THE JURISDICTION OR VENUE OF SUCH COURTS.    YOU AGREE THAT ANY ACTION BROUGHT BY YOU TO ENFORCE ANY PROVISION OF THIS AGREEMENT WILL BE BROUGHT AND MAINTAINED ONLY IN A STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE COUNTY AND STATE IN WHICH OUR PRINCIPAL PLACE OF BUSINESS IS THEN LOCATED.

H.    WAIVER OF PUNITIVE/EXEMPLARY DAMAGES.

THE PARTIES HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT OR CLAIM TO ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF A DISPUTE BETWEEN THEM EACH SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED.

I.    WAIVER OF JURY TRIAL.

THE PARTIES HEREBY IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM.

J.    BINDING EFFECT.

This Agreement is binding upon the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest, and shall not be modified except by written agreement signed by both you and us.

K.    INTERPRETATION.

The preambles and attachmentss are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral or written understandings or agreements between the Company and the Licensee relating to the subject matter of this Agreement except for the Commitment Agreement, certain portions of which survive the execution and delivery of this Agreement. In the event of a conflict between this Agreement and the Commitment Agreement (if applicable), the provisions of this Agreement shall control. However, and notwithstanding the foregoing, nothing in this Agreement is intended, or shall be interpreted, to disclaim any representations made by Licensor in the Franchise Disclosure Document that Licensor furnished to Licensee.    This Agreement may be modified only by a writing signed by both you and us.  Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto.  Except where this Agreement expressly obligates the Company to reasonably approve or not unreasonably withhold its approval of any action or request by the Licensee, the Company has the absolute right to refuse any request by the Licensee or to withhold its approval of any action or omission by the Licensee.  The headings of the several sections and paragraphs hereof are for convenience only and do not define, limit, or construe the contents of such sections or paragraphs.  The term "attorneys' fees" shall include, without limitation, reasonable legal fees, whether incurred prior to, in preparation for or in contemplation of the filing of any written demand or claim, action, hearing or proceeding, including appellate proceedings, to enforce the obligations of this Agreement. The

term "family member" as used herein refers to parents, spouses, offspring and siblings, and the spouses of parents and siblings. The term "affiliate" as used herein means any person or entity that directly or indirectly owns or controls, or is owned or controlled by, or is under common control with, another person or entity. References to a "controlling interest" in the Licensee shall mean fifty percent (50%) or more of the voting control of the Licensee or such lesser percentage that may have the power to control the management and affairs of the Restaurant or the Licensee. The term "Licensee" as used herein is applicable to one or more persons, a corporation or a partnership or other entity, as the case may be, and the singular usage includes the plural and the masculine and neuter usages include the other and the feminine. If two or more persons are at any time the Licensee hereunder, whether or not as partners or joint venturers, their obligations and liabilities to the Company shall be joint and several. This Agreement may be executed in counterparts, each of which shall be deemed an original.

      L.    <u>TIME</u>.  Time is of the essence of this Agreement.

19.    <u>NOTICES AND PAYMENTS.</u>

      All written notices and reports permitted or required to be delivered hereunder shall be deemed so delivered at the time delivered by hand, the day of transmission by facsimile or other electronic system, one (1) business day after being placed in the hands of a commercial courier service for overnight delivery, or three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified. All payments and reports required by this Agreement shall be directed to the Company at the address notified to the Licensee from time to time, or to such other persons and places as the Company may direct from time to time. Any required payment or report not actually received by the Company during regular business hours on the date due (or postmarked by postal authorities at least two (2) days prior thereto) shall be deemed delinquent.

20.    <u>ACKNOWLEDGMENTS.</u>

      Contemporaneously with the execution of this Agreement, you have carefully reviewed and executed the Disclosure Acknowledgment Statement attached and incorporated into this Agreement as Attachment A.

      You acknowledge that, due to the length of time we have been granting licenses to operate Perkins restaurants, there is more than one form of franchise or license agreement in effect between us and our various licensees and that such agreements contain provisions that may be materially different from the provisions contained in this Agreement and that you are not entitled to rely on any provision of any other such agreement, whether to establish course of dealing, waiver, estoppel or for any other purpose.

      **IN WITNESS WHEREOF** the parties hereto have executed and delivered this Agreement as of the Agreement Date.

**PERKINS & MARIE CALLENDER'S, LLC**        **5171 CAMPBELLS LAND CO., INC.**

By: _____        By: _____

Its:    Vice President        Its:   *President*
    ~~General Counsel~~
    Secretary

## ATTACHMENT A

**TO THE LICENSE AGREEMENT**
**BETWEEN**
**PERKINS & MARIE CALLENDER'S, LLC**
**AND**
**5171 CAMPBELLS LAND CO., INC.**

**Dated January 31, 2018**

### Disclosure Acknowledgment Statement

      PERKINS & MARIE CALLENDER'S, LLC ("we" or "us") through the use of this Disclosure Acknowledgment Statement, desires to ascertain that **5171 CAMPBELLS LAND CO., INC.** ("you") fully understand and comprehend that your execution of the agreement dated the date hereof for a license (the "License Agreement") to own and operate a Perkins restaurant (the "Restaurant") is a business decision, complete with its associated risks, and that it is our policy to verify that you are not relying upon any oral or written statements, representations, promises or assurances or visual observations relating to a Perkins restaurant which have not been authorized by us.

      1.    You recognize and understand that business risks, which exist in connection with the ownership, development and operation of any business, make the success or failure of the Restaurant subject to many variables, including your skills and abilities, competition, interest rates, the economy, inflation, store location, operation, labor and supply costs, lease terms and costs, and the market place.  You acknowledge that you have conducted an independent investigation of the business venture contemplated by the License Agreement and recognize that the success of the venture involves substantial business risk and will be primarily dependent upon your ability as an independent businessman.  You hereby acknowledge your willingness to undertake these business risks.

      2.    You acknowledge that you have received and had the opportunity to personally read and review, and that you comprehend and understand this Acknowledgment Statement and the License Agreement.  You acknowledge that we have permitted you ample time and opportunity to consult with advisors of your own choosing about the potential benefits and risks associated with the operation of a Perkins restaurant and of entering into this Acknowledgment Statement and the License Agreement.  You also acknowledge that you have received and read carefully, and that you understand, the Franchise Disclosure Document (the "Disclosure Document") prepared by us, and that we have not made any oral, written or visual claims, representations, promises, agreements, contracts, commitments, understandings or statements which contradict or are inconsistent with and not contained in the Disclosure Document, except as follows (if no exceptions, write "None" and initial) _None_ _____ .

      3.    You agree and acknowledge that the decision to enter into this business and undertake the risks inherent therein is in no manner predicated upon any oral, written or visual representations, assurances, warranties, guarantees or promises made by us or any of our directors, officers, employees or agents (including any broker) as to the likelihood of success of the Restaurant.

      4.    We expressly disclaim the making of, and you acknowledge that you have not received or relied upon, any information, representations, warranties, guarantees, inducements, promises or agreements, express or implied, orally or otherwise, from us or any of our directors, officers, employees or agents (including any broker) concerning the actual, average, projected or forecasted sales, revenues, profits, earnings or likelihood of success that you might expect to achieve from operating a Perkins restaurant, that are contrary to the statements made in the

Disclosure Document, except as follows (if no exceptions, write "None" and initial) *None rel.*

5.      We expressly disclaim the making of, and you acknowledge that you have not received or relied upon, any promises, agreements, contracts, commitments, representations, understandings, "side deals" or other assurances, express or implied, orally or otherwise, that we have made to or with you with respect to any matter regarding advertising, marketing, television, radio or other media support, site location, market penetration, or training, operating and support assistance or other services, that are contrary to the statements made in our Disclosure Document, except as follows (if no exceptions, write "None" and initial) *None rel.*

6.      You acknowledge that you have evaluated on your own and have made an independent investigation of the site for the Restaurant and the lease or purchase agreement for the site. You acknowledge that you bear primary responsibility for the selection of the site for the Restaurant and for negotiating the terms and conditions of your lease or purchase agreement for the site.

7.      You acknowledge that, although we have provided you with the plans and specifications for the Restaurant, have specified certain furniture, fixtures and equipment for the Restaurant, and have certain rights of review and/or approval under our Commitment Agreement and our License Agreement with you, that you have not received or relied upon, and we have not made, any warranty whatsoever, of the Restaurant or the plans, specifications, furniture, fixtures and equipment. You acknowledge that it is your sole responsibility to insure that the Restaurant's construction or conversion remodeling complies with any and all applicable laws, codes or regulations. You acknowledge that you are solely responsible for, and that we will have no liability or obligation, whatsoever, with respect to the plans, the construction or the conversion remodeling of the Restaurant except to the limited extent contained in the Construction Management Agreement between us, if applicable.

8.      You understand that the License Agreement is non-exclusive and that we or another Licensee may open one or more Perkins restaurants, or other restaurants, near your Restaurant.

**ACCEPTED AND AGREED TO BY:**

**PERKINS & MARIE CALLENDER'S, LLC**          **5171 CAMPBELLS LAND CO., INC.**

By: _____               By: _____

Its: ___Vice President___                  Its: ___President___
     General Counsel
     Secretary

### ATTACHMENT B

### GUARANTEE AND ASSUMPTION
### OF LICENSEE'S OBLIGATIONS

This Guaranty is from the undersigned officers, directors or owners of the licensee under the License Agreement (the "Agreement") dated the date hereof between **PERKINS & MARIE CALLENDER'S, LLC ("PMC")** and **5171 CAMPBELLS LAND CO., INC.** (the "Licensee").

In consideration of and as an inducement to the execution of the Agreement by PMC, each person signing this Guaranty hereby personally and unconditionally, jointly and severally: (i) guarantees to PMC and its successors and assigns that the Licensee will punctually pay when due all amounts required to be paid under the Agreement and perform each and every undertaking, agreement and covenant set forth in the Agreement; and (ii) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement. Each of the undersigned further agrees to pay any and all expenses (including reasonable attorneys' and accountants' fees and expenses) incurred by PMC in enforcing any rights under this Guaranty.

Each of the undersigned waives: (i) acceptance and notice of acceptance by PMC of the undersigned's obligations under this Guaranty; (ii) notice of demand for payment of any indebtedness or nonperformance of any obligation guaranteed by the undersigned; (iii) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations guaranteed by the undersigned; (iv) any right the undersigned may have to require that an action be brought against the Licensee or any other person as a condition of the undersigned's liability; (v) all other notices and legal or equitable defenses to which the undersigned may be entitled in the undersigned's capacity as guarantor; and (vi) the right to a jury trial in any action arising under this Guaranty or PMC's dealings with the Licensee.

Any indebtedness of Licensee owing to any of the undersigned or an entity owned or controlled by any of the undersigned is hereby subordinated to the obligations of Licensee owing to PMC. Each of the undersigned hereby agrees to not assert, or to permit such entity to assert, such claim or ask, demand or otherwise require such payment from Licensee until all payments then due and payable are current and no delinquencies exist with regard to any of the obligations under the License Agreement, or any other agreement between Licensee and PMC.

Each of the undersigned agrees that he or she shall have no right of subrogation against Licensee and will not exercise any rights which it may acquire by way of subrogation under this Guaranty, by any payment made hereunder or otherwise, until all of the obligations owing from Licensee to PMC have been paid or performed in full.

Each of the undersigned consents and agrees that: (i) the undersigned's direct and immediate liability under this Guaranty shall be joint and several; (ii) the undersigned will make any payment or render any performance required under the Agreement upon demand if the Licensee fails or refuses punctually to do so; (iii) the undersigned's liability will not be contingent or conditioned upon PMC's pursuit of any remedies against the Licensee or any other person, including any other guarantor; (iv) the undersigned's liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which PMC may from time to time grant to the Licensee, any guarantor or to any other person, including, for example, the acceptance of any partial payment or performance or the compromise or release of any claims and no such indulgence shall in any way modify or amend this Guaranty; (v) the undersigned's liability will not be diminished, relieved or otherwise affected by any amendment or modification to the Agreement and (vi) this Guaranty will continue and be irrevocable during the term of the Agreement and, as to those provisions of the Agreement that survive its termination or expiration, after its termination or expiration.

Any married person who signs this Guaranty hereby expressly agrees that recourse may be had against his or her separate property for any or all of his or her obligations under this Guaranty

This Guaranty shall be governed by, and construed under, the laws of the State of Tennessee, without regard to its conflicts of law principles.   Each of the undersigned hereby irrevocably submits to the jurisdiction of any state or federal court of competent jurisdiction in the state and county in which PMC's principal place of business is then located and, further, agrees to submit to the jurisdiction and venue of such courts and waives any objection to either the jurisdiction of venue of such courts.

**WITNESS**

Dated: 1/30/18

Dated: 1-30-2018

**GUARANTORS**

William T. Kane

Kristina Kochis

### ADDENDUM TO LICENSE AGREEMENT
### DATED JANUARY 31, 2018
### 1601 Prospect Road
### Ashtabula, Ohio 44004

This Addendum (the " Addendum" ) dated as of January 31, 2018, (the "Addendum Date") is made by and between Perkins & Marie Callender's LLC (" PMC") and 5171  Campbells Land Co., Inc. ("Licensee").

#### RECITALS

WHEREAS, on February 13, 2017, (the "Petition Date") Unique Ventures Group, LLC ("UVG") commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Case").

WHEREAS, on the Petition Date, PMC and UVG were parties to various agreements whereby PMC granted UVG a non-exclusive license to own and operate Perkins restaurants at various locations, including at 1601 Prospect Road, Ashtabula, Ohio 44004.

WHEREAS, on March 23, 2017, M. Colette Gibbons was appointed as the Chapter 11 Trustee (the "Trustee") in the Bankruptcy Case.

WHEREAS, the Trustee filed a motion to sell and assign substantially all of UVG's assets including the license agreements between PMC and UVG.

WHEREAS, an order of court was entered establishing bid procedures for the sale and assignment of UVG's assets which, *inter alia*, provided for procedures for potential bidders to seek approval from PMC as a licensee and scheduled a sale hearing for January 9, 2018  (the "Sale Hearing").

WHEREAS, Licensee submitted a request to PMC seeking to be approved as a licensee.

WHEREAS, PMC has approved Licensee as a licensee conditioned upon (a) Licensee being the successful bidder at the Sale Hearing, (b) evidence that Licensee has the financial

DMJ '.4984394. 1

ability to close (including a binding commitment from its lender) and (c) execution by Licensee of Perkins' standard License Agreement, guarantees from specified principals of Licensee and this Addendum.

WHE REAS, Licensee was the successful bidder at the Sale Hearing.

NOW, THE REFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, PMC and Licensee hereby agree as follows:

1.    This Addendum is entered into contemporaneously with the execution of the License Agreement for the Perkins restaurant at 1601 Prospect Road, Ashtabula, Ohio 44004 (the "License Agreement") and is incorporated in and supplements the License Agreement as if fully set forth therein.

2.    Licensee agrees that it will comply with the standards established by PMC for operation of the restaurant including but not limited to training, service standards, menu standards and uniform standards (the "Standards"). During the terms of the License Agreement, Licensee shall not seek to modify the Standards.

3.    Licensee represents and warrants that none of the principals or owners of UVG or the professionals which represented UVG have involvement in the operations, ownership or management of Licensee or representation of the Licensee in any capacity including on a professional basis.

4.    Licensee agrees that none of the principals or owners of UVG or the professionals which represented UVG shall have any involvement in the operations, ownership or management of the License or shall represent the Licensee in any capacity including on a professional basis.

[SIGNATURES ON NEXT PAGE]

DM:11496JJ7J1

2

IN WITNESS WHEREOF the parties have executed and delivered this Addendum as of the
Addendum Date.

PERKINS & MARIE CALLENDER'S LLC

By:

Name:    Vice President

Title:    General Counsel
          Secretary

5171 CAMPBELLS LAND CO., Inc.

By:

Name: _William T KANE_

Title: _President_

3

Ashtabula, OH
Unit Number 3383

## AMENDMENT TO LICENSE AGREEMENT

This Amendment dated January 31, 2018 is by and between **Perkins & Marie Callender's, LLC ("PMC")** and **5171 CAMPBELLS LAND CO., INC.** (the "Licensee") and shall amend the certain license agreement between the parties dated January 31, 2018 (the "License Agreement") pertaining to a Perkins restaurant located at 1601 Prospect Road, Ashtabula, Ohio 44004 (the "Restaurant").

### Terms of Agreement

1.  Section 8.A(5) of the License Agreements is modified as follows:

    We have the right to require that you remodel, redecorate, re-equip, modernize and refurnish the Premises and the Restaurant to reflect any changes in Perkins restaurants that we prescribe as our then-current standards and specifications, provided that at the time of our request, at least 25% of our Company owned and operated restaurants meet such standards and specifications. You understand that such remodeling, redecorating, re-equipping, modernization or refurnishing may require a substantial investment on your part and that we cannot make any guarantee of any particular return on that investment. We have the right to approve the layouts, designs, and new equipment, furniture and furnishings you use in any remodeling, redecorating and re-equipping. The Company has met the foregoing threshold and has requested that Licensee remodel the Restaurant. Accordingly, Licensee will complete a remodel of the Restaurant on or before December 31, 2020 according to the 2017 Perkins Restaurant Specification and Guidelines attached as <u>Exhibit "A"</u>, and in accordance with plans and specifications approved in advance by PMC.

The terms of this Amendment are specific to you and your operations, and are based on your unique situation. You agree to keep the terms of this Amendment confidential.

Except as modified above, all terms and conditions of the License Agreement remains in full force and effect.

{Signatures on following page}

1 | P a g e

Ashtabula, OH
Unit Number 3383

PERKINS & MARIE CALLENDER'S,
LLC

5171 CAMPBELLS LAND CO., INC.

By: _____

By: _____

Print Name: Vice President
General Counsel

Print Name: William T KANE

Title: Secretary

Title: President

Ashtabula, OH
Unit Number 3383

## Exhibit A

- ❖ **2017 Perkins Restaurant Exterior Material Specifications**

- ❖ **Perkins Restaurant Interior Specifications 2017**

- ❖ **Franchise Standards Remodel Standards**

- ❖ **Approved Vendors List**

# EXHIBIT 2

# Perkins & Marie Callender's, LLC

May 4, 2018

<u>Sent via FedEx</u>
5171 Campbells Land Co., Inc.
Attn: William T. Kane
252 Fourth Avenue
Rankin, PA 15104

RE:        **Notice of Default**
Our File No.:    FG-258

Dear Billy:

Perkins & Marie Callender's, LLC ("PMC") hereby provides you with notice of 5171 Campbells Land Company, Inc. ("CLC") default of certain obligations under each License Agreement and Addendum to License Agreement (collectively, the "License Agreements") entered with Perkins & Marie Callender's, LLC ("PMC") on January 31, 2018 for the Perkins Restaurants listed on Exhibit "A" (collectively, the "Franchised Units").

Notice is hereby given that CLC is currently in default of Section 8.C ("Approved Products, Distributors and Suppliers") of the License Agreements for using unapproved products in the Franchised Units, namely turkey and pork chops.

Further, as of the date of this notice Licensee is in default of Sections 7 and 9 of the License Agreements due to non-payment of sums due under the License Agreements, specifically Licensee's failure to pay Royalties and Marketing Fund Contributions as follows:

| Royalties | |
|---|---|
| Period 3, 2018 | $ 52,561.53 |
| Period 4, 2018 | $102,118.22 |
| | |
| Marketing Fund Contributions | |
| Period 2, 2018 | $ 35,836.37 |
| Period 3, 2018 | $ 79,261.47 |
| Period 4, 2018 | $ 76,588.59 |

Still further, Licensee has failed to pay Transfer Fees and miscellaneous invoices as follows:

| License Transfer Fees | |
|---|---|
| Due 1/31/2018 | $ 56,000.00 |
| | |
| Invoice | |
| Training | $    525.60 |
| Training | $      86.61 |
| Training | $    738.93 |

| | |
|---|---|
| Total Due | $403,717.32 |

6075 Poplar Avenue, Suite 800 • Memphis, TN 38119-4709 • 901.766.6400

In accordance with the License Agreements and the applicable laws, the License Agreements will terminate thirty (30) days from the date you receive this notice unless all past due amounts have been paid on or before the termination date.  In the event the License Agreements terminate, the Licensee will be obligated to comply with the post termination obligations in the License Agreements.  Please be reminded of the Guarantee and Assumption of Licensee's obligations under the License Agreements.

Sincerely,

Perkins & Marie Callender's, LLC

Andy Whiteley
Vice President, General Counsel and Secretary

cc.     Dave Blouin
        Jim Frank
         Marcus Hewitt
        Sandra Stone
        Joel Walker
        Jeff Warne

Exhibit "A"
Franchised Units

| Store | Name | City/State |
|---|---|---|
| 2474 | Warren (Niles) | Warren, OH |
| 2537 | New Castle | New Castle, PA |
| 3346 | Clarion | Clarion, PA |
| 3382 | Ashland | Ashland, OH |
| 3383 | Ashtabula - Prospect | Ashtabula, OH |
| 3388 | Canfield - E Main Street | Canfield, OH |
| 3448 | Titusville - Central Ave. | Titusville, PA |
| 3458 | Erie - East | Erie, PA |
| 3459 | Erie - South | Erie, PA |
| 3460 | Erie - West | Erie, PA |
| 3463 | Greenville - Hadley Road | Greenville, PA |
| 3464 | Grove City - W. Main Street | Grove City, PA |
| 3466 | Indiana | Indiana, PA |
| 3474 | Hermitage (Sharon) | Hermitage, PA |
| 3495 | Warren - Elm Rd. | Warren, OH |
| 3523 | Corry - Columbus Ave. | Corry, PA |
| 3525 | Bradford - Bolivar Dr. | Bradford, PA |
| 3531 | Olean - State Street | Olean, NY |
| 3572 | Warren - Ludlow St. | Warren, PA |
| 3573 | Conneaut - Rt 20 W Conneaut Pl | Conneaut, OH |
| 3604 | Meadville | Meadville, PA |
| 3670 | Youngstown - Boardman | Youngstown, OH |
| 3709 | Middleburg Heights (Cleveland) | Middleburg Heights, OH |
| 3730 | Mars (Cranberry Township) | Cranberry Township, PA |
| 3731 | Canton | Canton, OH |
| 3794 | Austintown | Austintown, OH |
| 3844 | Brooklyn | Brooklyn, OH |

# EXHIBIT 3

# Perkins & Marie Callender's, LLC

June 8, 2018

<u>Sent via FedEx</u>
5171 Campbells Land Co., Inc.
Attn: William T. Kane
252 Fourth Avenue
Rankin, PA 15104

|   | |
|---|---|
| RE: | **Letter of Understanding** |
| Our File No.: | FG-258 |

Dear Billy:

We appreciate the efforts that Dr. Linaburg and you undertook in order to meet with the team in Memphis; we believe that it was a constructive meeting. The purpose of this letter is to reiterate the main points discussed in the meeting.

As you know, the License Agreements terminated on June 4, 2018 by reason of uncured defaults; nonetheless, Perkins & Marie Callender's, LLC ("PMC") agreed (i) to permit Campbells Land Co., Inc. ("CLC") to temporarily continue operating the restaurants as Perkins Restaurants so long as certain requirements are met and, further, (ii) to consider reinstating the License Agreements on the conditions that:

•    CLC provides to PMC financial statements for each restaurant, as well as for CLC, on or before July 6, 2018. (Upon your request, I can provide you with a commonly used restaurant P&L format, which will put us in a better position to evaluate your restaurants' performance and opportunities.)

•    CLC pays Period 4 and Period 5 Marketing Contributions in three weekly installments of $38,751.48 each, with the first installment to be received no later than June 15, 2018, with successive payments to be received by PMC on the following two Fridays.

•    CLC pays Period 6 Royalties at 2% and Marketing Contributions at 3% no later than the date they are due under the License Agreements (i.e., June 27, 2018), noting that the balance of the Period 6 Royalties will be deferred until a time to be determined.

•    CLC delivers to PMC (to the attention of Andy Whiteley) a copy of the agreement (or agreements) with Reinhart regarding the dishwashers and walk-in refrigeration equipment and required product purchases related thereto no later than June 15, 2018.

•    CLC to send to Michael McGee a scope of work for the restaurant remodels currently in progress, namely Austintown, Canton, Warren (Boardman), Grove City, and New Castle.

Once we receive and evaluate the financial statements, we will decide whether or not the License Agreements will be reinstated and continue under the terms which we discussed in the meeting, as well as set the dates by which PMC shall receive the other deliverables discussed (e.g., payment of deferred royalties and interest, capital and remodel plan, organizational chart, etc.).

6075 Poplar Avenue, Suite 800  •  Memphis, TN 38119-4709  •  901.766.6400

We believe it will benefit CLC greatly if Ron and you, among other things, prioritize your work, focusing on what matters most; work on your marketing efforts with your Buntin representative; don't try to reinvent the brand; don't create specials; and don't worry about evaluating new products.

In an effort to help define success and guide you in the business, I have committed to working with you and your team to better evaluate operations and help develop a plan defining next steps, as well as provide the general knowledge of the business which you have conceded needs improvement. This was proposed to be accomplished by business reviews we can facilitate in your market and telephone conferences.

Lastly, be reminded, this correspondence is intended to provide the rough guidelines for allowing CLC to continue operating the restaurants as Perkins Restaurants and shall serve as a temporary license agreement subject to termination upon receipt of notice, with the understanding that all terms contained in the License Agreements which are not specifically modified by the provisions of this letter are incorporated herein by this reference. This document is not intended to be all-encompassing in terms of the matters we discussed relative to the long term continuation of the business.

Sincerely,

Perkins & Marie Callender's, LLC

Dave Blouin
Vice President Franchise Operations

cc.     Dave Blouin
        Jim Frank
        Marcus Hewitt
        Sandra Stone
        Jeff Warne
        Andy Whiteley

# EXHIBIT 4

# Perkins & Marie Callender's, LLC

June 3, 2019

<u>Sent via E-Mail and FedEx</u>
5171 Campbells Land Co., Inc.
Attn: William T. Kane
252 Fourth Avenue
Rankin, PA 15104

**NOTICE OF TERMINATION OF TEMPORARY LICENSE**
Our File Number: FG-258

Dear Mr. Kane:

On January 31, 2018, 5171 Campbell's Land Co., Inc. ("CLC") and Perkins & Marie Callender's, LLC ("PMC") entered into twenty-seven license agreements (the "License Agreements") granting to CLC the right to operate as Perkins Restaurants the facilities at the locations listed on the attachment accompanying this letter (the "Restaurants").

As the result of CLC's failing to pay royalty fees, marketing fund contributions, transfer fees and training expenses, on May 4, 2018, PMC provided to CLC a notice of default of the License Agreements, under which CLC was provided thirty days to cure the defaults; however, the defaults were not cured and the License Agreements terminated on or about June 4, 2018. On June 5, 2018, Dr. Linaberg and you met with members of PMC's senior management, including Jeff Warne, PMC's Chief Executive Officer, to discuss the termination and possible next steps.

As a follow-up to the meeting, Dave Blouin, PMC's Vice President, Franchise Operations, issued to CLC a Letter of Understanding dated June 8, 2018, which, among other things, granted to CLC the temporary right to continue operate the restaurants as Perkins Restaurants, subject to the conditions set forth in the Letter of Understanding. The Letter of Understanding incorporated the terms of the License Agreements except as specifically modified therein. Furthermore, the Letter of Understanding stated that the temporary license was subject to termination upon receipt of notice.

6075 Poplar Avenue, Suite 800 • Memphis, TN 38119-4709 • 901.766.6400

As of the date of this Notice of Termination, CLC owes to PMC:

- Royalties                    $742,913.29
- Deferred Royalties           $757,656.50
- Marketing Contributions      $609,934.65
- Transfer Fees                $  54,000.00

As a result of CLC's failure to meet the conditions set forth in the Letter of Understanding, including the failure to pay amounts owned to PMC, PMC hereby provides to CLC this Notice of Termination. Accordingly, CLC's right to operate the Restaurants as Perkins Restaurants terminates immediately. You may refer to Section 15 and Section 16 of the License Agreements for an explanation of the obligations CLC and you, as guarantor, owe to PMC as a result of the termination.

Perkins & Marie Callender's, LLC

By:    Andy Whiteley
       Vice President, General Counsel & Secretary

cc.    Rob Dauer
       Dave Blouin
       Jim Frank
       Marcus Hewitt
       Joel Walker
       Jeff Warne

# Perkins & Marie Callender's, LLC

June 4, 2019

<u>Sent via E-Mail</u>
5171 Campbells Land Co., Inc.
Attn: William T. Kane
252 Fourth Avenue
Rankin, PA 15104

RE:  De-Identification
Our File Number:  FG-258

Dear Mr. Kane:

As you know, the License Agreements, specifically including the temporary license agreement, between Perkins & Marie Callender's, LLC ("PMC") and 5171 Campbell's Land Co., Inc. ("CLC") terminated.

Pursuant to Section 16 of the License Agreements, CLC is required to pay to PMC all sums due and owing within 15 days of termination.

Furthermore, Section 16 requires CLC to immediately cease identifying itself as a current or former Perkins restaurant, or as a licensee, or use any trademark or colorable imitation thereof; remove from the premises the oversized American flag and bakery display cases; remove from the premises and discontinue using all signs, flags, menus, fixtures, furniture, furnishings, equipment, advertising, materials, stationery supplies, forms or other articles that display or contain any trademark or that otherwise identify or relate to a Perkins restaurant; remove all marks that are affixed to uniforms or cease to use all uniforms that have been used at the restaurants; take such action as may be required to cancel all fictitious or assumed name registrations relating to CLC's use of any trademark; change the telephone numbers of the restaurants; terminate or assign to PMC any website that identifies CLC as currently or formerly associated with PMC or that displays any Mark, as well as any domain names of such websites; take such action to alter the physical interior and exterior décor of the restaurants (specifically including, but not limited to, removing distinctive architectural features of or on the buildings) as will effectively de-identify and distinguish the premises from the Perkins restaurant system;

and furnish to PMC, within 30 days after the effective date of termination, evidence satisfactory to PMC of CLC's compliance with the foregoing obligations.

Because PMC must schedule personnel to visit the restaurants to ensure compliance with the de-identification obligations, please advise the undersigned as to CLC's plans, including a timeline, to de-identify the facilities. [To the extent such de-identification measures are not taken within 30 days of termination, PMC has the right to enter the premises (without committing trespass) and remove all items bearing the trademarks and take such actions as PMC deems necessary to de-identify the restaurants from the Perkins restaurant system, with the costs thereof being the responsibility of CLC.]

Perkins & Marie Callender's, LLC

By:     Andy Whiteley
        Vice President, General Counsel & Secretary


cc:     Rob Dauer (via E-Mail and FedEx)
        Dave Blouin
        Jim Frank
        Marcus Hewitt
        Joel Walker
        Jeff Warne

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| PERKINS & MARIE CALLENDER'S LLC, | ) ) ) | |
| Plaintiff, | ) ) | Docket No. 2:19-cv-02414 |
| v. | ) ) | |
| 5171 CAMPBELLS LAND CO., INC., WILLIAM T. KANE, AND KRISTINE KOCHIS., | ) ) ) ) | |
| Defendants. | ) ) | |

## TEMPORARY RESTRAINING ORDER AND NOTICE OF HEARING

This matter is before the Court on Plaintiff Perkins & Marie Callender's, LLC's ("PMC") Verified Complaint (ECF No. 1), as well as Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 9).

Having reviewed the Verified Complaint and the arguments in the Motion, the Court is satisfied that Defendant 5171 Campbells Land Co., Inc. ("CLC") has breached (and is in breach of) the License Agreements between the Parties and that Defendants Kane and Kochis have breached (and are in breach of) their Guarantees. It further appears to the Court that (1) absent entry of this Order, Plaintiff will continue to suffer immediate and irreparable harm, including unfair competition and the loss of customer goodwill, and (2) Plaintiff has no adequate remedy at law. The Court is satisfied with the efforts of Plaintiff's counsel to notify Defendants and their Pennsylvania counsel of Plaintiff's intention to seek injunctive relief as required by Federal Rule of Civil Procedure 65. Accordingly, the Motion for a temporary restraining order is well-taken and should be GRANTED.

1

IT IS THEREFORE ORDERED, pursuant to Rule 65(b) of the Federal Rules of Civil

Procedure, that a temporary restraining order against Defendants shall issue as follows:

    a.  Defendants are restrained from competing activities within a 3-mile radius of each Restaurant or within a 3-mile radius of any Perkins restaurant operated by PMC or any other licensee of PMC, as set forth in Section 16.A of the Agreements;

    b.  Defendants are restrained from using or disclosing PMC's confidential information as that term is defined in Section 6 of the Agreements, as set forth in Section 16.D of the Agreements and required by the DTSA and TUTSA;

    c.  Defendants shall return any and all confidential information retained by Defendants upon the termination of their relationship with PMC, as set forth in Section 16.D of the Agreements;

    d.  Defendants are restrained from continuing to directly or indirectly identify the Restaurants as current or former Perkins restaurants, or as franchisees or licensees of, or as otherwise associated with PMC, as set forth in Section 16.C(1) of the Agreements;

    e.  Defendants are restrained from continuing to use any trademark owned by PMC or any colorable imitation thereof in any manner or for any purpose, or utilize for any purpose any trade name, trade or service mark or other commercial symbol that suggests or indicates a connection or association with PMC, as set forth in Section 16.C(1) of the Agreements and as prohibited by the federal Lanham Act;

    f.  Defendants shall remove from the premises of the Restaurants and discontinue using for any purpose the oversized American flag and the bakery display cases, as set forth in Section 16.C(2) of the Agreements;

    g.  Defendants shall remove from the Premises, discontinue using for any purpose and return to PMC any and all signs, flags, menus, fixtures, furniture, furnishings, equipment, advertising, materials, stationery, supplies, forms or other articles that display or contain any PMC trademark or that otherwise identify or relate to a Perkins restaurant, as set forth in Section 16.C(3) of the Agreements;

    h.  Defendants shall remove all PMC trademarks that are affixed to uniforms and cease to use all uniforms that have been used in the Restaurants, as set forth in Section 16.C(4) of the Agreements;

2

i.  Defendants shall take all such actions as may be required to cancel all fictitious or assumed name or equivalent registrations relating to their use of any PMC trademark, as set forth in Section 16.C(5) of the Agreements;

j.  Defendants shall change the telephone number of the Restaurants and direct the telephone company to provide a recorded message advising callers that the prior number is no longer in service, and instruct all telephone directory publishers to modify all telephone directory listings of the Restaurants associated with any PMC trademarks when the directories are next published, as set forth in Section 16.C(6) of the Agreements;

k.  Defendants shall assign to PMC any website that identifies Defendants and the Restaurants as currently or formerly associated with PMC or that displays any PMC trademark, as well as any domain name of such website, as set forth in Section 16.C(7) of the Agreements;

l.  Defendants shall take such action to alter the physical interior and exterior decor of the Restaurants (specifically including, but not limited to, removing distinctive architectural features of or on the building) as will effectively de-identify and distinguish the Restaurants from the PMC Perkins' brand, as set forth in Section 16.C(8) of the Agreements;

m.  Defendants are restrained from destroying, deleting, or otherwise rendering inaccessible any text messages, e-mails, call logs, documents, or other information – electronically stored or otherwise – relating to the allegations and claims alleged in the Verified Complaint.

The Court further finds that Defendants agreed in the License Agreement paragraph 18(D) that PMC would not be required to post a bond to obtain injunctive relief. (See ECF No. 1-3) Accordingly, Plaintiff need not post at this stage any security in connection with this Order. The issue of a bond may be revisited at the preliminary injunction hearing.

Plaintiff shall immediately provide a copy of this Order to Defendants via FedEx overnight delivery and any other reasonable means Plaintiff may have for contacting or communicating with Defendant.

A hearing to determine if this Order shall be converted to a Preliminary Injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure shall be held on Monday July 8, 2019, at 4:00 p.m. At least four days prior to the hearing, Defendants shall file any opposition to Plaintiff's

3

Motion for Temporary Restraining Order and Preliminary Injunction.  At least two days prior to the hearing, Plaintiff shall file any Reply in further support of its Motion.

**SO ORDERED**, this 2nd day of July, 2019.

/s/ Jon P. McCalla

JON P. McCALLA
UNITED STATES DISTRICT JUDGE

4