## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | |
|---|---|
| **5171 CAMPBELLS LAND CO., INC.,** | **Bankruptcy No. 19-22715-CMB** |
| Debtor, | **Chapter 11** |
| **5171 CAMPBELLS LAND CO., INC.,** | **Document No.** |
| **Movant,** | **Related to Doc. No. 158** |
| vs. | |

ELMHURST PROPERTIES, INC.,
ASCENTIUM CAPITAL, LLC, IEMFS,
Ltd. d/b/a GSG FINANCIAL, HITACHI
CAPITAL AMERICA CORP., TRI STATE
EQUIPMENT CO., INC., WESBANCO
BANK, INC., STORE CAPITAL
ACQUISITIIONS, LLC, STORE
MASTER FUNDING XIII, LLC,
US FOODS, INC., VISION FINANCIAL
GROUP, INC., LED SOLUTIONS,
PENNSYLVANIA DEPARTMENT OF
REVENUE, THE NEW YORK
DEPARTMENT OF TAXATION AND
FINANCE, THE OHIO DEPARTMENT
OF TAXATION and THE INTERNAL
REVENUE SERVICE,

Respondents.

## ORDER OF COURT (A) APPROVING SALE OF PERSONALTY FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND (B) APPROVING ASSUMPTION AND ASSIGNMENT OF DEBTOR'S LAND LEASE WITH ELMHURST PROPERTIES, INC.

Upon consideration of the foregoing Emergency Motion of 5171

Campbells Land Co, Inc. (the "Debtor") for Sale of (1) Personalty; and (2)

Debtor's Interest in that certain Land Lease with Elmhurst Properties, Inc. Free

and Clear of all Liens, Claims and Encumbrances (the "Sale Motion") pursuant to

{C1071392.1 }

that certain Amended and Restated Asset Purchase Agreement dated September 4, 2019, a copy of which is attached hereto as **Exhibit A** (the "Purchase Agreement")[1] by and between the Debtor and Phoenix Management Systems, LLC, a Pennsylvania limited liability company (the "Buyer"), the Court HEREBY FINDS, DETERMINES, ORDERS, ADJUDGES AND DECREES THAT[2]:

1.     Pursuant to 11 U.S.C. Section 363(b) and (f), the Debtor has effectuated service of the Sale Motion and the related Notice of Sale setting the hearing and response deadline upon the Respondents, all creditors and all other parties in interest as required by the applicable Bankruptcy Rules.

2.     Cause exists for shortening any notice period required by Bankruptcy Rules 2002 and 6004 and the notice provided by the Debtor was reasonable in light of the circumstances.

3.     Cause further exists to waive compliance with any advertising or publication requirements under the Bankruptcy code or the Bankruptcy Rules, including Local Bankruptcy Rule 6004-1, with the exception of the requirement to upload the Notice of Sale to the EASI system, which requirement the Debtor has complied with.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.
[2] Findings of Fact shall be construed as conclusions of law, and conclusions of law should be construed as findings of fact when appropriate. *See* Fed. R. Bank. P. 7052. Any statements of this Court from the bench at the Sale Hearing shall constitute additional findings of fact and conclusions of law as appropriate and are expressly incorporated by reference in this Sale Order.

4.      The Debtor has demonstrated compelling circumstances and a sufficient and sound business purpose and justification for the proposed sale to be approved on an emergency basis.

5.      The sale is in good faith in accordance with **In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir 1986)**.

6.      The Buyer is a purchaser in good faith, as that term is used in the Bankruptcy Code, and is entitled to the protection of section 363(m) of the Bankruptcy Code with respect to sale contemplated in the Purchase Agreement (the "Sale Transaction").  The Sale Transaction was negotiated and entered into in good faith, based upon arm's-length negotiations and without collusion or fraud of any kind.  The Purchase Price to be paid by the Buyer was not controlled by an agreement among potential bidders.  Neither the Buyer nor any of its affiliates, officers, directors, managers, shareholders, or any of their respective successors or assigns is an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  The Sale Transaction may not be avoided, and no damages may be assessed against the Buyer or any other party under section 363(n) of the Bankruptcy Code or any other applicable law.

7.      The Buyer would not consummate the transactions contemplated hereby, thus adversely affecting the Debtor, its estates, and its creditors, if the sale of the Purchased Assets and the assignment of the Assigned Contracts to the Buyer were not free and clear of all defenses, claims (including any adverse claims of ownership), obligations and Encumbrances of any kind or nature whatsoever to the greatest extent permitted under sections 105, 363 and 365 of

the Bankruptcy Code and other applicable law, whether such defenses, claims, obligations and Encumbrances (collectively, the "Interests") are known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, noticed or unnoticed, perfected or unperfected, allowed or disallowed, disputed or undisputed, whether accruing prior to or subsequent to the commencement of this Bankruptcy Case, whether imposed by agreement, understanding, law, equity or otherwise, relating to, accruing or arising at any time prior to the Closing, except the Assumed Liabilities.

8.    A reasonable opportunity to object or be heard regarding the relief has been afforded to all interested persons and entities.  Notice of the hearing on the Sale Motion (the "Sale Hearing") was good, sufficient, fair and adequate under the circumstances, was provided to all parties in interest entitled to receive notice and complied in all respects with 11 U.S.C. § 102(1) and Bankruptcy Rules 2002, 6004 and 6006.

9.    All objections to the Sale Motion or to the relief granted herein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby denied and overruled on the merits.

10.    The matters considered by the Court at the hearing were "core" proceedings pursuant to 28 U.S.C. Section 157(b)(2) over which the Court has jurisdiction to enter a final Order.

11.    The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full.

12.    The terms of the sale contained in the Purchase Agreement are fair and reasonable and in the best interests of this Estate.  Accordingly, the Sale Motion is **GRANTED** and the sale of the Purchased Assets and the assumption and assignment of the Assigned Contracts to the Buyer, pursuant to the terms of the Purchase Agreement, is **APPROVED** in all respects pursuant to sections 105, 363 and 365 of the Bankruptcy Code, including Section 363(b).  The Debtor and the Buyer and their respective affiliates, officers, directors, employees and agents (including William T. Kane as the President of the Debtor) are hereby authorized and directed to take such actions as are necessary to consummate and implement the Sale Transaction as contemplated in the Purchase Agreement and this Sale Order. William T. Kane in his capacity as the President of the Debtor, has the power and authority to execute the Purchase Agreement and closing documents ancillary thereto and otherwise consummate and implement the Sale Transaction and irrevocably and forever bind the Debtor thereto.

13.    Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtor is hereby authorized to fully assume, perform under, consummate and implement the Purchase Agreement, together with such additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and to take all further actions as may reasonably be requested by Buyer for the purpose of assigning, transferring, granting conveying

and conferring the Purchased Assets to Buyer, or as may be necessary or appropriate to the performance of the obligations contemplated by the Purchase Agreement and this Sale Order.  To the extent that the terms of the Purchase Agreement and this Order conflict, this Order shall control.

14.    The Purchased Assets shall be transferred to Buyer and upon the Closing (one or both of them) shall be free and clear of all Interests of any kind or nature whatsoever, whether such Interests are known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, noticed or unnoticed, perfected or unperfected, allowed or disallowed, disputed or undisputed, whether accruing prior to or subsequent to the commencement of this Bankruptcy Case, whether imposed by agreement, understanding, law, equity or otherwise, relating to, accruing or arising at any time prior to the Closing, and all such Interests of any kind or nature whatsoever, shall attach to the net cash proceeds of the Sale Transaction in the order of their priority, with the same validity, force and effect that they now have as against the Purchased Assets.  Upon the Closing, the Buyer shall be fully and irrevocably vested with the Purchased Assets free and clear of all Interests.

15.    Without limiting the foregoing, the Buyer is not a successor to, or vicarious or otherwise liable for, the liabilities, claims, debts or obligations of the Debtor under any theory of law or for any purpose, and all creditors of the Debtor and all parties are enjoined from taking action against the Buyer or the Purchased Assets, other than with respect to the Assumed Liabilities.  Without in

any way limiting the foregoing, the Buyer shall not, and shall not be deemed to: (i) be the successor of or successor employer under (a) the Worker Adjustment and Retraining Notification, as amended (WARN) Act, (b) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including by the requirements of Part 6 of Title I of Employee Retirement Income Security Act and Section 4980B of the Internal Revenue Code (COBRA), and applicable regulations thereunder, (c) any similar state or local law or (d) any collective bargaining agreement or other labor or employment agreement or pension or employee benefits plan (including any common law successorship liability in relation to any pension plans or any multiemployer plans to which the Debtor has at any time contributed to or had any liability or potential liability, including with respect to unfunded, underfunded and/or withdrawal liability); (ii) be the successor of or successor employer to the Debtor, and shall instead be, and deemed to be, a new employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (iii) have, *de facto*, or otherwise, merged or consolidated with or into the Debtor; (iv) be a mere continuation or substantial continuation of the Debtor or the enterprise(s) of the Debtor; or (v) be liable for any acts or omissions of the Debtor in the conduct of the Purchased Restaurants or arising under or related to the Purchased Assets other than as set forth in the Purchase Agreement.

16.    As a condition of approval of this sale, Buyer shall reasonably cooperate with the Official Committee of Unsecured Creditors (the "**Committee**")

and any future Plan Administrator or Trustee in providing reasonable access to the Purchased Restaurants for inspection at times that will not unreasonably interfere with Buyer's business operations.  While such access will be subject to reasonableness and, where appropriate, subpoena and normal Court procedures and Rules, the Buyer shall nevertheless cooperate in such access and not act to prevent such reasonable inspection.    In the event the Committee, Plan Administrator or Trustee seeks to subpoena any of the Debtor's former employees who become a Transferred Employee, Buyer will not unreasonably interfere with the Committee's, Plan Administrator's or Trustee's subpoena efforts.  Buyer shall (at no cost to Buyer) provide the Debtor, Committee or any future Plan Administrator or Trustee reasonable access to business records of the Debtor (including daily receipts, sales report, etc.) acquired by Buyer as part of the Sale Transaction and in Buyer's possession or control, provided Buyer shall not be obligated to maintain any such business records of the Debtor for more than one (1) year from the Closing Date (after which Buyer may destroy such business records).

17.    Except with respect to the Assumed Liabilities, all persons or entities holding Interests of any kind or nature with respect to the Purchased Assets are hereby barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interests against the Buyer, its successors or assigns, or the Purchased Assets.  This Sale Order is and shall be effective as a determination that all such Interests shall be and are, without further action by any person or entity, released with respect to the Purchased

Assets and the Buyer as of the Closing. Following the Closing, no holder of any Interest shall interfere with Buyer's title to or use and enjoyment of the Purchased Assets based on or related to any such Interest, or based on any action the Debtor may take in this Bankruptcy Case.

18.    The Debtor is the sole and lawful owner of the Purchased Assets holding good and marketable title in and to the Purchased Assets. Subject only to the entry of this Sale Order and receipt of the approvals and consents required by the Purchase Agreement, the Debtor has the full power and authority to execute all documents contemplated thereby, and the sale of the Purchased Assets by the Debtor has been duly and validly authorized by all necessary action of the Debtor.  No consents or approvals other than those provided for in the Purchase Agreement or this Sale Order are required for the Debtor to consummate the transactions described in this Sale Order.

19.    Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtor's assumption and assignment to the Buyer of the Assigned Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  The Buyer may add or eliminate any contract from the list of Assigned Contracts in accordance with Section 2.2 of the Purchase Agreement.

20.    The Debtor is hereby authorized and directed, in accordance with sections 105(a) and 365 of the Bankruptcy Code, to (a) assume and assign to the Buyer, effective upon the Closing, the Assigned Contracts free and clear of

all Interests of any kind or nature whatsoever, and (b) execute and deliver to the Buyer such agreements, documents or other instruments as may be necessary to sell, assign, transfer, convey and deliver the Assigned Contracts to the Buyer. To the extent any Assigned Contract is not an executory contract or unexpired lease subject to section 365 of the Bankruptcy Code, the Debtor is authorized to transfer all of its rights and future obligations under such Assigned Contract as a Purchased Assets to the Buyer free and clear of liabilities, claims or Interests arising prior to the closing, pursuant to section 363 of the Bankruptcy Code.

21.    The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract that prohibits, restricts or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code.

22.    All defaults or other obligations of the Debtor under any Assigned Contract (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured upon payment at the Closing by the Debtor, or as soon thereafter as practicable, of any Cure Amount with respect to each Assigned Contract, and all objections filed by non-debtor parties to the Assigned Contracts having been resolved or overruled, or such contracts having been removed from the list of Assigned Contracts.

23.    Each non-debtor party to an Assigned Contract hereby is forever barred, estopped and permanently enjoined from asserting (i) against the Debtor

or the Buyer, any default, whether declared or undeclared, or known or unknown, arising under the Assigned Contract prior to the Closing Date, and (ii) against the Buyer, any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtor as the counter-parties to any Assigned Contract.

24.    Any provision in an Assigned Contract that purports to prohibit or condition the assignment of such Assigned Contract or allow the non-debtor party to such Assigned Contract to terminate, recapture, impose any penalty, condition a renewal or extension, or modify or limit any term or condition upon the assignment of such Assigned Contract, is hereby deemed to be an unenforceable anti-assignment provision and shall be void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Buyer of the Assigned Contracts have been satisfied and, except as set forth in this Sale Order or in any other order issued by this Court, all counterparties to such Assigned Contracts shall be deemed to have consented to the assignment to Buyer as contemplated by section 365(c) of the Bankruptcy Code. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all rights, title, privilege and interest of the Debtor in and to the Assigned Contracts.

25.    Upon the Closing, the Buyer shall be deemed to be substituted for the Debtor as a party to the applicable Assigned Contracts.

26.    Payment of the Cure Amount (if any) shall, with respect to each Assigned Contract, (a) effect a cure of all defaults, (b) compensate the non-

debtor party to such Assigned Contract for any actual pecuniary loss resulting from such defaults, and (c) together with the assumption of the Assigned Contracts by the Debtor and its assignment to the Buyer, constitute adequate assurance of future performance thereof.

27.    The Buyer has provided adequate assurance of its future performance under the Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

28.    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all parties to the Assigned Contracts are forever barred and enjoined from raising or asserting against the Buyer or the Purchased Assets any assignment fee, default, breach, claim or pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts existing as of the Closing Date or arising by reason of the Closing.

29.    Upon Closing, all leases that the Debtor has with Vision Financial Group, Inc. related to the Purchased Assets shall be deemed rejected.

30.    Notwithstanding anything to the contrary elsewhere in this Order or Purchase Agreement, Reinhart Foodservice, L.L.C. ("Reinhart") owns the dish machines, water softeners and related equipment, (collectively, the "Reinhart Property") provided to the Debtor pursuant to the March 18, 2018 Equipment Lease Agreement and related documents (collectively the "Reinhart Lease Agreement") and the Reinhart Property shall not be included within the definition of the Purchased Assets or any sub-category thereof sold to the Buyer. Possession of the Reinhart Property at each location shall not be transferred to

the Buyer except upon the assumption and assignment of the applicable Lease Agreement, or as otherwise agreed between Buyer and Reinhart in writing.

31.    In the event that the applicable Reinhart Lease Agreement is not assumed and assigned to the Buyer, the applicable Reinhart Property shall be promptly returned to Reinhart, unless Reinhart agrees otherwise in writing.

32.    In the event that the Reinhart Lease Agreement is assumed and assigned to the Buyer, the pre-petition and post-petition cure amount shall be determined based upon future agreement of the parties or order of the court.

33.    Moreover, notwithstanding anything to the contrary elsewhere in this Order or in the Purchase Agreement, pending assumption or rejection of the applicable Reinhart Lease Agreement, Debtor shall remain liable for all post-petition charges for use of the Reinhart Property from the Petition Date through the date of Closing of the sale as an administrative expense.

34.    Reinhart shall be entitled to cash-in-advance payment for food and other products to be delivered to the Debtor between the date hereof and the Closing of the sale.  Upon Closing of the sale, Reinhart's open post-petition invoice in the amount of approximately $2,500 shall be paid in accordance with paragraph 40 herein.

35.    This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no reason for delay in the implementation of this Sale Order. This Sale Order shall be effective immediately

upon its entry and the parties may consummate the transaction pursuant to the terms and conditions set forth herein and in the Purchase Agreement.

36.    The terms and provisions of the Purchase Agreement, together with the terms and provisions of this Sale Order, shall be binding in all respects upon the Debtor, its estate, creditors and officers, and Buyer and its affiliates, successors and assigns, including any trustee or Plan Administrator that may be appointed in this Bankruptcy Case (including if this Bankruptcy Case is converted to chapter 7 of the Bankruptcy Code) and any affected third parties, including, but not limited to, entities asserting  claims against, or Interests in, the Debtor's estate or the Purchased Assets.

37.    The Debtor and the Committee have agreed that a Liquidating Plan shall be filed and supported for confirmation, which Plan isolates any extant Avoidance Actions (rights under Chapter 5 of the Bankruptcy Code) and other causes of action of the Estate to be administered for the benefit of creditors by a Plan Administrator selected by the Committee.  In order to provide certainty with respect to the Plan process, the Debtor and the Committee have agreed that the Debtor shall file such Liquidating Plan within 21 days, that the Debtor's exclusive right to file a Plan shall terminate as to the Committee upon the entry of this Order, and that the Debtor shall not be entitled to convert to Chapter 7 after the entry of this Order, without the consent of the Committee.  Nothing contained in any chapter 11 plan confirmed in this Bankruptcy Case, or in any related confirmation order, disclosure statement, or order approving disclosure statement shall conflict with or derogate from the provisions of this Sale Order, and the

transactions being in contemplation of, in furtherance of and in connection with such chapter 11 plan. Failure of the Debtor to comply with its obligation to file a Liquidating Plan shall not, in any way, affect: (i) the Debtor's obligation to close the Sale Transaction pursuant to the Purchase Agreement (and Buyer's right to compel the Debtor to close), or (ii) the final and irrevocable transfer of the Purchased Assets from the Debtor to Buyer at the Closing(s) and the binding nature of all closing documents related thereto.

38.    As a condition of approval of this sale, The Debtor and US Foods, Inc. ("US Foods") have agreed that upon closing: (1) all security interests that US Foods has in the Purchased Assets and the proceeds of the sale of the Purchased Assets shall be released; (2) that US Foods shall not seek any recovery from the sales proceeds for any of its claims; (3) that US Foods shall be granted a release from all claims under Chapter 5 of the Bankruptcy Code that could be brought by the Debtor or any other party with standing to bring claims under Chapter 5 of the Bankruptcy Code including without limitation, the Debtor, any statutory committee appointed in this bankruptcy case, any Chapter 11 trustee, and any chapter 7 trustee; and (4) that US Foods shall be paid its asserted PACA Claim in full consistent with paragraph 40 herein.

39.    The Debtor and Perkins & Marie Callendar's, LLC ("PMC") have agreed that PMC's collective administrative claims shall not exceed $160,000.00 and that payment of any administrative claims shall be deferred consistent with paragraph 40 herein.

40.    Closing of the Sale Transaction must close in accordance with the terms of the Purchase Agreement with the proceeds of the sale to be distributed to Robert O Lampl as Escrow agent to be held in escrow. Robert O Lampl as Escrow Agent shall be immediately authorized to make a $10,000.00 payment to Hitachi Capital America, Corp. ("Hitachi"). Upon receipt of this payment, any liens Hitachi has on the proceeds of the within sale and on the proceeds of the sales contemplated by the Motions filed at Doc. Nos. 149, 151 and 153 shall be forever released. Hitachi reserves its right to assert an unsecured claim for any deficiency and to pursue any guarantors of the underlying debt.

Except as set forth herein, there shall be no further disbursements of the sale proceeds until the Court has entered an Order approving a Settlement Agreement between the Debtor on the one hand and STORE Capital Acquisitions, LLC ("STORE Capital) and STORE Master Funding XIII, LLC ("STORE Master" and together with STORE Capital, "STORE") on the other as STORE holds a first position lien on a significant portion of the Purchased Assets. Upon the entry of an Order approving a Settlement Agreement between the Debtor and STORE, Robert O Lampl as Escrow Agent shall authorized to disburse funds for the following without further Order of Court:

(a)    Post-Petition Payroll;

(b)    Post-Petition Payroll Taxes;

(c)    Post-Petition Sales Taxes;

(d)    U.S. Trustee Fees;

(e)     Payment of US Foods' PACA claim. This payment shall be made within forty-eight (48) hours of Robert O Lampl as Escrow Agent's receipt of the sale proceeds. Furthermore, in the event that the STORE Settlement Agreement has not been approved within forty-eight (48) hours of Robert O Lampl as Escrow Agent's receipt of the sale proceeds, the Debtor shall be still be required to make this payment. However, if the STORE Settlement Agreement has not been approved, said payment shall be made from funds other than the sale proceeds.

(f)     Payment of Reinhart's open post-petition invoices in the amount of $2,430.79. *$3631.55*

(g)     $200,000 to the following parties, to be held in escrow pending an approved fee application:

(i) $75,000 to Compass Advisory Partners, LLC,

(ii) $75,000 to Robert O Lampl, and

(iii) $50,000 to Bernstein-Burkley, P.C.

All other administrative claims not specifically provided for herein shall be deferred until after the payments set forth in subparagraphs (a) through (g) are made in full.

Date: 9/5/19

Carlota M. Böhm
Chief United States Bankruptcy Court
Judge

FILED
9/5/19 11:31 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

{C1071392 1 }                                   17

**EXECUTION VERSION**

AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

between

5171 CAMPBELLS LAND CO., INC.

and

PHOENIX MANAGEMENT SYSTEMS, LLC

September 4, 2019

EXHIBIT A

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This AMENDED AND RESTATED ASSET PURCHASE AGREEMENT is made and entered into as of September 4, 2019 between **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation ("Seller"), with its principal corporate offices at 18276 Conneaut Lake Road, Meadville, PA 16335 and **PHOENIX MANAGEMENT SYSTEMS, LLC**, a Pennsylvania limited liability company, with its principal corporate offices at 1388 State Route 487, Bloomsburg, PA 17815 ("Buyer").

## BACKGROUND

A.      Seller is engaged in the business of operating certain family-dining and casual-dining restaurants (the "Business") some of which are operated under the Perkins brand, including the Purchased Restaurants (as defined below).

B.      On July 8, 2019 (the "Petition Date"), Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq.*, the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") commencing its bankruptcy case (Case No. 19-22715-CMB), the "Bankruptcy Case"). As of the date of this Agreement, Seller continues to operate the Business and manage its properties and affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

C.      Buyer desires to purchase, and Seller desires to sell, convey, assign and transfer to Buyer, the Purchased Assets (as defined below), subject to the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, covenants and agreements herein contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

For the purposes of this Agreement, in addition to those capitalized terms defined elsewhere throughout this Agreement, the following capitalized terms shall have the meanings set forth below:

"Accounts Receivable" shall mean all accounts receivable or other rights to payment of Seller of any kind or nature including work and services in process.

"Affiliate" shall mean, with respect to any specified Person, any other Person who, directly or indirectly, owns or controls, is under common ownership or control with, or is owned or controlled by, such specified Person. Without limiting the generality of the foregoing, a Person shall be deemed to "own" another Person if it owns, directly or indirectly, fifty (50%) or more of the capital stock, membership interest, or other equity interest of such other Person generally entitled to vote, without regard to specified contingencies, for the election of directors or equivalent governing body of such other Person.

"<u>Agreement</u>" shall mean this Amended and Restated Asset Purchase Agreement, including all exhibits and schedules hereto, as may be amended.

"<u>Assigned Contracts</u>" as defined in Section 2.2.

"<u>Avoidance Actions</u>" means any and all rights, claims, causes of action and rights to recover or avoid transfers or to avoid any lien or interest that Seller may have under Chapter 5 of the Bankruptcy Code or otherwise, including, but not limited to, sections 506, 510, 522, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or applicable non-bankruptcy law or state law, and the proceeds thereof, or otherwise to exercise the avoidance powers provided under the Bankruptcy Code.

"<u>Bankruptcy Rules</u>" shall mean the Federal Rules of Bankruptcy Procedure, the local rules of the Bankruptcy Court, and any Orders of the Bankruptcy Court, as in effect from time to time.

"<u>Breach</u>" means, with respect to any representation, warranty, covenant, or obligation, any material misstatement or inaccuracy in, or any material failure to perform or comply with, the representation, warranty, covenant, or obligation within any applicable cure period.

"<u>Business</u>" as defined in Section A of the "Background" paragraph of this Agreement.

"<u>Business Day</u>" shall mean any day of the year other than: (i) any Saturday or Sunday; or (ii) any other day on which banks located in Pittsburgh, Pennsylvania, are closed for business.

"<u>Cash</u>" shall mean all cash, certificates of deposit, bank accounts and other cash equivalents or short-term investments, together with all accrued but unpaid interest thereon.

"<u>Closing</u>" as defined in Section 11.1.

"<u>Closing Date</u>" as defined in Section 11.1.

"<u>Contract</u>" shall mean any contract, lease, easement, license, sales order, purchase order, supply agreement, or any other agreement, commitment or understanding whether oral or written, other than Permits.

"<u>Credit Card Holdback</u>" shall mean $200,000.00.

"<u>Cure Cap</u>" shall mean $15,000.00.

"<u>Cure Obligations</u>" shall mean all obligations to counterparties to the Assigned Contracts as of the Petition Date which must be satisfied in order to effectuate, pursuant to section 365(b)(1) of the Bankruptcy Code, the assumption by Seller and assignment to Buyer of the Assigned Contracts under Section 2.2 of this Agreement.

"<u>Dollars</u>" or numbers preceded by the symbol "$" shall mean amounts in United States Dollars.

2

"Elm Road Restaurant" shall be the Seller's restaurant located on Elm Road in Warren Ohio (Store Number: 3495) and one of the Purchased Restaurants.

"Encumbrance" shall mean any charge, claim, condition, equitable interest, lien (including without limitation any lien held or asserted by any Governmental Authority), option, pledge, security interest, mortgage, right of way, easement, encroachment, servitudes, right of first option, right of first refusal, or similar restriction, including restrictions of use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any attribute of ownership, or other encumbrance, option or defect in title of every type and description, whether imposed by law, agreement, understanding or otherwise.

"Escrow Agent" means Campbell & Levine, LLC in its capacity as escrow agent for the Credit Card Holdback.

"Excluded Liabilities" shall mean all obligations and liabilities of Seller that are not included in the Assumed Liabilities.

"Excluded Restaurants" shall mean all restaurants of Seller that are not Purchased Restaurants.

"Final Order" shall mean an Order as to which there is no appeal, motion for reconsideration, stay or similar request for relief pending, and as to which the time period to seek or file any such appeal, motion for reconsideration, stay or similar request for relief has expired.

"Food and Beverage Inventory" shall mean perishable (to the extent there is at least one (1) week before its expiration date) and non-perishable food and beverage Inventory.

"Governmental Authority" shall mean the government of the United States, or any other foreign country or any state, provincial or political subdivision thereof and any entity, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Intellectual Property" shall mean intellectual property of every kind and nature, including, without limitation, all inventions, information, data, customer lists and related information, samples, specifications, plans, drawings, blue prints, compositions, processes, designs, formulas, technical and business information, and know-how, including confidential information and trade secrets (whether or not patentable or reduced to practice), all United States and foreign patents and petty patents (including continuations, continuations-in-part, divisions, reissues, re-examinations, extensions and renewals thereof) and patent applications, all United States and foreign registered and unregistered, brand names, trademarks, and service marks, logos and designs (and registrations and applications for registration of the same), domain names and all goodwill symbolized thereby or associated therewith, and copyrights and copyright registrations (and applications for the same) relating thereto, including computer software and mask works, and all extensions or renewals thereof, United States and foreign registrations and applications to register copyrights, technical manuals and documentation made or used in connection with any of the foregoing.

"Law" shall mean any law, statute, code, regulation, ordinance, or rule enacted or promulgated by any Governmental Authority.

3

"Loss" or "Losses" shall mean any and all damages (but excluding consequential, punitive and treble damages), losses, actions, proceedings, causes of action, obligations, liabilities, responsibilities, claims, encumbrances, penalties, demands, assessments, judgments, costs and expenses including, without limitation, court costs and reasonable attorneys', experts' and consultants' fees and disbursements.

"Material Adverse Effect" means a state of facts, events, change or effect with respect to Seller that results in a material adverse effect on the Purchased Assets taken as a whole; but excluding any state of facts, event, change or effect caused by, attributable or relating to: (i) changes or conditions affecting Seller's industry generally; (ii) changes in economic, regulatory or political conditions generally; (iii) the filing and administration of the Bankruptcy Case (except for the conversion of the Bankruptcy Case to a proceeding under chapter 7); or (iv) the announcement of this Agreement.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Ordinary Course of Business" means an action taken or omitted to be taken by a Person only if that action or omission is consistent with the past practices of such Person.

"Parties" shall mean both Seller and Buyer, each of whom individually may be referred to as a "Party."

"Permits" shall mean permits, tariffs, authorizations, licenses, certificates, variances, interim permits, approvals, franchises and rights under any Law or otherwise issued or required by any Governmental Authority and any applications for the foregoing which are currently used or otherwise necessary for Seller to engage in the operation of the Business as currently conducted.

"Person" shall mean any individual, corporation, business trust, proprietorship, firm, partnership, limited partnership, limited liability partnership, limited liability company, trust, association, joint venture, Governmental Authority or other entity.

"Previously Omitted Contract" as defined in Section 2.2 hereof.

"Purchased Asset(s)" as defined in Section 2.1 hereof.

"Purchased Restaurants" shall mean the following restaurants now or previously operated by Seller:

|   | Store Number | Description | City/State |
|---|---|---|---|
| 1. | 3495 | Warren – Elm Rd. | Warren, OH |
| 2. | 3531 | Olean – State Street | Olean, NY |
| 3. | 3709 | Middleburg Heights | Middleburg Heights, OH |
| 4. | 3458 | Erie – East | Erie, PA |
| 5. | 3670 | Youngstown – Boardman | Youngstown, OH |
| 6. | 3459 | Erie – South | Erie, PA |
| 7. | 3604 | Meadville | Meadville, PA |

4

| 8. | 3466 | Indiana | Indiana, PA |
|---|---|---|---|
| 9. | 2474 | Warren (Niles) | Warren, OH |
| 10. | 3346 | Clarion | Clarion, PA |
| 11. | 3794 | Austintown | Austintown, OH |
| 12. | N/A | Edinboro (not in operation) | Edinboro, PA |
| 13. | 3382 | Ashland | Ashland, OH |

"Sale Order" shall mean an Order of the Bankruptcy Court that, among other things approves, pursuant to Sections 363 and 365 of the Bankruptcy Code, with findings that Buyer acted in good faith and is afforded the benefits of Section 363(m) of the Bankruptcy Code: (i) the execution, delivery and performance by Seller of this Agreement, and the other instruments and agreements contemplated hereby; (ii) the sale of the Purchased Assets to Buyer free and clear of all Encumbrances on the terms set forth herein; and (iii) the performance by Seller of its obligations under this Agreement, including, without limitation, the assumption and assignment of the Assigned Contracts.

"Tax" (and, with correlative meaning, "Taxes" and "Taxable") shall mean any federal, state, provincial, county, local or foreign taxes, charges, fees, duties (including customs duties), levies or other assessments, including income, gross receipts, net proceeds, ad valorem, turnover, real and personal property (tangible and intangible), sales, use, franchise, excise, value added, alternative, add-on minimum, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, license, payroll, environmental, capital stock, disability, severance, employee's income withholding, other withholding, unemployment and Social Security Taxes, which are imposed by any Governmental Authority, and such term shall include any interest, penalties, fines or additions to tax attributable thereto or associated therewith, and shall include any transferee or successor liability in respect of Taxes (whether by contract or otherwise).

"Tax Code" shall mean the Internal Revenue Code of 1986, as amended, and the temporary and final regulations promulgated thereunder.

"Tax Return" shall mean any report, return, statement, notice, form, declaration, claim for refund or other document or information filed, submitted to, or required to be supplied to a Governmental Authority in connection with the determination, assessment, collection or payment of any Tax, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party" shall mean a Person other than Buyer, Seller, or their respective Affiliates.

"Transferred Employees" shall have the meaning set forth in Section 10.1(a).

"Transition Services Agreement" shall mean a Transition Services Agreement in substantially the form attached hereto as Exhibit A.

### ARTICLE II
### PURCHASE AND SALE OF PURCHASED ASSETS;
### ASSUMPTION OF ASSUMED LIABILITIES

2.1    Purchased Assets. Subject to and upon the terms and conditions set forth in this Agreement, at the Closing, Seller shall sell, assign, convey, transfer and deliver to Buyer, and Buyer

5

shall purchase, acquire and take assignment and delivery of, all of Seller's right, title and interest in and to the Purchased Restaurants and all personal property located therein, including the following assets, properties and rights, as they exist at the time of the Closing:

(a)    Equipment and Fixed Assets of the Purchased Restaurants.  All fixtures, machinery, equipment, fixed assets, furniture, tools, maintenance equipment, rolling stock, mobile equipment, electrical, mechanical, electronic, computers, software, telecommunications, servers, and other equipment and fixed assets of every kind owned by Seller located at the Purchased Restaurants or wherever located and related to the operation of the Purchased Restaurants (collectively, the "Equipment and Fixed Assets"), including without limitation, the Equipment and Fixed Assets set forth on Schedule 2.1(a) and any personal property subject to a financing/capital lease;

(b)    Inventory of Purchased Restaurants.  All inventory of any kind or nature, including the Food and Beverage Inventory, dairy, produce, supplies, raw materials, chemicals, spares, spare parts, packaging materials, finished goods, and other consumables and inventories owned by Seller and used, or intended to be used, in the operation of the Purchased Restaurants and/or located at the Purchased Restaurants (collectively, the "Inventory");

(c)    Information and Records Related to Purchased Restaurants.  To the extent legally transferable, all books and records used in the operation of the Purchased Restaurants ("Books and Records") that are in Seller's care, custody or control, including, without limitation, customer lists, safety and training records, equipment manuals, drawings, engineering materials, and operating data;

(d)    Permits Related to Purchased Restaurants.  To the extent legally transferable, without cost to Seller, all Permits and applications for Permits that are necessary to the operation of the Purchased Restaurants as presently operated and conducted.  Buyer shall pay any fees required to transfer such Permits; and

(e)    Intellectual Property Related to Purchased Restaurants.  The Intellectual Property listed on Schedule 2.1(e) and all goodwill, if any, relating to the Purchased Restaurants.

(f)    Accounts Receivable, Deposits and Prepaid Expenses Related to the Purchased Restaurants.  Seller's Accounts Receivable related to the Purchased Restaurants including any unbilled invoices for services, deposits for utilities, prepaid expenses, goods or products up to the Closing Date.

(g)    Goodwill.  All goodwill, payment intangibles and general intangible assets and rights of Seller to the extent associated with the Purchased Restaurants;

(h)    Rights Under Confidentiality, Non-Disclosure, Non-Solicitation and Non-Competition Agreements.  All rights of Seller under any and all confidentiality, non-disclosure, non-solicitation and/or non-competition agreements executed by Buyer and any Third Party (including prospective current or former employees and/or other prospective third parties) in favor of Seller[1]

---

[1] Buyer is acquiring the rights of Seller under such agreements for the purpose of protecting the confidential information, intellectual property and other trade secrets, business and professional information being acquired by Buyer from Seller under the Agreement and to otherwise protect Buyer's business operations and interests.

related to operation of the Purchased Restaurants or the sale of the Purchased Assets. For purposes of certainty, nothing in this Agreement (including this Section 2.1(h)) or any documents executed in connection with this Agreement or the consummation of the transactions contemplated by this Agreement shall be deemed to be an offer of employment by Buyer, assumption of any liability, or otherwise create a right to employment with Buyer in any employee of Seller; and

(i)    Other Assets Related to Purchased Restaurants. All other non-cash tangible and intangible assets owned and/or used by Seller in the operation of the Purchased Restaurants and that are located at the Purchased Restaurants (not specifically excluded in Section 2.3 below), including all internet domain names, email domains, post office box numbers, telephone and facsimile numbers and other listings and numbers used in connection with the Purchased Restaurants, the transfer of which shall be arranged by and paid for by Buyer.

All of the foregoing assets described in this Section 2.1, together with the Assigned Contracts described in Section 2.2 are referred to herein collectively as the "Purchased Asset(s)".

2.2    Assignment of Contracts. Subject to the terms and conditions of this Agreement and the need to obtain any required consent or modifications required by Buyer from any Third Party, at the Closing Seller shall assume and assign and transfer to Buyer, all of their right, title and interest in and to the Contracts listed on Schedule 2.2 (collectively, the "Assigned Contracts"). As of the Closing, Seller shall assume pursuant to Section 365(a) of the Bankruptcy Code and sell and assign to Buyer pursuant to Sections 363(b), (f) and (m) and Section 365(f) of the Bankruptcy Code each of the Assigned Contracts. Notwithstanding anything in this Agreement to the contrary, Buyer may, from time to time and in its sole and absolute discretion, amend or revise the list of Assigned Contracts listed on Schedule 2.2 in order to add or eliminate any Contract to or from such Schedule up to the Closing (the "Designation Deadline"). Automatically upon the addition of any Contract to Schedule 2.2 by Buyer in accordance with the previous sentence, it shall be an Assigned Contract for all purposes of this Agreement, *provided however*, Seller shall not be required to assume and assign such added Assigned Contract unless and until the Bankruptcy Court enters an Order approving such assumption and assignment. Automatically upon the deletion of any Contract from Schedule 2.2 by Buyer in accordance with the first sentence of this Section 2.2, it shall no longer be an Assigned Contract and shall become an Excluded Asset for all purposes of this Agreement, and no liabilities arising thereunder or relating thereto shall be assumed by Buyer or be the obligation, liability or responsibility of Buyer. If any Contract is added to the list of Assigned Contracts, then Seller shall take such steps as are reasonably necessary to cause such Contract to be assumed and assigned to Buyer as promptly as possible at or following the Closing. If Buyer discovers a Contract following the Closing that Buyer wishes to assume (any such Contract, a "Previously Omitted Contract"), Buyer shall have the right, in its sole and absolute discretion, to have to have such Previously Omitted Contract(s) assumed and assigned to the Buyer (for no additional consideration), and upon any assumption and assignment of such Previously Omitted Contract to Buyer, such Contract shall become an Assigned Contract, *provided* Buyer shall be responsible for and shall promptly pay all Cure Costs associated therewith. Seller shall not, for at least thirty (30) days after the Closing Date, seek to assume, reject or assign any Contract relating to the Purchased Restaurants to any Third Party.

2.3    Excluded Assets.  Notwithstanding anything contained in this Agreement to the contrary, the Purchased Assets shall not include and Seller shall retain all of its right title and interest in and to the following (collectively, the "Excluded Assets"):

(a)    Cash, cash equivalents and accounts;

(b)    All personal property located in the Excluded Restaurants;

(c)    Any asset of Seller that otherwise would constitute a Purchased Asset, but for the fact that such asset has been conveyed, leased or otherwise disposed of prior to the Closing in Seller's Ordinary Course of Business;

(d)    All existing or potential causes of action and claims against third parties (including Avoidance Actions), whether in law or in equity ("Excluded Claims");

(e)    Personnel, business and other records that Seller is required by Law to retain in its possession, or which relate to the Excluded Claims, and all corporate seals, minute books, charter documents, stock transfer records, record books, original Tax and financial records and such other files, books and records relating to the Excluded Assets or to the organization, existence or capitalization of Seller;

(f)    Any asset in which Seller first acquires a transferable interest following the Closing, provided however, in the event the Parties elect to hold multiple closing as contemplated in Section 3.3 hereof, assets Seller acquires after the First Closing with respect to the Elm Road Restaurant (and not sold in the Ordinary Course of Business) shall be Purchased Assets and not excluded by this Section 2.3(f);

(g)    Seller's rights under this Agreement;

(h)    Any rights to tax refunds;

(i)    The assets listed on Schedule 2.3(i); and

(j)    Stock and membership interests.

2.4    Assumed Liabilities.  Buyer shall assume only:  (a) the Cure Obligations for the Assigned Contracts identified on Schedule 2.2 not to exceed the Cure Cap, plus the Cure Obligations for Assigned Contracts added by Buyer to the list of Assigned Contracts prior to Closing under Section 2.2 hereof, and (b) those liabilities and obligations first arising under the Assigned Contracts after the Closing (collectively, the "Assumed Liabilities").  Except for the Assumed Liabilities, Buyer shall have no liability whatsoever for any liabilities or obligations of Seller or the Debtors and all such liabilities and obligations shall be and remain liabilities and obligations of Seller and the Debtors.

2.5    Excluded Liabilities.  Notwithstanding any provision in this Agreement to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming, and shall not be deemed to have assumed, any liabilities of Seller of whatever nature (whether arising prior to, at the time of, or subsequent to Closing) that are not Assumed Liabilities.  Seller shall be solely and

8

exclusively liable for, and shall pay, perform, discharge and otherwise satisfy, any and all such other liabilities of Seller, including those relating to, arising out of or in connection with the operation of the Business or the Purchased Assets (including the use and ownership thereof) at any time prior to the Closing, and those liabilities set forth below (collectively, the "Excluded Liabilities"):

(a)    any and all liabilities of Seller relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(b)    any and all liabilities of Seller related to Contracts and/or Permits that are not Assigned Contracts;

(c)    any and all liabilities arising under or related to the Assigned Contracts that arose prior to the Closing Date, except for the Cure Obligations (as limited in Section 2.4(a) not to exceed the Cure Cap) and the Cure Obligations for Assigned Contracts added by Buyer to the list of Assigned Contracts prior to Closing under Section 2.2 hereof;

(d)    any and all liabilities for wages, bonuses, retention bonuses or payments, employee benefits, accrued vacation, or other accrued or vested paid time off, assessments, severance, other employment compensation, or other claims of, for, from or related to any employees, or employer Taxes, including without limitation, any arising from the vesting of any equity grants upon the Closing of the transactions contemplated hereby, or unpaid amounts to any consultants of Seller accrued or arising prior to the Closing;

(e)    any and all liabilities for unfunded or underfunded pension obligations or withdrawal liability, including any such liabilities that arose pursuant to a Contract (including an Assigned Contract) or applicable Law;

(f)    any and all warranty and return obligations associated with products or business activity prior to the Closing;

(g)    any and all product liability claims associated with products or business activity prior to the Closing;

(h)    any and all liabilities, including liabilities for Taxes, whether direct or as a result of successor liability, transferee liability, joint and several liability or contractual liability, attributable to the Purchased Assets and/or the operation of the Business prior to the Closing Date;

(i)    any and all costs and expenses incurred by Seller incident to the negotiation and preparation of this Agreement and the transactions contemplated hereby and any liability of Seller to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated hereby; and

(j)    any and all liabilities of Seller in respect of any federal, state, provincial, regional, foreign or local Law.

## ARTICLE III
## PURCHASE PRICE AND PAYMENT

9

3.1    Purchase Price. The aggregate consideration for the sale, transfer, assignment and conveyance of the Purchased Assets will be Five Hundred Ten Thousand and no/100 Dollars ($510,000.00) (the "Purchase Price"), plus the assumption by Buyer of the Assumed Liabilities, provided however, the Purchase Price shall be downwardly adjusted to the extent the value (determined on an at cost basis) of the Food and Beverage Inventory at each Purchased Restaurant is less than $5,000.00 and the total Food and Beverage Inventory at all of the Purchased Restaurants is less than $65,000.00. (the Purchase Price, together with the assumption of the Assumed Liabilities, the "Total Consideration").

3.2    Payment of Purchase Price. At the Closing, Buyer shall deliver, by wire transfer of immediately available funds, a Cash payment in the amount equal to the Purchase Price (the "Closing Payment") pursuant to the terms of this Agreement.

3.3    Potential Multiple Closings. Notwithstanding anything in this Agreement to the contrary, Buyer and Seller may mutually agree (in their respective sole and absolute discretion) to bifurcate the closings for the transactions contemplated herein as follows: (i) the first Closing shall be for all of the Purchased Restaurants except the Elm Road Restaurant and the Closing Payment for such Purchased Restaurants shall be $310,000.00 (the "First Closing"), and (ii) the second subsequent Closing shall be for the Elm Road Restaurant and the Closing Payment for the Elm Road Restaurant shall be $200,000.00 (the "Second Closing").

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants as of the date hereof and as of the Closing Date as follows:

4.1    Existence, Good Standing. Seller is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania. Seller has all requisite corporate power and authority to own its properties and assets and to conduct its businesses as presently conducted.

4.2    Authorization and Validity. Seller has all requisite corporate power and authority to enter into this Agreement and any related agreements to which Seller is or will become a party and, subject only to the Bankruptcy Court's entry of the Sale Order, the execution and delivery of this Agreement and any related agreements to which Seller is or will become a party and the performance of Seller's obligations hereunder and thereunder have been, or on the Closing Date will be, duly authorized by all necessary corporate action and no other corporate proceedings on the part of Seller are necessary to authorize such execution, delivery and performance. This Agreement and any related agreements to which Seller is or will become a party have been, or on the Closing Date will be, duly executed by Seller and, subject only to the Bankruptcy Court's entry of the Sale Order, constitute, or will when executed and delivered constitute, Seller's valid and binding obligation, enforceable against Seller in accordance with their terms.

4.3    Consents. Subject to the entry of the Sale Order and satisfaction of the terms set forth herein, and except as set forth on Schedule 4.3, no consent of any Person not a party to this Agreement or any Governmental Authority (other than in connection with Seller's assignment of

10

Permits) is required in connection with the execution, delivery and performance of this Agreement by Seller, or the consummation of the transactions contemplated hereby.

4.4     No Conflict or Violation. Subject only to the Bankruptcy Court's entry of the Sale Order and receipt of any required consents, the execution, delivery and performance by Seller of this Agreement do not and will not, (a) violate or conflict with any provision of Seller's organizational documents, (b) violate any provision of Law, or any Order, judgment or decree of any Governmental Authority applicable to Seller, (c) result in or require the creation or imposition of any Encumbrances on any of the Purchased Assets; or (d) violate or result in a Breach of or constitute (with due notice or lapse of time or both) a default under any Contract to which Seller is a party or by which Seller is bound or to which the any of Seller's properties or assets is subject.

4.5     Title to Purchased Assets. Subject only to the entry of the Sale Order, at the Closing, Seller will have good and marketable title to the Purchased Assets which shall be transferred to Buyer free and clear of all Encumbrances.

4.6     Permits. Schedule 4.6 sets forth a list of all Permits held by Seller which are necessary to conduct the Business as currently conducted.

4.7     Litigation. Except for those matters described on Schedule 4.7 and except for amounts listed on Seller's bankruptcy schedules and claims or pleadings filed with the Bankruptcy Court, there is no legal, administrative or arbitration proceeding, suit, action of any nature or Order, judgment, writ, injunction, award, or decree, claim, investigation or inquiry ("Litigation") relating to any Purchased Assets or the transactions contemplated by this Agreement, pending or asserted against Seller, by or before any Governmental Authority or by or on behalf of any Third Party.

4.8     Brokers. Seller has not used any broker or finder in connection with the transactions contemplated hereby.

4.9     Employees. Schedule 4.9 sets forth a true and complete list of individuals that are currently employed by Seller in the Business and all individuals that are on temporary or permanent lay-off or furlough status, including name, title, date of hire, former or current base salary or wage rate, position, title, and whether such employee is out on disability or other permitted leaves of absence and/or is on temporary or permanent lay-off or furlough status. Schedule 4.9 sets forth any labor or collective bargaining agreements that Seller is a party to.

4.10     Exclusivity and Survival of Representations. The representations and warranties made by Seller in this Article IV are in lieu of, and are exclusive of, all other representations and warranties by Seller, including but not limited to any warranty or representation as to the condition or suitability of the Purchased Assets, which are being conveyed on an "AS IS, WHERE IS" basis. Seller hereby disclaims any representations or warranties, express or implied, not set forth in this Article IV or in any document to be delivered by Seller at Closing. All of the representations and warranties made by Seller in this Article IV shall terminate as of Closing. No claim for a breach of any such representations or warranty may be made by Buyer against Seller after the Closing Date.

11

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants as of the date hereof and as of the Closing Date:

5.1     Existence and Good Standing.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania.

5.2     Authorization and Validity.  Buyer has all requisite power and authority to enter into this Agreement and any related agreements to which Buyer is or will become a party and the execution and delivery of this Agreement and any related agreements to which Buyer is or will become a party and the performance of Buyer's obligations hereunder and thereunder have been, or on the Closing Date will be, duly authorized by all necessary corporate action and no other proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance. This Agreement and any related agreements to which Buyer is or will become a party have been, or on the Closing Date will be, duly executed by Buyer and constitute, or will when executed and delivered constitute, Buyer's valid and binding obligation, enforceable against Buyer in accordance with their terms.

5.3     Consents.   No consent of any Person not a Party to this Agreement or any Governmental Authority (other than in connection with Seller's assignment of Permits) is required in connection with the execution, delivery and performance of this Agreement by Buyer, or the consummation of the transactions contemplated hereby.

5.4     No Conflict or Violation.  The execution, delivery and performance by Buyer of this Agreement does not: (i) violate or conflict with any provision of Buyer's organizational documents; (ii) violate any provision of Law, or any Order, judgment or decree of any court or Governmental Authority applicable to Buyer; or (iii) violate or result in a Breach of or constitute (with due notice or lapse of time or both) a default under any Contract to which Buyer is party or by which Buyer is bound or to which any of Buyer's properties or assets is subject.

5.5     Litigation.  There is no Litigation of any nature pending or asserted against Buyer by or before any Governmental Authority or by or on behalf of any Person which questions or challenges the validity of this Agreement or any of the transactions contemplated hereby or which, if adversely determined, would adversely affect the ability of Buyer to consummate the transactions contemplated hereby.

5.6     Brokers.  Buyer has not used any broker or finder in connection with the transactions contemplated hereby.

## ARTICLE VI
## PRE-CLOSING COVENANTS AND OTHER AGREEMENTS

6.1     Bankruptcy Court Approval.

(a)     This Agreement and the transactions contemplated hereby are contingent upon the approval and authorization of the Bankruptcy Court.  Except as expressly set forth herein, Seller and Buyer shall have no liability under this Agreement unless and until it is approved by the

12

Bankruptcy Court and shall have no obligation to consummate the transactions contemplated herein unless and until the Bankruptcy Court enters the Sale Order in a form and substance acceptable to Buyer in its sole and absolute discretion. In the event that the Sale Order is appealed, Seller shall use best commercial efforts to defeat such appeal.

       (b)    Among other things, the Sale Order will be in form and content acceptable to Buyer and Seller in their respective sole and absolute discretion and provide that:

       (i)    this Agreement is approved;

       (ii)    the Purchased Assets shall be sold and conveyed to Buyer free and clear of all Encumbrances;

       (iii)    Seller is authorized and empowered to assume and assign to Buyer the Assigned Contracts;

       (iv)    Buyer shall have no successor liability except for the Assumed Liabilities;

       (v)    findings of fact and conclusions of law that the transactions are arms-length, without collusion, and that Buyer has acted in good faith pursuant to Section 363(m) of the Bankruptcy Code and that the transfers are for adequate consideration;

       (vi)    all Encumbrances on the Purchased Assets shall attach to the Purchase Price; and

       (vii)    a finding that Buyer is a good faith purchaser of the assets and entitled to the protections of Section 363(m) of the Bankruptcy Code.

    6.2    <u>Cooperation</u>. Each of Buyer and Seller shall use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby. Buyer shall promptly take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

    6.3    <u>Conduct of Business</u>. Unless otherwise agreed by Seller and Buyer, as contemplated in this Agreement, or as required by the Bankruptcy Code or an Order of the Bankruptcy Court, from the date hereof through the Closing Date, Seller shall conduct the Purchased Restaurants in the Ordinary Course of Business consistent with past practice during the Bankruptcy Case (including maintaining at least $5,000 of Food and Beverage Inventory) and will not sell or dispose of any of the Purchased Assets or make payments or enter into any contractual commitments to any employee of Seller other than sales of inventory, payments of salary and wages and other benefits and the reimbursement of reasonable documented business expenses, in each case, in the Ordinary Course of Business consistent with past practice during the Bankruptcy Case.

6.4    Adequate Assurances Regarding Assigned Contracts. To the extent necessary, Buyer shall provide additional adequate assurance of Buyer's future performance of each Assigned Contract to Seller and to the counterparties to each Assigned Contract.

6.5    Notice of Certain Events. Each of Buyer and Seller shall promptly notify the other Party of the occurrence of any event or condition or the existence of any fact that would reasonably be expected to have a Material Adverse Effect or to cause any of the conditions to either of the Parties' obligations to consummate the transactions contemplated by this Agreement not to be fulfilled. Notwithstanding Seller's obligation to provide notice to Buyer, there shall not have occurred any event or circumstance that constitutes a Material Adverse Effect.

6.6    [Intentionally deleted].

6.7    Access to Information, Inspections.

(a)    From the date hereof through the Closing Date, and upon reasonable advance notice received from Buyer, Seller shall give Buyer and its authorized representatives reasonable access to its facilities and Books and Records relating to the Purchased Assets, such access to be exercised in a manner that does not unreasonably interfere with Seller's operations.

(b)    Following the Closing, and upon reasonable advance notice received from Seller, Buyer shall give Seller and its agents and representatives reasonable access during regular business hours, to the Transferred Employees and any Books and Records relating to the Purchased Assets, to the extent reasonably necessary to permit Seller to investigate any matter relating to or arising during any period prior to the Closing.

(c)    Each Party will use reasonable efforts to minimize any disruptions to the business of the other Party in connection with its requests or discussions pursuant to this Section

## ARTICLE VII
## TAXES

7.1    Taxes Related to Purchase of Purchased Assets. All Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Purchased Assets, and all recording and filing fees (collectively, "Transaction Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets and that are not exempt under section 1146(a) of the Bankruptcy Code, shall be borne solely by Seller. Buyer and Seller shall cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement. At Closing, Seller shall provide to Buyer all requisite exemption certificates. Seller and Buyer shall prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate Governmental Authority taxing authorities.

7.2    Cooperation on Tax Matters. Buyer and Seller shall furnish or cause to be furnished to each other, as promptly as practicable and to the extent in such Party's possession or control, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for

14

refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any Governmental Authority relating to Tax matters.

     7.3    Allocation of Total Consideration. Schedule 7.3 sets forth the allocation of the Total Consideration for the purposes of, and in accordance with, Section 1060 of the Tax Code. Buyer shall report, act and file its Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation unless Seller and Buyer mutually agree to a different allocation following the Closing.

**ARTICLE VIII**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER**

     The obligations of Buyer to consummate the transactions contemplated hereby are subject to the satisfaction or waiver by Buyer each of the following separate conditions precedent on or before the Closing Date:

     8.1    New Leases for the Purchased Restaurants. Prior to Closing, each landlord of the Purchased Restaurants (including Elmhurst Properties, Inc.) and Buyer shall lease the real property related to the Purchased Restaurant pursuant to written leases acceptable to Buyer in its sole and absolute discretion. This condition will be satisfied if the Bankruptcy Court enters an Order authorizing Seller to assume and assign the lease related to the Elm Road Property (as such lease is described on Schedule 2.2).

     8.2    Resolution of Relief from Stay Motion. Prior to Closing, the Motion for Relief from Stay filed by Elmhurst Properties, Inc. related to the Elm Road Restaurant [Dkt. No. 130] shall be resolved to the satisfaction of Buyer in its sole and absolute discretion and any Order related to such resolution or decision by the Bankruptcy Court shall become a Final Order.

     8.3    New Franchise License Agreements with Perkins. Prior to Closing, Perkins & Marie Callender's Holding, LLC ("Perkins") and Buyer shall enter into written franchise license agreement(s) for each of the Purchased Restaurants (in a form and substance acceptable to Buyer in its sole and absolute discretion) and the successful bidder in Perkins bankruptcy agrees to assume such franchise license agreement(s).

     8.4    New Contract with LED Solutions. Prior to Closing, LED Solutions and Buyer shall enter into a written service contract for LED lighting each of the Purchased Restaurants (in a form and substance acceptable to Buyer in its sole and absolute discretion).

     8.5    New Contract with Vision Financial Group. Prior to Closing, Vision Financial Group, Inc. and Buyer shall enter into a written agreement for the point of sales systems for each of the Purchased Restaurant (in a form and substance acceptable to Buyer in its sole and absolute discretion).

     8.6    New Contract with Reinert Foodservices. Prior to Closing, Reinert Foodservices and Buyer shall enter into a written agreement for the dishwashing machine and coffee equipment for

15

each of the Purchased Restaurant (in a form and substance acceptable to Buyer in its sole and absolute discretion).

8.7    Accuracy of Representations and Warranties. The representations and warranties of Seller contained herein or any certificate delivered to Buyer pursuant to this Agreement shall be true, accurate and correct as of the date of this Agreement and as of the Closing Date, as if made at and as of such date (unless any such representation or warranty refers specifically to a specified date, in which case such representation or warranty shall be true, accurate, and correct on and as of such specified date).

8.8    Compliance with Agreements and Covenants. Seller shall have materially performed and complied with all of its covenants, obligations, and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date.

8.9    No Material Adverse Effect. There shall not have occurred any event, fact or circumstance that has had, or is reasonably likely to have, a Material Adverse Effect.

8.10    Bankruptcy Court Approval. The Bankruptcy Court shall have entered a Sale Order, in a form and substance acceptable to Buyer in its sole and absolute discretion, which shall be a Final Order, in full force and effect and not stayed as of the Closing Date. For purposes of certainty, the Sale Order shall provide for the sale of the Purchased Assets free and clear of all Encumbrances, including free and clear of any liabilities for any unfunded or underfunded pension obligations or withdrawal liability.

8.11    No Injunction. On the Closing Date: (i) there shall be no Order staying, reversing, modifying, vacating or amending the Sale Order; and (ii) there shall be no preliminary or permanent injunction or other Order of any court or Governmental Authority declaring this Agreement invalid or unenforceable in any material respect or otherwise preventing the transactions contemplated herein from being consummated.

8.12    Deliveries. Seller shall have made, or be prepared to make at the Closing, all of the deliveries set forth in Section 11.2.

8.13    Sale Order Date. The Bankruptcy Court shall enter a Sale Order authorizing and approving the sale to Buyer no later than September 5, 2019.

## ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller to consummate the transactions contemplated hereby are subject to the satisfaction or waiver by Seller of the following conditions precedent on or before the Closing Date:

9.1    Accuracy of Representations and Warranties. The representations and warranties of Buyer contained herein or any certificate delivered to Seller pursuant to this Agreement shall be true, accurate, and correct as of the date of this Agreement and as of the Closing Date, as if made at and as of such date (unless any such representation or warranty refers specifically to a specified date, in

16

which case such representation or warranty shall be true, accurate and correct on and as of such specified date).

9.2    Compliance with Agreements and Covenants. Buyer shall have materially performed and complied with all of its covenants, obligations, and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date.

9.3    Required Consents. Seller shall have obtained the consents listed on Schedule 4.3.

9.4    Bankruptcy Court Approval. The Bankruptcy Court shall have entered the Sale Order which shall be in full force and effect on the Closing Date.

9.5    No Injunction or Litigation. On the Closing Date: (i) there shall be no Order staying, reversing, modifying, vacating or amending the Sale Order; (ii) there shall be no preliminary or permanent injunction or other Order of any court or Governmental Authority declaring this Agreement invalid or unenforceable in any material respect or otherwise preventing the transactions contemplated herein from being consummated; and (iii) there shall not be pending or threatened any suit, action or proceeding (y) challenging or seeking to restrain, prohibit, alter or materially delay the consummation of any of the transactions contemplated by this Agreement or (z) seeking to obtain from Seller or any of its Affiliates any damages in connection with the transactions contemplated hereby.

9.6    Assigned Contract Cure. On the Closing Date, Buyer shall, consistent with section 365(b)(1)(A) of the Bankruptcy Code and as may be negotiated between Buyer and the respective counterparty, but subject to its rights otherwise provided under this Agreement, satisfy all undisputed Cure Obligations not to exceed the Cure Cap relating to Assigned Contracts. On the Closing Date, Seller shall, consistent with section 365(b)(1)(A) of the Bankruptcy Code and as may be negotiated between Seller and the respective counterparty, but subject to its rights otherwise provided under this Agreement, satisfy all undisputed Cure Obligations that exceed the Cure Cap relating to Assigned Contracts.

9.7    Deliveries. Buyer shall have made, or be prepared to make at the Closing, all of the deliveries set forth in Section 11.3.

9.8    Sale Order Date. The Bankruptcy Court shall enter a Sale Order authorizing and approving the sale to Buyer no later than September 5, 2019.

## ARTICLE X
## EMPLOYEES AND BENEFIT PLANS

10.1    Transferred Employees.

(a)    Buyer may extend to any employee of Seller an offer of employment (any such offer being referred to herein as a "Transfer Offer") that, if accepted, shall become effective on the Closing Date. Seller shall not interfere or hinder Buyer's reasonable efforts to have employees accept Transfer Offers. Employees of Seller who commence employment with Buyer pursuant to a Transfer Offer shall be referred to herein as "Transferred Employees." Nothing in this Section 10.1 or elsewhere in this Agreement shall be construed to create a right in any employee of Seller, to

17

employment with Buyer.  Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Buyer to terminate, reassign, promote, or demote any Transferred Employee after the Closing Date or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, compensation, benefits, or terms or conditions of employment of such Transferred Employee.

(b)    On the Closing Date, Seller shall have released each of the Transferred Employees from his or her employment with Seller and any agreement restricting their right to compete with Seller, or any Affiliate of Seller and from any agreement restricting his or her use or disclosure of confidential or proprietary information related to the Purchased Assets (including the Intellectual Property).

(c)    Buyer shall have no liability in connection with the termination by Seller of the employment or engagement of any employee of, or other Person providing services to, Seller.

(d)    Seller will be responsible for the payment and satisfaction of (i) all wages and other remuneration due to the employees with respect to their services to Seller prior to the Closing Date, (ii) all payments required under the Law with respect to actions or activities occurring prior to the Closing Date in connection with the transactions contemplated hereby, (iii) the provision of health plan continuation coverage for (A) any employee of Seller (including any Transferred Employee) terminated or who resigned at or prior to the Closing, and (B) any employee of Seller that is not a Transferred Employee terminated after the Closing, in each case, in accordance with the requirements of COBRA and ERISA §§ 601-608, (iv) all termination or severance payments to any employee who resigned or was terminated on or prior to the Closing Date and any claims that consummation of the transactions contemplated hereby or any measures to be imposed in connection with the transactions contemplated hereby constitutes an involuntary termination or constructive termination of the employment of any of employees, and (v) all liabilities arising under claims by the employees for benefits attributable to any of Seller's benefits plan.

(e)    Nothing herein express or implied by this Agreement shall confer upon any employee, or legal representative thereof, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement.

10.2    Employee Benefits. Without limiting the foregoing, all liabilities and obligations in respect of Seller's past, present and future employees occurring prior to the Closing shall be Excluded Liabilities.

## ARTICLE XI
## CLOSING

11.1    Closing. The consummation of the transactions contemplated hereby (the "Closing")[2] shall take place remotely or in Pittsburgh, Pennsylvania at the offices of Campbell & Levine, LLC, at 10:00 a.m. (EST) no later than three (3) Business Days after the Sale Order becomes a Final Order

---

[2] In the event the Parties elect to hold multiple closing as contemplated in Section 3.3 hereof, the term "Closing" shall be severable and mean the consummation of the sale of the Purchased Restaurants other than the Elm Road Restaurant and, to the extent the Second Closing occurs, the consummation of the sale of the Elm Road Restaurant.

18

(the "Closing Date")[3], subject to the closing conditions contained in this Agreement. Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller in the Purchased Assets to be acquired by Buyer hereunder shall be deemed to have passed to Buyer and the assumption of all of the Assigned Contracts and the Assumed Liabilities shall be deemed to have occurred as of 12:00:01 a.m. (Eastern Time) on the Closing Date. All proceedings to be taken and all documents to be executed and delivered by all Parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

11.2    Deliveries by Seller.  At or prior to the Closing, Seller shall deliver to Buyer the following, each dated the Closing Date and duly executed by Seller:

(a)    Such certificates of title, bills of sale, assignments, deeds or other instruments of transfer, conveyance or assignment, all in form and substance acceptable to Buyer in its sole and absolute discretion, as shall be effective to vest in Buyer title to the Purchased Assets free and clear of all Encumbrances other than the Assumed Liabilities (as such documents need to be modified, if necessary, in the event the Parties mutually agree to hold multiple closings as contemplated in Section 3.3);

(b)    A true and correct copy of the Sale Order;

(c)    A certificate, signed by an officer of Seller, certifying as to the accuracy of Seller's representations and warranties as of the Closing Date

(d)    If the Parties: (i) elect to hold multiple closings as contemplated in Section 3.3, and (ii) mutually agree to the terms of a management agreement related to management of the Elm Road Restaurant by Buyer, a signature page to such management agreement executed by Seller;

(e)    If required by Buyer, the Transition Services Agreement, duly executed by Seller; and

(f)    all other certificates, agreements and other documents required by this Agreement (or as Buyer may reasonably request) to be delivered by Seller at or prior to the Closing in connection with the transactions contemplated by this Agreement.

11.3    Deliveries by Buyer.  At the Closing, Buyer shall deliver to Seller the following, each dated the Closing Date and duly executed by Buyer:

(a)    One or more Assignment and Assumption Agreements, in form and substance reasonably acceptable to Seller, evidencing Buyer's obligation to pay, discharge and perform the Assumed Liabilities, including the Cure Obligations not to exceed the Cure Cap (as such documents need to be modified, if necessary, in the event the Parties mutually agree to hold multiple closings as contemplated in Section 3.3);

---

[3] In the event the Parties elect to hold multiple closing as contemplated in Section 3.3 hereof, the term "Closing Date" shall be severable and mean the date of the First Closing and, to the extent the Second Closing occurs, the date of the Second Closing.

        (b)      A certificate, signed by an officer of Seller, certifying as to the accuracy of Buyer's representations and warranties as of the Closing Date;

        (c)      If the Parties: (i) elect to hold multiple closings as contemplated in Section 3.3, and (ii) mutually agree to the terms of a management agreement related to the management of the Elm Road Restaurant by Buyer, a signature page to such management agreement executed by Buyer;

        (d)      If required by Buyer, the Transition Services Agreement, duly executed by Buyer; and

        (e)      The Closing Payment (bifurcated as provided in Section 3.3 if the Parties elect to hold multiple closings), as follows: (i) an amount equal to the Credit Card Holdback to the Escrow Agent to be held by the Escrow Agent to ensure Buyer receives all credit card payments for customer transactions occurring on and after the Closing Date, and (ii) an amount equal to the difference between the Closing Payment and the Credit Card Holdback to Seller in accordance with the Sale Order. The Escrow Agent shall hold the Credit Card Holdback in its client trust account (i.e., IOLTA account) and shall disburse the Credit Card Holdback in accordance with joint written instructions from Seller and Buyer (which instructions shall be consistent with any disbursement requirements in the Sale Order) or further order of the Bankruptcy Court. In the event of any disagreement between the Parties resulting in adverse claims or demands being made in connection with all or any portion of the Credit Card Holdback or in the event that the Escrow Agent is in reasonable doubt as to what action it should take with respect to the Credit Card Holdback, the Escrow Agent shall be entitled to: (i) retain that portion of the Credit Card Holdback that is subject to such disagreement until the Escrow Agent shall have received a final, nonappealable order of the Bankruptcy Court directing delivery of such portion of the Credit Card Holdback, or (ii) interplead that portion of the Credit Card Holdback that is subject to such disagreement to the Bankruptcy Court. The Escrow Agent shall be entitled to act on such Bankruptcy Court order without further question.

## ARTICLE XII
## TERMINATION

12.1    <u>Termination</u>. This Agreement may be terminated on written notice as follows:

        (a)      By mutual consent of Seller and Buyer;

        (b)      By either Party, in the event of a material Breach by the other Party of any representation, warranty, covenant or obligation of such Party under this Agreement which remains uncured after notice and a reasonable opportunity to cure (which except in the case of a breach of the obligations to consummate the transaction, shall not be less than ten (10) Business Days);

        (c)      By Buyer, if any of the conditions in Article VIII of this Agreement have not been satisfied in all material respects on or before the Closing Date and Buyer is not the reason why such conditions have not been satisfied, or if satisfaction of a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived the condition on or before the Closing Date;

(d)      By Seller, if any of the conditions in Article IX of this Agreement have not been satisfied in all material respects on or before the Closing Date and Seller is not the reason why such conditions have not been satisfied, or if satisfaction of a condition is or becomes impossible (other than through the failure of Seller to comply with its obligations under this Agreement) and Seller has not waived the condition on or before the Closing Date;

(e)      By either Party if (i) all of the conditions precedent of both Parties' obligation to close have occurred, (ii) such Party is not the reason why the Closing has not occurred, and (iii) the Closing (one or both of them) has not occurred by September 30, 2019; and

(f)      By Buyer prior to the commencement of the Bankruptcy Court hearing to consider entry of the Sale Order if Buyer is not satisfied, in its sole and absolute discretion, with the results of its due diligence on the Purchased Assets and/or the Purchased Restaurants.

12.2     Effect of Termination.  In the event this Agreement is terminated, this Agreement shall be null and void and neither Party shall have any remaining obligations to the other Party with respect hereto.  For clarity, if the First Closing occurs, but the Second Closing does not occur on or before September 30, 2019, the Parties may exercise their rights under Section 12.1(e) to terminate this Agreement (and the remaining obligation to sell and purchase the Elm Road Restaurant shall be null and void), but any such termination shall not effect finality of the First Closing and purchase and sale of the other Purchased Restaurants or the Parties obligations under this Agreement that survive Closing.

## ARTICLE XIII
## INDEMNIFICATION AND POST-CLOSING COVENANTS

13.1     Termination of Seller Representations and Warranties.  All representations and warranties made by Seller in this Agreement shall terminate as of the Closing.

13.2     Indemnification by Buyer.

(a)      Buyer will indemnify, defend and hold Seller harmless from and against any Losses arising directly or indirectly from any of the following, regardless of whether the claim arises under contract, breach of warranty, tort or other legal theory:

(i)      any Breach of any representation or warranty made by Buyer in this Agreement or in any agreement or certificate delivered by Buyer at Closing;

(ii)      any Breach by Buyer of any covenant or obligation of Buyer in this Agreement or in any agreement or certificate delivered by Buyer at Closing;

(iii)      any claim by any Person for brokerage or finder's fees or commissions or similar payments that remain unpaid after the Closing and which are based upon any agreement or understanding alleged to have been made by such Person with Buyer (or any Person acting on its behalf) in connection with the contemplated transactions; or

(iv)      Buyer's operation, ownership, and utilization of the Purchased Assets after the Closing Date.

21

(b)    All of the representations, warranties, covenants, and agreements made by Buyer in this Agreement shall survive the Closing.

13.3    Administrative Claims Arising Under Assigned Contracts. Seller shall timely pay all obligations to counterparties to the Assigned Contracts that arose between the Petition Date and the Closing Date under such Assigned Contract and shall indemnify, defend and hold Buyer harmless from any liability, costs, expenses, losses, court costs, attorneys' fees, and other out-of-pocket costs arising from any such administrative claims arising under the Assigned Contracts. Seller, however, shall not be responsible for paying any administrative expense claims arising in connection with Assigned Contracts designated by Buyer under Section 2.2 hereof, and assumed by Seller pursuant to the terms of the Sale Order, that are subsequently removed by Buyer from the list of Assigned Contracts after entry of the Sale Order by the Bankruptcy Court. Notwithstanding anything to the contrary, this indemnification shall survive Closing indefinitely.

13.4    Receipt of Accounts Receivable Post-Closing. From and after the Closing:  (i) if Seller or its Affiliate receives or collects any funds relating to any Purchased Asset, Seller or its Affiliate shall remit the same to Buyer within three (3) Business Days after its receipt thereof, and (ii) if Buyer receives or collects any funds relating to any Excluded Asset, Buyer shall remit the same to Seller within three (3) Business Days after its receipt thereof. Notwithstanding anything to the contrary, this indemnification shall survive Closing indefinitely.

13.5    Further Assurances Each Party shall execute and cause to be delivered to each other Party such instruments and other documents, and shall take such other actions, as such other Party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement. Notwithstanding anything to the contrary, this indemnification shall survive Closing indefinitely.

## ARTICLE XIV
## MISCELLANEOUS

14.1    Entire Agreement. This Agreement constitutes the entire understanding between the Parties with respect to the subject matter contained herein and supersedes any prior understandings and agreements among them respecting such subject matter.

14.2    Headings. The headings in this Agreement are for convenience of reference only and shall not affect its interpretation.

14.3    Notices. All notices or other communications required hereunder shall be in writing and shall be deemed to have been given if delivered personally, on the next day if mailed by overnight mail, to the addresses of the Parties as follows:

If to Seller:

        5171 Campbells Land Co., Inc.
        c/o Compass Advisory Partners
        306 Fourth Avenue, Apt. 701
        Pittsburgh, PA 15222
        Attention: Jack Teitz, Proposed Chief Restructuring Officer

        with a copy to:

        Law Office of Robert O Lampl
        223 Fourth Avenue
        Pittsburgh, PA 15222
        Attention:  Robert O Lampl, Esq. and Ryan Cooney, Esq.

If to Buyer:

        Phoenix Management Systems, LLC
        1388 State Route 487
        Bloomsburg, PA 17815
        Attention: Russell Berner

        with a copy to:

        Campbell & Levine, LLC
        310 Grant Street, Suite 1700
        Pittsburgh, PA 15219
        Attention:  Paul J. Cordaro, Esq.

14.4    Exhibits and Schedules. Each Exhibit and Schedule referred to herein is incorporated into this Agreement by such reference.

23

14.5    Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable such illegality, invalidity or unenforceability will not affect any other provision hereof. This Agreement shall, in such circumstances be deemed modified to the extent necessary to render enforceable the provisions hereof.

14.6    Waiver.  Except as otherwise provided in this Agreement, the failure of any Party to insist upon strict performance of any of the terms or conditions of this Agreement will not constitute a waiver of any of its rights hereunder.

14.7    Assignment.  Buyer may assign any of its rights or delegate any of its obligations hereunder without the prior written consent of Seller.

14.8    Successors and Assigns.  This Agreement binds, inures to the benefit of, and is enforceable by the successors and permitted assigns of the Parties, including any trust which may be created as part of any plan of liquidation established by Seller, and does not confer any rights on any other Persons or entities.

14.9    Governing Law.  This Agreement, and all other documents executed in connection with this Agreement shall be construed and enforced in accordance with Federal Bankruptcy Laws (including the Bankruptcy Code).  To the extent applicable, and where State Law is implicated, the Laws of the Commonwealth of Pennsylvania shall govern, without reference to any conflict of law principles.

14.10   Venue.  Buyer and Seller agree that all actions brought, arising out of, or related to the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions. Each Party hereby irrevocably consents to the personal and subject matter jurisdiction of the Bankruptcy Court and agrees that the Bankruptcy Court may enter final and binding judgments with respect to any controversy arising from or related to this Agreement and the transactions contemplated herein. In the event the Bankruptcy Court for any reason declines to exercise jurisdiction each Party hereby consents to the personal jurisdiction of any state or federal court having competent subject matter jurisdiction located in Allegheny County, Pennsylvania.

14.11   Amendments.  This Agreement shall amend and restate in its entirety that certain Asset Purchase Agreement dated August 28, 2019 by and between Buyer and Seller.  This Agreement may be amended only by a written instrument duly executed by all of the Parties in writing, or the Sale Order.

14.12   Counterparts.  This Agreement may be executed in any number of counterparts and any Party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  In order to facilitate execution of this Agreement, electronic or facsimile signatures shall be deemed to be original signatures.

14.13   No Third Party Beneficiaries.  This Agreement is solely for the benefit of the Parties hereto and no provision of this Agreement shall be deemed to confer upon any other Person any remedy, claim, liability, reimbursement, cause of action or other right.

14.14  <u>Expenses</u>. Except as otherwise provided in this Agreement, each of the Parties shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated.

[Remainder of Page Intentionally Left Blank]

25

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Agreement as of the date first above written.

5171 CAMPBELLS LAND CO., INC.

By: _____

Name:   William T. Kane
Title:    President

PHOENIX MANAGEMENT SYSTEMS, LLC

By:    K Investments Limited
Its:    Sole Member

     By:    KIL, Inc.
     Its:    General Partner

By: _____
Name: _____
Title: _____

26

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Agreement as of the date first above written.

**5171 CAMPBELLS LAND CO., INC.**

By:_____
Name:  William T. Kane
Title:    President

**PHOENIX MANAGEMENT SYSTEMS, LLC**

By:    K Investments Limited
Its:    Sole Member

       By:    KIL, Inc.
       Its:    General Partner

By_____
Name:    John C. Klingerman
Title:    Vice-President of KIL, Inc.

26

## EXHIBIT A

**(Form of Transition Services Agreement)**

C&L 8-26-2019

## TRANSITION SERVICES AGREEMENT

**THIS TRANSITION SERVICES AGREEMENT** (this "Agreement") is made and effective as of September 3, 2019 by and between 5171 CAMPBELLS LAND CO., INC., a Pennsylvania corporation (the "Seller"), and PHOENIX MANAGEMENT SYSTEMS, LLC, a Pennsylvania limited liability company (the "Purchaser"). Capitalized terms used in this Agreement without definition have the respective meanings given to them in the Purchase Agreement (as defined below).

**WHEREAS**, the Seller is engaged in the Business;

**WHEREAS**, the Seller has agreed to sell and assign to the Purchaser, and the Purchaser has agreed to purchase and assume from the Seller, substantially all of the assets and certain liabilities of the Seller used in the Purchased Restaurants pursuant to the terms and conditions set forth in that certain Asset Purchase Agreement, dated as of August ___, 2019 (as may be amended from time to time, the "Purchase Agreement"); and

**WHEREAS**, after the consummation of the transactions contemplated by the Purchase Agreement, Purchaser wishes to engage Seller to perform, and Seller wishes to perform, on a transitional basis for the benefit of the Purchaser, certain services with respect to the operation of the Business upon the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the representations, warranties, covenants, agreements, and conditions set forth in this Agreement and the Purchase Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.    Services.

     (a)    General. The Seller shall provide the Purchaser with the services described in Exhibit A (the "Performance Exhibit") with respect to the Purchased Restaurants (collectively, the "Services"). The Seller will perform, or cause to be performed, the Services in the manner and at a relative level of service substantially similar to that provided by the Seller as of the Closing Date.

     (b)    Additional Services. Upon the Purchaser's request, the Seller may negotiate in good faith with the Purchaser to amend the Performance Exhibit to (i) add additional services for Purchaser pursuant to this Agreement in exchange for additional fees to be mutually agreed upon (the "Additional Services") and/or (ii) extend the term of this Agreement. Unless specifically stated to the contrary, any Additional Service will be deemed a "Service" for the remainder of the term of this Agreement.

2.    Quality of Services.

     (a)    The Seller warrants that: (i) the Services will comply and be performed in all material respects in accordance with all of the terms and conditions set forth in this Agreement, including the Performance Exhibit, (ii) the Services will be performed in all material respects in accordance with all applicable Laws, and (iii) the Services will be performed by employees of the Seller who have appropriate knowledge and experience of dealing with the Services. If the Services do not conform to the foregoing warranty, then the Purchaser shall have the right to require the Seller to perform the Services again at no additional expense to the Purchaser.

{C1071036.1}

(b)      Except as necessary to implement the Purchase Agreement or unless otherwise specifically set forth in the Performance Exhibit, it is the intention of the parties that the Purchaser's use of any Service will not be substantially greater than the level of use required by the Seller for the Business during the twelve (12)-month period immediately prior to the execution of the Purchase Agreement. In no event will the Purchaser be entitled to any new service or to substantially increase its use of any of the Services above that level of use without the prior written consent of the Seller.

(c)      In providing the Services, the Seller is not obligated to: (i) purchase, lease, or license any additional equipment or software unless any additional costs to the Seller are reimbursed by the Purchaser, (ii) create or supply any documentation or information not currently existing or available through minimal efforts of the Seller, (iii) pay any costs related to the transfer or conversion of data to the Purchaser or any alternate supplier of Services, or (iv) enter into additional contracts with Third Party Providers or change the scope of current agreements with Third Party Providers unless any additional costs to the Seller are reimbursed by the Purchaser, except, in each case, to the extent the Seller undertakes such matters as Additional Services hereunder.

3.      Fees; Billing and Payment.

(a)      Fees. As consideration for the Services, the Purchaser will pay, or cause to be paid, to the Seller the amount specified for each Service as set forth in the Performance Exhibit (collectively, the "Fees"). All charges based on a monthly or other time basis will be pro-rated based on actual days elapsed during the period of service. Upon the termination of any Service in accordance herewith, the Fees to be paid under this Section 3(a) will be the accrued pro-rated daily fees payable under this Section 3(a).

(b)      Billing. Within thirty (30) days after the end of each calendar month, the Seller will submit one (1) invoice to the Purchaser for all Services provided during such calendar month pursuant to this Agreement. The invoices will include a reasonably detailed description of, and specify the amount for, each type of Service. The Seller will provide documentation supporting any amounts invoiced pursuant to this Section 3(b) as the Purchaser may from time to time reasonably request.

(c)      Payment. The Purchaser will pay, or cause to be paid, all amounts due pursuant to this Agreement within thirty (30) days after receipt of each such invoice hereunder. The Purchaser will promptly notify the Seller, and in no event later than ten (10) Business Days following receipt of such invoice, of any objection of the Purchaser with regard to such invoice and the parties will promptly commence good faith negotiations to resolve such dispute.

(d)      Taxes. The Purchaser will pay (or will reimburse the Seller for) all Taxes imposed on the Seller or which the Seller have any obligation to collect with respect to or relating to this Agreement, the Services, or the performance by the Seller of its obligations hereunder, other than income Taxes, gross receipt Taxes, or similar Taxes imposed on the income of the Seller. The parties will cooperate with each other to a commercially reasonable degree in connection with obtaining all available exemptions from such Taxes.

4.      Confidentiality.

(a)      Unauthorized Disclosure and Use. Each party shall maintain, and shall cause its respective Affiliates to maintain, the Confidential Information of the other party in strict confidence and secrecy and shall not, directly or indirectly, disclose any such Confidential Information to any other Person. Neither party shall, directly or indirectly, (i) use any Confidential Information of the other party for any purpose, (ii) keep or make copies of any documents, records, or property of any nature whatsoever

containing any Confidential Information of the other party, or (iii) assist any third party in engaging in any of the foregoing, except to the extent necessary to comply with the express terms of this Agreement or as explicitly approved in advance in writing by the other party. Nothing in this Agreement shall reduce either party's obligation to comply with all applicable Laws and orders relating to trade secrets, confidential information, and unfair competition.

(b)    Legal Obligation to Disclose. Notwithstanding the provisions of Section 4(a), if a party becomes compelled to make any disclosure of the Confidential Information of the other party by judicial or administrative process or applicable Law, then such disclosing party may make only such disclosure if such disclosing party (i) gives the other party prompt written notice of such requested or required disclosure so as to permit such other party to seek a protective order or other appropriate remedy or waives compliance with Section 4(a), (ii) limits such disclosure to what is legally required to be disclosed, and (iii) uses commercially reasonable efforts (insofar as is permissible) to preserve the confidentiality of any such Confidential Information so disclosed.

(c)    Definition of Confidential Information. As used in this Agreement, "Confidential Information" means all information, data, documents, agreements, files, and other materials, whether disclosed orally or disclosed or stored in written, electronic, or other form or media, relating generally or specifically to a party's business that is supplied to or obtained by the other party pursuant to or as a result of this Agreement and that is not generally known in the trade or industry. Notwithstanding the foregoing, "Confidential Information" shall not mean or include information that (i) is or becomes generally available to the public other than as a result of a disclosure by the receiving party in violation of this Agreement, (ii) is or was independently acquired or developed by a party without reference to the Confidential Information (iii) was known to the receiving party on a non-confidential basis prior to its disclosure by the disclosing party; provided, that the source of such information was not, to the receiving party's knowledge after due inquiry, bound by any confidentiality agreement with or other contractual, legal, or fiduciary obligation of confidentiality to the disclosing party.

5.    Proprietary Rights.

(a)    Ownership. This Agreement and the performance of the Services hereunder will not affect the ownership of any assets (including the Purchased Assets) of either party. Neither party will gain, by virtue of this Agreement or the Services hereunder, by implication or otherwise, any rights of ownership of any intellectual property or other property owned by the other. The Purchaser will own all data acquired by the Purchaser pursuant to the Purchase Agreement as well as any changes or additions thereto made on behalf of the Purchaser in the performance of the Services. Except to the extent otherwise set forth in the Performance Exhibit, any software, development tools, know-how, methodologies, processes, technologies, or algorithms owned by the Seller and which may during the term of this Agreement be operated or used by the Seller in connection with the performance of the Services hereunder will remain the Seller's property and the Purchaser will have no rights or interests therein.

(b)    Development of Arrangements for Operation of Information Technology Systems. The Seller and the Purchaser will cooperate in the development of a mutually acceptable transition plan with respect to the provision of telephone, electronic mail, financial reporting, enterprise resource management, and other information technology services by the Seller to the Purchaser pursuant to this Agreement. Such plan will address matters including system access, security, confidentiality, allocation of costs and expenses, and sharing of information technology resources and personnel. Each party will comply with and perform its obligations under the information technology plan agreed upon by the parties.

6.     Indemnification.

(a)     By the Seller. The Seller shall indemnify, defend, and hold the Purchaser and its successors and permitted assigns (collectively, the "Purchaser Indemnitees") harmless from Losses actually suffered or incurred by such Purchaser Indemnitee as a direct result of:

(i)     any breach by the Seller of Section 4; or

(ii)     the willful misconduct or gross negligence on the part of Seller or any of its Affiliates or any of their respective employees, agents, representatives, or licensees in connection with the performance of the obligations of the Seller or any of its Affiliates under this Agreement.

(b)     By the Purchaser. The Purchaser shall indemnify, defend and hold the Seller and its respective successors and permitted assigns (collectively, the "Seller Indemnitees") harmless from Losses actually suffered or incurred by such Seller Indemnitee as a direct result of:

(i)     any breach by the Purchaser of Section 4; or

(ii)     the willful misconduct or gross negligence on the part of the Purchaser or any of its employees, agents, representatives, or licensees in connection with the performance of the Purchaser's obligations under this Agreement.

7.     Limitation of Liability.

No party nor any of its respective Affiliates shall be entitled to indemnification pursuant to this Agreement for (i) indirect, exemplary or special damages or (ii) punitive damages (except with respect to punitive damages that are actually awarded to a third party in an action brought against any party).

8.     Force Majeure.

No party shall be liable for any failure to perform, or delay in performing, any obligations under this Agreement to the extent such failure or delay is due to an act of God, fire, flood, earthquake, explosion, war (declared or undeclared), strike, lockout or other labor trouble, material shortages of utilities, delay in transportation, breakdown or accident, occurrence commonly referred to as a terrorist attack and any armed hostilities associated therewith, embargo, legal prohibition, riot, insurrection, or any other cause beyond the reasonable control of the party failing to perform or delaying the performance of such obligations. Subject to giving the other party full particulars of the circumstances in question and to using its commercially reasonable efforts to resume full performance without avoidable delay, the party so failing or delaying shall be entitled to a reasonable extension of time for the performance of such obligations. Except to the extent such delay is caused by the wrongful act or omission of the other party, any costs arising from such failure or delay, for which indemnification is not available hereunder, shall be borne by the party incurring the costs.

9.     Term; Termination.

(a)     Term. The term of this Agreement shall commence on the date hereof and, unless earlier terminated in accordance with Section 9(b), shall continue until the expiration of all of the Services as detailed in the Performance Schedule.

(b)     Termination.

{C1071036.1 }                                                    4

(i)    By the Purchaser and the Seller. The Purchaser and/or the Seller shall have the right to terminate this Agreement by mutual written consent.

(ii)    By the Purchaser. The Purchaser shall have the right to terminate the performance by the Seller of all or some of the Services at any time for any reason or no reason whatsoever.

(iii)    Termination by the Seller. The Seller shall have the right to terminate the Seller's performance of all, but not less than all, of the Services if Purchaser materially breaches any representation, warranty, covenant, or other obligation of the Purchaser under this Agreement and such breach is not cured as promptly as commercially practicable but in any event within thirty (30) days after the Purchaser's receipt of written notice thereof from the Seller. If the Seller terminates its performance of all of the Services pursuant to this Section 9(b)(iii), then such termination shall constitute the termination of this Agreement.

(c)    Effect of Termination. Upon the expiration or termination of this Agreement, each party shall immediately cease all use of, and return to the other party, any Confidential Information of the other party in its possession or under its control, including all copies of and computer disks or drives containing such Confidential Information. Upon the expiration or termination of this Agreement, the Purchaser shall pay to the Seller all accrued and unpaid Fees.

(d)    Non-Exclusive Rights. The expiration or termination of this Agreement (or the termination of all or a portion of the Services pursuant to Sections 9(b)(i), 9(b)(ii), or 9(b)(iii) shall not affect the respective rights and obligations of the parties that accrued prior to such expiration or termination or the right of either party to seek and recover damages for breach of this Agreement as permitted by this Agreement.

(e)    Survival. Notwithstanding anything to the contrary in this Agreement, the provisions set forth in Sections 4, 5, 6, and 9 shall survive the expiration or termination of this Agreement.

10.    Miscellaneous.

(a)    Relationship of the Parties.

(i)    The Seller is not an agent or an employee of the Purchaser, and this Agreement creates neither a joint venture nor a partnership between the Seller and the Purchaser. This Agreement does not authorize either party to (A) bind, commit, perform, assume, or create any obligation or responsibility as an agent, employee, or legal representative on behalf or in the name of the other party, or (B) have the power to control the activities and operations of the other party. The parties are independent contractors with respect to each other under this Agreement. Each party agrees not to hold itself out as having any authority or relationship contrary to this Section 10(a).

(ii)    In all matters relating to this Agreement, each party is solely responsible for the acts of its Affiliates, employees, and agents, and employees or agents of one party will not be considered employees or agents of any other party. The Seller shall make available to the Purchaser or its Affiliates, as the case may be, such persons as designated on the Performance Exhibit and such persons shall perform the Services designated on the Performance Exhibit. The Seller is solely responsible for personnel and/or entities performing the Services pursuant to this Agreement. Such personnel or entities shall not be subject to the discretion or control of

{C1071036.1 }                                  5

Purchaser for any purpose and shall remain at all times employees of Seller. Without limitation, the Seller shall (A) pay all costs and expenses of its employees providing Services pursuant to this Agreement, (B) process all payrolls for such employees, (C) pay all workers' compensation, unemployment compensation, and other withholding, payroll, and other taxes relating to such employees, and (D) pay for and administer all fringe benefit programs for which such employees may be eligible, all in the same manner as with the Seller's other employees.

(b)    Notices. All notices, requests, demands, and other communications under this Agreement shall be given, and shall be deemed to be delivered, in the manner and as provided in Section 14.3 of the Purchase Agreement.

(c)    Assignment. Except as contemplated herein, neither this Agreement nor any of the rights, interests, or obligations hereunder shall be assigned, directly or indirectly, by operation of Law or otherwise, by any party without the prior written consent of the other party hereto.

(d)    Parties in Interest. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, successors, and permitted assigns.

(e)    Governing Law; Consent to Jurisdiction: This Agreement shall be governed by the Laws of the Commonwealth of Pennsylvania, excluding choice of law principles that would require the application of the Laws of a jurisdiction other than the Commonwealth of Pennsylvania. Any dispute, controversy or claim arising out of or relating to this Agreement shall be resolved in accordance with Section 14.10 of the Purchase Agreement.

(f)    Amendment.    This Agreement, including any Exhibit, may be amended, modified, or supplemented at any time only by written agreement signed by the Seller and the Purchaser.

(g)    Severability. If any term or other provision of this Agreement for any reason is declared invalid, illegal, or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions of this Agreement, which other provisions shall remain in full force and effect and the application of such invalid or unenforceable provision to Persons or circumstances other than those as to which it is held invalid, illegal, or unenforceable shall be valid and be enforced to the fullest extent permitted by applicable Law. Upon such declaration that any term or other provision is invalid, illegal, or incapable of being enforced, the parties to this Agreement shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

(h)    Waiver. Any failure of the Seller to comply with any term or provision of this Agreement may be waived by the Purchaser, and any failure of the Purchaser to comply with any term or provision of this Agreement may be waived by the Seller, at any time by an instrument in writing signed by or on behalf of such other party, but such waiver shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure to comply. Further, neither the waiver by any of the parties hereto of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights, or privileges hereunder.

(i)    Entire Agreement. This Agreement and the Exhibits and other documents referred to herein which form a part hereof contain the entire understanding of the parties hereto with

respect to the subject matter hereof. This Agreement supersedes all prior agreements and understandings, oral and written, with respect to its subject matter.

(j)    Interpretative Provisions. The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement. The words "include," "includes," and "including" are deemed to be followed by the phrase "without limitation." The words "herein," "hereto," "hereof," and words of similar import refer to this Agreement as a whole, including any Exhibit hereto, and not to any particular section, subsection, paragraph, subparagraph, or clause contained in this Agreement. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. The words "dollar" or "$" shall mean U.S. dollars. The word "day" means calendar day unless Business Day is expressly specified. The term "written" in respect of contracts, agreements or other arrangements shall be interpreted to mean handwritten, typed, or printed contracts, agreements or other arrangements (as opposed to oral) that have been executed by two (2) counterparties pursuant to a handwritten signature, and shall not be deemed executed by virtue of an oral acknowledgement, but are deemed executed by electronic or email acknowledgement or signature. If any action under this Agreement is required to be done or taken on a day that is not a Business Day, then such action shall be required to be done or taken not on such day but on the first succeeding Business Day thereafter. The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any party hereto irrespective of which party caused such provisions to be drafted. Each of the parties acknowledges that it has been represented by counsel in connection with the preparation and execution of this Agreement.

(k)    Counterparts. This Agreement may be executed in two (2) or more counterparts (delivery of which may be by facsimile or via email as a portable document format (.pdf)), each of which will be deemed an original, and it will not be necessary in making proof of this Agreement or the terms of this Agreement to produce or account for more than one (1) of such counterparts.

*[Signature Page Follows]*

    **IN WITNESS WHEREOF,** the undersigned have caused this Agreement to be executed by their duly authorized representatives as of the day and year first set written above.

**5171 CAMPBELLS LAND CO., INC.**

By:_____
Name:   Jack Teitz
Title:     Proposed Chief Restructuring Officer

**PHOENIX MANAGEMENT SYSTEMS, LLC**

By:    K Investments Limited
Its:    Sole Member

        By:    KIL, Inc.
        Its:    General Partner

By:_____
Name:_____
Title:_____

{C1071036 1 }

**Exhibit A**

Services

| [Payroll] | |
|---|---|
| Description of Service: | |
| Termination Date: | Sixty (60) days from the Closing Date |
| Fee: | |
| Responsible Person: | |

{C1071036 1 }

## SCHEDULE 2.1(a)

### (Equipment & Fixed Assets)

Fixed Asset list for each Purchased Restaurant to be provided at the request of Buyer (to the extent in the possession or control of Buyer).

## **SCHEDULE 2.1(e)**

**(Intellectual Property)**

**NONE**

## SCHEDULE 2.2

### (List of Assigned Contract)*

| Counterparty | Description of Contract/Lease | Cure Obligation |
|---|---|---|
| Elmhurst Properties, Inc.<br>P.O. Box 122<br>Canfield, OH 44406 | Lease for Elm Road Restaurant<br><br>Land Lease dated November 15, 1977, as amended by that certain Addendum #1 dated November 15, 1977, and that certain Land Lease Amendment, Assignment and Assumption and Consent dated February 5, 2007. | $0.00 |

*Per Section 2.2 of the Agreement, Buyer may, from time to time and in its sole and absolute discretion, amend or revise the list of Assigned Contracts listed on this Schedule in order to add or eliminate any contract to or from this Schedule up to the Closing. Previously Omitted Contracts may also be added to this Schedule in accordance with Section 2.2 of the Agreement.

## SCHEDULE 2.3(i)

**(Additional Excluded Assets)**

**NONE**

## SCHEDULE 4.3

### (Required Consents)

**NONE**

**SCHEDULE 4.6**

**(Permits)**

Building Occupancy Permits for each Purchased Restaurant

## SCHEDULE 4.7

### (Litigation)

As disclosed on Seller's Schedules and Statement of Financial Affairs filed in the Bankruptcy Case.

## SCHEDULE 4.9

**(Employees/Collective Bargaining Agreements)**

Due to the sensitive nature of employee salary and wage information, <u>Schedule 4.9</u> has been omitted, but Seller represents and warrants that the unredacted employee list provided by Seller to Buyer on August 22, 2019 is true and correct.

No Collective Bargaining Agreements.

## **SCHEDULE 7.3**

**(Allocation of Total Consideration)**

**To be determined**